UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| AFINITI, LTD.,<br>      Andrew's Place, 5th Floor<br>      51 Church Street<br>      Hamilton HM12, Bermuda<br><br>and<br><br>AFINITI, INC.,<br>      1701 Pennsylvania Avenue NW<br>      Suite 600<br>      Washington, D.C., 20006,<br><br>                  Plaintiffs,<br><br>      vs.<br><br>MUHAMMAD ZIAULLAH KHAN CHISHTI,<br>QINHE (HAINAN) INTELLIGENT<br>TECHNOLOGY LTD.,<br>ISBEI LTD.,<br>ISBEI (HAINAN) TECHNOLOGY CO., LTD.,<br>ISBEI AI (PRIVATE) LTD.,<br>and<br>SARAH POBERESKIN,<br><br>                  Defendants. | Civil Action No. 1:23-cv-00303<br><br><br>**COMPLAINT FOR:**<br><br>1.  BREACH OF CONTRACT<br><br>2.  VIOLATION OF THE DEFEND TRADE SECRETS ACT<br><br>3.  VIOLATION OF THE DISTRICT OF COLUMBIA UNIFORM TRADE SECRETS ACT<br><br>4.  VIOLATION OF THE COMPUTER FRAUD AND ABUSE ACT<br><br>5.  UNJUST ENRICHMENT<br><br>6.  CONVERSION<br><br>7.  CIVIL CONSPIRACY<br><br>8.  VIOLATION OF THE RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT ("RICO")<br><br>9.  CONSPIRACY TO VIOLATE RICO<br><br><br>**JURY TRIAL DEMANDED** |

## COMPLAINT

Plaintiffs Afiniti, Ltd. and Afiniti, Inc. (collectively "Afiniti" or "Plaintiffs") allege the following in support of their complaint against Defendants Muhammad Ziaullah Khan Chishti ("Chishti"); Qinhe (Hainan) Intelligent Technology Ltd. ("Qinhe"); Isbei Ltd., Isbei (Hainan) Technology Co., Ltd., and Isbei AI (Private) Ltd. (collectively "Isbei"); and Sarah Pobereskin ("Pobereskin") (collectively "Defendants").

## SUMMARY OF THE ACTION

1.     Plaintiff Afiniti provides applied artificial intelligence ("AI") services and other technologies to help its clients improve interactions in contact centers, such as call centers. Afiniti's AI identifies and predicts patterns from call center data to determine better customer-agent pairings than traditional call center pairing methods.  These traditional methods tend to rely on rudimentary techniques such as assigning an inbound call to a particular agent simply because that agent happens to be available.  In contrast, Afiniti's AI services pair customers with customer service agents in a way that improves overall contact center performance, thus increasing positive outcomes for everyone involved.  Afiniti validates the performance of its system—and the overall improvement in the call center—through real-time benchmarks that compare the Afiniti system to the client's default methodologies.  The Afiniti system is based upon Afiniti's proprietary and confidential information, including trade secrets and confidential software.

2.     Afiniti's founder and former Chairman, director, and CEO, Defendant Muhammad Ziaullah Khan Chishti, exited Afiniti in November 2021.[1]  In the aftermath of Chishti's departure,

---

[1] Chishti stepped down from his roles at Afiniti in November 2021 after a former Afiniti employee testified under oath before the U.S. House of Representatives Judiciary Committee that beginning in 2016, when the employee was 24 years old, Chishti sexually harassed and sexually assaulted her and then forced the resulting dispute into confidential binding arbitration.  In December 2022, the House Judiciary Committee released a copy of the 2019 arbitration decision, which found in favor of the ex-employee and awarded her over $4.5 million in damages.  Chishti has recently filed

Afiniti took steps to stabilize its global business operations, including reducing, but not shuttering, its operations in China.  Afiniti later learned that Chishti and other co-conspirator persons and entities unlawfully converted and used Afiniti Trade Secrets (defined below in paragraph 79) to launch a competing enterprise that exploited the wrongfully acquired Afiniti Trade Secrets. Chishti's acts upon his exit from the company in November 2021 were in violation of, at least, his contractual obligations to Afiniti.  Among other acts, Chishti conspired with his wife, Sarah Pobereskin, and others to set up an array of companies based in China, Pakistan, and elsewhere to improperly convert and commercially exploit Afiniti Trade Secrets.  The Qinhe and Isbei Defendants are among those companies.  Within months of the incorporation of the first of those companies in March 2022, Qinhe and Isbei were already providing customers with the same contact center AI services that took Afiniti many years and hundreds of millions of dollars in research and development to bring to market.  This incredible feat could only have been achieved through the unlawful use of Afiniti Trade Secrets and other Afiniti proprietary information.[2]

3.      Chishti, Pobereskin, and others (known and unknown) sought to recreate Afiniti through Qinhe and Isbei in China and Pakistan.

4.      Qinhe and Isbei provide similar and/or the same AI services as Afiniti, including a behavioral pairing system for call centers that Qinhe refers to as the "K2 Engine."  These services purport to help companies optimize interactions between enterprises and their customers.

---

a complaint against the ex-employee in this Court alleging defamation and other claims related to the ex-employee's Congressional testimony.  *See Chishti v. Spottiswoode*, No. 1:22-cv-03490, Dkt. 1 (D.D.C. Nov. 13, 2022).

[2] The fact pattern described in this Complaint bears remarkable similarity to that alleged by another company founded by Chishti, Align Technology Inc. ("Align").  Following Chishti's ouster as Chief Executive Officer and Chairman of Align in 2004, Align brought numerous lawsuits against Chishti and his new company OrthoClear Inc. ("OrthoClear), alleging patent infringement and trade secret misappropriation (among other claims).  OrthoClear ceased to exist following settlement of those litigations in 2006.

5.      Chishti and Pobereskin actively recruited Afiniti employees to help execute their competing scheme.  Along with Chishti (and Pobereskin), other former Afiniti employees helped set up and operate Qinhe and Isbei in an impossibly abbreviated period of time.  To circumvent years of research and development, Chishti, Pobereskin, Qinhe, and Isbei targeted and hired Afiniti employees with specific knowledge of Afiniti Trade Secrets and operations.  In brazen fashion, the competing entity in China was named "Qinhe," a Chinese word that translates to "Affinity" in English, evoking Afiniti's own name in China.  Plaintiffs infer that this is an attempt to mislead Chinese officials and prospective clients into believing that Qinhe is legitimately affiliated with, or the same enterprise as, Afiniti.  Qinhe also set up its copy of Afiniti's operations in the exact same office space as Afiniti's former Chinese headquarters.  For its part, Isbei created a logo that bears a striking resemblance to Afiniti's logo.

6.      Defendants' acts as described herein are unlawful.  Chishti has violated and continues to violate the ongoing obligations of his employment agreement with Afiniti at least by: failing to return Afiniti company property and Afiniti Trade Secrets, including source code; disclosing Afiniti Trade Secrets outside of Afiniti; recruiting Afiniti employees to join Qinhe and Isbei to obtain and exploit further Afiniti Trade Secrets; and competing with Afiniti before the expiration of his non-compete commitments.  All Defendants have misappropriated Afiniti Trade Secrets, including by disclosing and misusing those trade secrets in the operations of Qinhe and Isbei, despite knowing that they were acquired from Afiniti by improper means.  In taking the above actions, Defendants have violated a number of federal and District of Columbia laws, as detailed herein.

7.      Defendants' unlawful acts are causing irreparable harm to Afiniti and must cease to avoid any further harm.  For that reason, this Complaint seeks specific performance of Chishti's

contractual obligations to Afiniti, as well as an injunction against further disclosure and use of Afiniti Trade Secrets by any of the Defendants, among other relief.  Afiniti has already suffered significant harm from Defendants' unlawful acts, which have also resulted in substantial unjust enrichment to Defendants.  Therefore, this Complaint seeks an award of damages to compensate Afiniti for the harm it has suffered, to divest Defendants of their ill-gotten gains, and to punish Defendants for their deliberate and wanton behavior.

## PARTIES

8.      Plaintiff Afiniti, Ltd. is headquartered in Bermuda with a corporate office at Crawford House, 50 Cedar Avenue, Hamilton HM11, Bermuda.  Afiniti, Ltd. has a principal place of business at Andrew's Place, 5th Floor, 51 Church Street, Hamilton HM12, Bermuda.  Afiniti, Ltd. has a place of business in Washington, D.C.

9.      Plaintiff Afiniti, Inc. is a Delaware corporation with its principal place of business at 1701 Pennsylvania Avenue NW, Suite 600, Washington, D.C. 20006.  Afiniti, Inc. is a wholly owned subsidiary of Afiniti, Ltd.

10.      Afiniti was founded in 2005 and has since become an industry leader in call center AI and related technology.  Afiniti's solution has transformed the customary call center pairing system.  Using its proprietary technology, Afiniti optimizes the performance of its clients' call centers by making predictions about the best matches between agents and end customers in a matter of milliseconds.  The intelligent, non-random decisions made by Afiniti's solution, determining which human beings speak to one another in a call center, helps drive customer satisfaction, agent efficiency, and overall call center profitability.  The Afiniti solution stands in contrast to traditional call center routing methods which connect customers and agents on a "first in, first out" basis, without regard to agent-customer suitability, as well as primitive "performance-based" routing systems which tend to overload higher-performing agents and underutilize lower-

performing agents.  The intelligent pairing decisions made through the Afiniti system outperform these traditional and "performance-based" routing systems—which Afiniti demonstrates for its clients through a proprietary benchmarking process—while maximizing efficiency across the contact center.

11.     Afiniti partners with dozens of leading companies across the entire contact center value chain, including telephony vendors, channel partners, business process outsourcers, consultants, data companies, hosted and managed service providers, and value-added resellers. These partnerships enable Afiniti, among other things, to integrate seamlessly with its clients' contact center infrastructure.

12.     In addition to the Afiniti pairing solution described above, Afiniti develops and delivers additional products and services that enhance clients' call center operations.

13.     Afiniti operates globally, including on five continents.

14.     Defendant Chishti founded Afiniti and was involved with developing the Afiniti intelligent pairing solution and other technology including, importantly, versions 5 and 6 of the operative source code for the Afiniti intelligent pairing solution that includes Afiniti Trade Secrets. As CEO of Afiniti, Chishti enjoyed unfettered access to Afiniti technology, including Afiniti Trade Secrets.  Chishti's employment with Afiniti terminated in November 2021.

15.     Chishti (born Wilson Dewy Lear in the United States) is a dual citizen of the United States and Pakistan.  Chishti has made claims that he is currently domiciled in Puerto Rico.[3]  From Afiniti's founding in 2005 until November 2021, Chishti was the Chief Executive Officer at Afiniti and, for nearly all of that tenure, was based in Afiniti's Washington, D.C. office.  During his employment at Afiniti, Chishti maintained a residence in Washington, D.C., at 910 15th Street

---

[3] *See Chishti v. Spottiswoode*, No. 1:22-cv-03490, Dkt. 1 ¶ 29 (D.D.C. Nov. 13, 2022).

NW, Washington, D.C. 20005.  As of July 2022, Chishti listed the 15th Street residence as his registered address.  Chishti currently lists Washington, D.C. as his location on LinkedIn.



16.     Defendant Pobereskin is a dual citizen of the United States and the United Kingdom.  Like Chishti, Pobereskin has claimed that she is currently domiciled in Puerto Rico.[4] Pobereskin is currently employed as a Principal at ghSMART in Washington, D.C., as identified in her LinkedIn profile.  Pobereskin's biography on the ghSMART website identifies her as currently living in Washington, D.C. and New York City.

---

[4] *Id.*



17.    Pobereskin and Chishti married in December 2020.

18.    Defendant Qinhe (Hainan) Intelligent Technology Ltd. is an entity incorporated on March 21, 2022 in the People's Republic of China with its registered address and principal place of business at 401-2, Block E, Fullsing Town, 32 Binhai Avenue, Longhua District, Haikou City, Hainan Province.

19.    Defendant Isbei Ltd. is an entity incorporated on March 28, 2022 in the Cayman Islands with a registered address of Ocorian Trust (Cayman) Limited, P.O. Box 1350, Windward 3, Regatta Office Park, Grand Cayman KY1-1108, Cayman Islands.  Pobereskin is the sole director of Isbei Ltd.

20.    Defendant Isbei (Hainan) Technology Co., Ltd. ("Isbei Hainan") is a wholly owned subsidiary of Isbei Ltd. incorporated on April 11, 2022 in the People's Republic of China with its registered address and principal place of business at 401-2, Block E, Fullsing Town, 32 Binhai Avenue, Longhua District, Haikou City, Hainan Province, the same as Defendant Qinhe (Hainan) Intelligent Technology Ltd.

21.     Defendant Isbei AI (Private) Ltd. ("Isbei Pakistan") is an entity incorporated on July 26, 2022 in the Islamic Republic of Pakistan with a registered address at House No 96, Sector F - 8/2, Khayaban-e-Iqbal, Margalla Road, Islamabad, Pakistan.  Chishti owns 99 percent of Isbei Pakistan and serves as one of its two directors.

## JURISDICTION

### This Court Has Subject Matter Jurisdiction Over All Claims in This Action

22.     The Court has original jurisdiction over all federal claims in this action under 28 U.S.C. § 1331.  The Court has original jurisdiction over Plaintiffs' claims under 18 U.S.C. §§ 1836, *et seq.*, for misappropriation of trade secrets under the Defend Trade Secrets Act ("DTSA").  18 U.S.C. § 1836(c).  The Court also has original jurisdiction over Plaintiffs' claims under 18 U.S.C. §§ 1962, *et seq.*, for violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO").  18 U.S.C. § 1964(c).

23.     The Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367 over all other claims that do not arise under the Constitution, laws, or treaties of the United States because they involve a common nucleus of operative fact as described herein.

24.     To the extent that Chishti and Pobereskin claim that they are now residents of Puerto Rico and not of Washington, D.C., the Court also has diversity jurisdiction over this action, including pendent claims, under 28 U.S.C. § 1332.  Afiniti, Ltd. is a Bermuda company with its principal place of business in Bermuda.  Afiniti, Inc. is a Delaware company with its principal place of business in Washington, D.C.  If not Washington, D.C., Defendants Chishti and Pobereskin may claim residency in Puerto Rico.  All other Defendants are residents of, or have their principal place of business in, China, Pakistan, or the Cayman Islands.  Thus, the parties, to the extent Chishti and Pobereskin allege that they are residents of Puerto Rico and not of

8

Washington, D.C., are citizens of different states.  The matter in controversy also exceeds $75,000 excluding interest and costs.

### *This Court Has General Personal Jurisdiction Over Chishti and Pobereskin*

25.      To the extent that Defendants Chishti and Pobereskin are actually "domiciled in . . . the District of Columbia," then the Court has general personal jurisdiction over Chishti and Pobereskin under D.C. Code § 13-422.

26.      Chishti's LinkedIn profile[5] identifies his location as the "Washington DC-Baltimore Area."  Chishti also worked at Afiniti's offices in Washington, D.C., until his employment terminated in November 2021 and claims to maintain a residence at 910 15th Street NW, Washington, D.C. 20005 at least as of July 2022, when Chishti listed it as his registered address as the Director of Isbei Pakistan.  Chishti also holds a Washington, D.C. driver's license that was registered in 2020.  Accordingly, Plaintiffs infer that Chishti is domiciled in Washington, D.C., giving the Court general personal jurisdiction over him.

27.      Pobereskin is currently employed as a Principal at ghSMART in Washington, D.C., as identified in her LinkedIn profile.  Pobereskin's biography on the ghSMART website states that she "currently lives in New York City and Washington DC."[6]  Pobereskin's LinkedIn profile[7] identifies her work for ghSMART as occurring in "Washington, D.C."  Pobereskin is also married to Chishti, who Plaintiffs infer is domiciled in Washington, D.C., as described above.  Accordingly, Plaintiffs infer that Pobereskin is domiciled in Washington, D.C., giving the Court general personal jurisdiction over her.

---

[5]   Ex.   1   (accessed   and   downloaded   February   1,   2023   and   available   at https://www.linkedin.com/in/zia-chishti-a5908814).
[6]   Ex.   2   (accessed   and   downloaded   February   2,   2023   and   available   at https://ghsmart.com/team/sarah-pobereskin/).
[7]   Ex.   3   (accessed   and   downloaded   February   1,   2023   and   available   at https://www.linkedin.com/in/sarahpobereskin/).

### *This Court Has Specific Personal Jurisdiction Over All Defendants*

28.     The Court has specific personal jurisdiction over all Defendants under D.C. Code § 13-423(a).

### *This Court Has Specific Personal Jurisdiction Over Chishti and Pobereskin*

29.     The Court has personal jurisdiction over Chishti.  *See* D.C. Code §§ 13-422, -423(a).

30.     Even if the Court does not have general personal jurisdiction over Chishti, it has specific personal jurisdiction over him for purposes of this action.  The specific personal jurisdiction provision of the District of Columbia long-arm statute provides jurisdiction because Plaintiffs' claims for relief arise from Chishti "(1) transacting any business in the District of Columbia; . . . (3) causing tortious injury in the District of Columbia by an act or omission in the District of Columbia; [and/or] (4) causing tortious injury in the District of Columbia by an act or omission outside the District of Columbia if he regularly does or solicits business, engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed, or services rendered, in the District of Columbia; . . . ."  D.C. Code § 13-423(a).

31.     As detailed in this Complaint, Chishti's involvement in misappropriating Afiniti Trade Secrets falls under each of these three provisions of D.C. Code § 13-423(a).

32.     In 2005, Chishti (and personnel from The Resource Group ("TRG"), an investor in Afiniti) founded Afiniti in Washington, D.C.; Chishti served as Chief Executive Officer of Afiniti until November 18, 2021.  As CEO, Chishti regularly worked in Washington, D.C. and conducted business in Washington, D.C. on behalf of Afiniti.

33.     On March 29, 2016, Chishti entered into an employment agreement with Plaintiff Afiniti, Inc. (at that time called SATMAP Incorporated), in Washington, D.C. (the "Employment Agreement").  That Employment Agreement permitted Chishti to access source code, confidential

10

information, and trade secrets during his employment, and it required Chishti to return company property, including confidential information and trade secrets, upon termination of his employment.

34.     While he was Afiniti's CEO, and during the term of his employment pursuant to the Employment Agreement, Chishti accessed source code, confidential information, and trade secrets owned by and/or licensed to Plaintiffs Afiniti, Ltd. and Afiniti, Inc.  Chishti kept copies of such information on his Afiniti-issued computer in Washington, D.C., and/or other hardware, software, or systems, including copies of versions 5 and 6 of the operative source code.  Plaintiffs expect discovery to reveal that Chishti and the other Defendants wrongfully acquired and utilized Afiniti Trade Secrets through additional Afiniti resources in Washington, D.C., and elsewhere, including with the help of other (now former) Afiniti employees.

35.     Chishti did not return Afiniti Trade Secrets to Afiniti, Inc. after termination of his employment, as he had agreed, and has still not returned them, nor has he returned the Afiniti-issued computer.  After Chishti's employment was terminated, his improper retention of Afiniti Trade Secrets became, among other things, unlawful misappropriation and intentional conversion. Given the timing and the common locations of the residence and work of Chishti in Washington, D.C., Plaintiffs infer that Chishti unlawfully retained and then improperly used Afiniti Trade Secrets at least in part in the District of Columbia.  Plaintiffs expect that discovery will further reveal the full extent of how Chishti provided Afiniti Trade Secrets, including source code, to persons and entities, including Isbei, Qinhe, Pobereskin, and others.  In view of Chishti's prior history and knowledge of Afiniti, Chishti knew these and other wrongful acts would and did in fact cause harm to Afiniti in the District of Columbia and elsewhere.

36.    Thus, Plaintiffs' claims for relief arise from Chishti "transacting any business in the District of Columbia" (D.C. Code § 13-423(a)(1)) because they relate to Chishti's work for Afiniti in Washington, D.C., where he obtained Afiniti Trade Secrets, including source code, and they further relate to any business Chishti transacted while in Washington, D.C., with the persons and entities that received copies of the misappropriated Afiniti Trade Secrets, including source code.

37.    Chishti's conduct also falls under provision (3) of the District of Columbia long-arm statute, which provides personal jurisdiction over persons or entities that "caus[e] tortious injury in the District of Columbia by an act or omission in the District of Columbia; . . . ." D.C. Code § 13-423(a)(3).   Afiniti, Inc. was injured in Washington, D.C. (*i.e.*, its principal place of business) by Chishti's tortious acts, attempts, and conspiracies concerning Afiniti Trade Secrets. Likewise, as an owner of Afiniti Trade Secrets, Afiniti, Ltd. was injured (both directly and indirectly by harm to its subsidiary Afiniti, Inc., which uses Afiniti Trade Secrets) in Washington, D.C. by Chishti's tortious misappropriation of Afiniti Trade Secrets and other acts, attempts, and conspiracies that occurred in Washington, D.C.   For example, Chishti's action of unlawfully retaining possession of Afiniti Trade Secrets, including source code, and Chishti's failure to return these and other materials to Afiniti, Inc., in Washington, D.C., occurred while Chishti was in Washington, D.C., including when Chishti had agreed to return that information to Afiniti in Washington, D.C.  Plaintiffs expect that discovery in this case will reveal further details regarding how Chishti, without authorization, also wrongfully attempted, conspired, converted, possessed, conveyed, disclosed, and used Afiniti Trade Secrets with the assistance of other persons and entities, including individuals who were or would become affiliated with Isbei and Qinhe, including while Chishti was present in Washington, D.C.

38.     To the extent that any action with respect to Afiniti Trade Secrets occurred while Chishti was outside of Washington, D.C., provision (4) of the District of Columbia long-arm statute also applies because it provides personal jurisdiction over persons or entities that "caus[e] tortious injury in the District of Columbia by an act or omission outside the District of Columbia if he regularly does or solicits business, engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed, or services rendered, in the District of Columbia; . . . ." D.C. Code § 13-423(a)(4).  For instance, Chishti has also misappropriated Afiniti Trade Secrets through disclosing or directing disclosure of them to Isbei in Pakistan, China, and the Cayman Islands, and Qinhe in China.  The misappropriation has caused harm in the District of Columbia to Afiniti, Inc., a company with its principal place of business in Washington, D.C., that is an owner and/or licensee of Afiniti Trade Secrets, and from which Chishti took and unlawfully kept Afiniti Trade Secrets.  It also caused harm to Afiniti, Ltd., an owner and/or licensee of Afiniti Trade Secrets and beneficiary of Afiniti, Inc.'s lawful use of Afiniti Trade Secrets in Washington, D.C.

39.     As described above, both Afiniti, Inc. and Afiniti, Ltd. were—and continue to be—injured in Washington, D.C. by Chishti's and his co-conspirators' tortious espionage, theft, and misappropriation of Afiniti Trade Secrets, including attempts and conspiracies to do the same. Plaintiffs understand that Chishti "regularly does or solicits business, engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed, or services rendered, in the District of Columbia," for at least the reasons described above and throughout this Complaint, including conducting business on behalf of Afiniti from 2005 until November 2021.  In addition, Chishti has maintained and may continue to maintain a residence in Washington, D.C. (as noted on his LinkedIn profile) and regularly conducted and, on information

and belief, may still conduct business in Washington, D.C.  Chishti is married to Pobereskin, who works as a Principal at ghSMART in Washington, D.C.[8]  As part of his marriage to Pobereskin, Chishti engages in a persistent course of conduct in Washington, D.C.

40.     Further, Chishti consented to personal jurisdiction in this Court and waived any objection to such personal jurisdiction for disputes relating to the Employment Agreement.

41.     In addition, Chishti recently availed himself of this Court's jurisdiction by filing a defamation lawsuit in connection with events leading to the conclusion of his employment with Afiniti.  *Chishti v. Spottiswoode*, No. 1:22-cv-03490, Dkt. 1 (D.D.C. Nov. 13, 2022).  Chishti has further offered to come to Washington, D.C., to testify on his own behalf.[9]  Specifically, Chishti requested a congressional investigation regarding the facts detailed in the defamation lawsuit and has offered to testify as part as that investigation.  Chishti, therefore, cannot contest the Court's personal jurisdiction over him in connection with this action.

42.     The exercise of personal jurisdiction by this Court over Chishti comports with notions of fair play and substantial justice, *i.e.*, it is reasonable.

43.     The Court has personal jurisdiction over Pobereskin.  *See* D.C. Code §§ 13-422, -423(a).

44.     Even if the Court does not have general personal jurisdiction over Pobereskin, it has specific personal jurisdiction over her for purposes of this action.  The specific personal jurisdiction provision of the District of Columbia long-arm statute provides jurisdiction because Plaintiffs' claims for relief arise from Pobereskin "(1) transacting any business in the District of

---

[8]   Ex.   2   (accessed   and   downloaded   February   2,   2023   and   available   at https://ghsmart.com/team/sarah-pobereskin/); Ex. 3 (accessed and downloaded February 1, 2023 and available at https://www.linkedin.com/in/sarahpobereskin/).
[9] Ex. 4.

Columbia; . . . (3) causing tortious injury in the District of Columbia by an act or omission in the District of Columbia; [and/or] (4) causing tortious injury in the District of Columbia by an act or omission outside the District of Columbia if he regularly does or solicits business, engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed, or services rendered, in the District of Columbia; . . . ." D.C. Code § 13-423(a).

45.     As detailed in this Complaint, Pobereskin's involvement, including with co-conspirators, in the tortious espionage, theft, and misappropriation of Afiniti Trade Secrets, including attempts and conspiracies to do the same, falls under each of these three provisions of D.C. Code § 13-423(a).  For example, Plaintiffs understand that Pobereskin, in her position as the sole director of Isbei Ltd. and from her location in Washington, D.C., used Afiniti Trade Secrets received from Chishti (and likely others) and transmitted those Afiniti Trade Secrets to other persons and entities, including Isbei and Qinhe, as well as persons associated therewith.  Thus, Plaintiffs' claims for relief arise from Pobereskin "transacting any business in the District of Columbia."  D.C. Code § 13-423(a)(1).

46.     Pobereskin's conduct also falls under provision (3) of the District of Columbia long-arm statute, which provides personal jurisdiction over persons or entities that "caus[e] tortious injury in the District of Columbia by an act or omission in the District of Columbia; . . . ." D.C. Code § 13-423(a)(3).  Afiniti, Inc. was injured in Washington, D.C. (*i.e.*, its principal place of business) by Pobereskin's tortious acts, attempts, and conspiracies concerning Afiniti Trade Secrets.  Likewise, as an owner of Afiniti Trade Secrets, Afiniti, Ltd. was injured (both directly and indirectly by harm to its subsidiary Afiniti, Inc., which uses Afiniti Trade Secrets) in Washington, D.C. by Pobereskin's tortious misappropriation of Afiniti Trade Secrets and other acts, attempts, and conspiracies that occurred in Washington, D.C., and elsewhere.  For example,

Pobereskin's actions of receiving Afiniti Trade Secrets from Chishti and potentially others, which Pobereskin knew or should have known to have been unlawfully obtained and unlawfully provided to her, and wrongfully using or causing others to wrongfully use those trade secrets in the operation of Isbei Ltd. occurred while she was in Washington, D.C.  Based on her prior contacts with and knowledge of Afiniti, including through Chishti, and her resulting acts as described herein, Pobereskin knew or certainly should have known her wrongful acts would cause harm to Afiniti in the District of Columbia.  Plaintiffs expect discovery to reveal further wrongful acts of Pobereskin in Washington, D.C.

47.    To the extent that Pobereskin claims that any action with respect to Afiniti Trade Secrets occurred while she was outside of Washington, D.C., provision (4) of the District of Columbia long-arm statute applies because it provides personal jurisdiction over persons or entities that "caus[e] tortious injury in the District of Columbia by an act or omission outside the District of Columbia if [s]he regularly does or solicits business, engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed, or services rendered, in the District of Columbia; . . . ."  D.C. Code § 13-423(a)(4).  For instance, Pobereskin has also misappropriated Afiniti Trade Secrets through disclosing or directing disclosure of them to Isbei in Pakistan and the Cayman Islands.  The misappropriation has caused harm in the District of Columbia to Afiniti, Inc., a company with its principal place of business in Washington, D.C., that is an owner and/or licensee of Afiniti Trade Secrets, and from which Chishti took and unlawfully kept Afiniti Trade Secrets.  It also caused harm to Afiniti, Ltd., an owner and/or licensee of Afiniti Trade Secrets and beneficiary of Afiniti, Inc.'s lawful use of Afiniti Trade Secrets in Washington, D.C.

48.     As described above, both Afiniti, Inc. and Afiniti, Ltd. were—and continue to be—injured in Washington, D.C. by Pobereskin's tortious acts.  Pobereskin's public profile reflects that she regularly does or solicits business, engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed, or services rendered, in the District of Columbia.  For example, Pobereskin's LinkedIn profile identifies her as working as a Principal for ghSMART in Washington, D.C.  This matches what appears in her bio on the ghSMART website.  That bio also identifies her as currently living in Washington, D.C.  Thus, Pobereskin regularly does business in Washington, D.C. and engages in a persistent course of conduct in Washington, D.C.

49.     Pobereskin is also a co-plaintiff with Chishti in the defamation lawsuit recently filed in connection with events leading to the conclusion of Chishti's employment with Afiniti. *Chishti v. Spottiswoode*, No. 1:22-cv-03490, Dkt. 1 (D.D.C. Nov. 13, 2022).  Therefore, as Pobereskin has availed herself of this Court's jurisdiction in that ongoing litigation, she cannot contest the Court's personal jurisdiction over her in connection with this action.

50.     The exercise of personal jurisdiction by this Court over Pobereskin comports with notions of fair play and substantial justice, *i.e.*, it is reasonable.

### *This Court Has Specific Personal Jurisdiction Over the Isbei and Qinhe Entities*

51.     The Court has personal jurisdiction over the Isbei and Qinhe entities pursuant to the District of Columbia long-arm statute.  *See* D.C. Code § 13-423(a).

52.     The Court has specific personal jurisdiction over the Isbei and Qinhe entities for purposes of this action.  The specific personal jurisdiction provision of the District of Columbia long-arm statute provides jurisdiction because Plaintiffs' claims for relief arise from the Isbei and Qinhe entities "act[ing] directly or by an agent" concerning "(1) transacting any business in the District of Columbia; . . . (3) causing tortious injury in the District of Columbia by an act or

17

omission in the District of Columbia; [and/or] (4) causing tortious injury in the District of Columbia by an act or omission outside the District of Columbia if he regularly does or solicits business, engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed, or services rendered, in the District of Columbia; . . . ."  D.C. Code § 13-423(a).

53.      As detailed elsewhere in this Complaint, Plaintiffs understand that agents of the Isbei and Qinhe entities, including at least Chishti and Pobereskin, intentionally possessed, transmitted, and misused Afiniti Trade Secrets on behalf of the Isbei and Qinhe entities in Washington, D.C.  The agents acting on behalf of the Isbei and Qinhe entities, including at least Chishti and Pobereskin, expressly aimed their activities at Washington, D.C., knowing that the harm would be felt there.  They knew that Afiniti, Inc.'s principal place of business was in Washington, D.C., and they knew that they were possessing, transmitting, and misusing Afiniti Trade Secrets causing harm to Afiniti in Washington, D.C.

54.      Chishti worked as CEO at Afiniti from 2005 until November 2021.  As part of his employment and role with Afiniti, he had access to Afiniti Trade Secrets, including Afiniti source code and confidential information.  He had substantial and direct knowledge of Afiniti's business and technologies.  Pobereskin, as Chishti's spouse during the final eleven months of his employment with Afiniti, would have been aware of Chishti's employment and role in Afiniti's operations.  In fact, Pobereskin frequently met, dined, and hosted Afiniti employees.  Thus, by converting and misappropriating Afiniti Trade Secrets with knowledge of their source and knowledge that harm from the misappropriation would be felt by Afiniti in Washington, D.C., the Isbei and Qinhe entities (through their agents) purposefully directed their activities at Washington, D.C.  This gives the Court personal jurisdiction over those entities.

55.     The Isbei and Qinhe entities have significant connections to Chishti and Pobereskin and benefit from their wrongful acts in Washington, D.C.  As discussed in this Complaint, Chishti and Pobereskin are agents for the Isbei and Qinhe entities, which have ratified Chishti and Pobereskin's wrongful acts by being formed with the purpose and intent of furthering the conversion and misappropriation of Afiniti Trade Secrets, knowingly accepting the wrongfully obtained Afiniti Trade Secrets from Chishti and/or Pobereskin, and using Afiniti Trade Secrets to develop and distribute the "K2 Engine" along with other acts of misappropriation to be revealed through discovery.  As such, Chishti and Pobereskin's jurisdictional contacts with Washington, D.C. (and the United States as a whole) are imputed to the Isbei and Qinhe entities.

56.     For instance, Chishti incorporated Isbei Pakistan on July 26, 2022, in Islamabad, Pakistan.  Chishti listed his address as 910 15th Street, No. 910, Washington, D.C., 20005, USA, in the incorporation papers for Isbei Pakistan.  Chishti owns 99% of Isbei Pakistan shares and Osman Ali Kahn Niazi (last name is potentially also translated as "Niazai"; this Complaint will refer to him as "Niazi") owns the remaining 1%.  Isbei Pakistan has converted and misappropriated the trade secrets it received from Chishti and potentially others and continues to do so today, thereby ratifying Chishti's conduct.   Through such ratification, Chishti's pre-incorporation activities, particularly his jurisdictional contacts with the District of Columbia, are imputed to Isbei Pakistan.

57.     In addition, Isbei Ltd. was incorporated on March 28, 2022 in the Cayman Islands. Chishti's wife, Pobereskin, is its sole director.  Isbei Hainan was incorporated on April 11, 2022 in Hainan Province, China, and is wholly owned by Isbei Ltd.

58.     Isbei Ltd. acquired Afiniti Trade Secrets through Chishti's acts discussed above, either directly from Chishti, indirectly from Pobereskin, or through agents and co-conspirators of

Chishti and Pobereskin.  Pobereskin, as Chishti's wife, would have been aware of Chishti's conduct, and that the trade secrets Isbei Ltd. was using were wrongfully acquired.  Thus, Isbei Ltd.'s wrongful use of Afiniti Trade Secrets ratifies Chishti's and/or Pobereskin's conduct as its agent, like Isbei Pakistan above, and personal jurisdiction over Isbei Ltd. is therefore coextensive with that over Chishti and Pobereskin.

59.     Isbei Hainan also uses misappropriated Afiniti Trade Secrets.  This use similarly ratifies Chishti and/or Pobereskin's wrongful conduct.  In addition to it being wholly owned by Isbei Ltd., Yan Min and Liu Xiaoxin were involved in the establishment of Isbei Hainan as a supervisor and legal representative, respectively.  Yan was the deputy president, and Liu was a finance director, at Shenzhen Afiniti Technologies Co. Ltd ("Afiniti Shenzhen").  Both Yan and Liu would have known Chishti, recognized Afiniti Trade Secrets, and understood that Chishti and/or Pobereskin could only have obtained those through conversion and misappropriation from Afiniti.  Therefore, Isbei Hainan also ratified Chishti and/or Pobereskin's conduct as its agent, and personal jurisdiction over Isbei Hainan is therefore coextensive with that over Chishti and Pobereskin.

60.     Like the Isbei entities, Qinhe (Hainan) Intelligent Technology Ltd. and its subsidiaries have wrongfully acquired and misused, and continue to misuse, misappropriated Afiniti Trade Secrets, including to distribute a product Qinhe calls the "K2 Engine."  Plaintiffs expect discovery to reveal how Qinhe obtained the trade secrets from Chishti, either directly or indirectly through Isbei or its agents, or through others acting at the behest of Chishti and Pobereskin.

61.     Plaintiffs, on information and belief, expect that discovery will confirm that Chishti is an angel investor in Qinhe.

62.     Isbei's website identifies Qinhe as Isbei's "exclusive delivery partner" in China. Qinhe appears to have only a single service, powered by the so-called "K2 Engine," and both the service and the "K2 Engine" use converted and misappropriated Afiniti Trade Secrets.  Qinhe was incorporated on March 21, 2022 in China.  At that time, it was wholly owned by Liu Xiaoxin, who also established Isbei Hainan one week later.  Liu, and others to be identified through discovery, must have been aware when establishing Qinhe that it would be receiving a product—Qinhe's only product—from Chishti, Pobereskin, Isbei, possibly other former Afiniti employees, and/or others acting at the behest of Chishti and Pobereskin.  Otherwise, without its only product, Qinhe would have no product or service to "deliver."  The circumstances demonstrate that Liu and others, such as Pobereskin, were coordinating and conspiring with Chishti to establish Qinhe and Isbei as two arms of a distribution network with at least the purpose of furthering conversion and misappropriation of Afiniti Trade Secrets: Isbei to use converted Afiniti Trade Secrets in development of its platform, and Qinhe to distribute and commercialize that platform as the "K2 Engine" in China.  Furthermore, on information and belief, Isbei hired, engaged, or recruited at least three former Afiniti employees—Abu Turab Suri, Yasir Zamir, Muhammad Hussain Anwaar—with detailed and technical knowledge of Afiniti Trade Secrets for the purpose of using that knowledge to unlawfully use and exploit the Afiniti Trade Secrets to Isbei and the Defendants' benefit.  Suri, Zamir, and Anwaar worked from the Washington, D.C. offices of Afiniti, Inc. as detailed in their employment agreements.  Suri, Zamir, and Anwaar also lived in the United States, and on information and belief, continue to live in the United States.  Chishti and Isbei, and their agents, knew that Suri, Zamir, and Anwaar previously worked in the Washington, D.C. office of Afiniti, that they resided in the United States, and that they possessed knowledge of Afiniti Trade Secrets that Chishti and Isbei expected to exploit.  As former Afiniti employees based in the

Washington, D.C. offices of Afiniti, Inc. with knowledge of Afiniti Trade Secrets, Suri, Zamir, and Anwaar's continuing, unauthorized use of Afiniti Trade Secrets in the United States on behalf of Chishti, Isbei, and the other Defendants, further harms Afiniti in Washington, D.C.

63.     Likewise, in addition to Liu Xiaoxin, Qinhe's current ownership and management includes Yan Min (with connections to Isbei and Afiniti discussed herein) and Zhao Jian (VP of commercial strategy at Afiniti (Hainan) Technologies Co. Ltd. between April 1, 2021, and March 31, 2022), who currently owns 75% of Qinhe and was Isbei Hainan's founding general manager. As described herein, Liu Xiaoxin, Zhao Jian, and Yan Min are understood to have purposefully and successfully conspired with Chishti, Pobereskin, and unknown others to convert and misappropriate Afiniti Trade Secrets.

64.     Other connections between Qinhe, Chishti, Isbei, and Afiniti confirm that Qinhe knew of Chishti's, Pobereskin's, and others' tortious acts and ratified those acts at least by distributing the "K2 Engine," which at least copied, incorporated, and/or included works derived from Afiniti Trade Secrets.  For example, "Qinhe" blatantly coined its new name with Chinese characters that translate to "Affinity" in English.  Each of Qinhe and Isbei Hainan opened an office in the same building as Afiniti in Hainan such that they share the same registered address as Afiniti. And Qinhe now employs numerous former Afiniti employees, including Luan Yi, Liu Hongjuan, Sissi Zhao Xiyun, Zoe Lu Chunyu, Li Ping, Zuo Cheng, and Bao Lichen, who each know or should know that the product that Qinhe brought to market in mere months is the same technology that Afiniti commercialized in China for the same customers in China that Afiniti had previously serviced.

65.     For the reasons discussed above, Chishti and Pobereskin conspired with and are connected to each of the Isbei and Qinhe companies.   Isbei and Qinhe converted and

misappropriated Afiniti Trade Secrets through tortious acts, both inside and outside of the District of Columbia, using information that Chishti, Pobereskin, and possibly others obtained through tortious acts in the District of Columbia.  The harm from such conversion and misappropriation impacts the value and secrecy of Afiniti Trade Secrets in the District of Columbia.  Isbei and Qinhe, through their acts and those of their agents, have ratified Chishti's and Pobereskin's wrongful acts as their own.  Therefore, Chishti's and Pobereskin's jurisdictional contacts apply to Qinhe, just as they do to the Isbei entities, such that the District of Columbia's long-arm statute confers personal jurisdiction over Isbei and Qinhe.

66.     The exercise of personal jurisdiction by this Court over the Isbei and Qinhe Defendants comports with notions of fair play and substantial justice, *i.e.*, it is reasonable.

### *This Court Has Personal Jurisdiction Pursuant to Federal Rule of Civil Procedure 4(k)(2) and Pendent Personal Jurisdiction*

67.     To the extent that any Defendant alleges that the Court does not have specific personal jurisdiction over it under the District of Columbia long-arm statute, the Court has personal jurisdiction over such Defendant(s) under Federal Rule of Civil Procedure 4(k)(2) for all federal claims alleged in this Complaint.  Plaintiffs' claims arise under federal law, including the claim for misappropriation of trade secrets under the DTSA, the claim for violation of the Computer Fraud and Abuse Act, and the claim for violation of the Racketeer Influenced and Corrupt Organizations Act.  Under this scenario where the District of Columbia long-arm statute is assumed to preclude exercise of personal jurisdiction under District of Columbia law, Plaintiffs are not aware of any U.S. state in which the Defendants would be subject to jurisdiction, as the contacts described herein have the strongest nexus to the District of Columbia.  However, each Defendant's relationship with the United States as a whole, including its contacts with and the effects of its actions on Plaintiffs in the United States, are sufficient to satisfy due process.  At least

Chishti and Pobereskin acted as agents of the Isbei and Qinhe entities in the United States to conspire to and actually convert and misappropriate Afiniti Trade Secrets as discussed herein.  As described above, the Defendants' possession, transmission, and use of Afiniti Trade Secrets occurred at least in significant part in Washington, D.C., with potential additional acts in Puerto Rico (where Chishti was known to spend time), Virginia (where relevant source code servers are located), and/or elsewhere in the United States and abroad.   Moreover, the theft and misappropriation of Afiniti Trade Secrets, as explained above, was purposefully directed at Afiniti, Inc., which has its principal place of business in Washington, D.C.  Afiniti's injuries (detailed herein) foreseeably resulted from those intentional, wrongful, and ongoing torts and breaches. Acts in furtherance of the conspiracy, espionage, theft, misappropriation, and other torts, as detailed throughout this Complaint, also occurred in the United States, including in Washington, D.C.  Chishti and Pobereskin have a relationship with the United States and Washington, D.C., and their actions as agents of the Isbei and Qinhe entities, as well as any other work they have done or directed on behalf of or as agents of the Defendant entities in the United States in furtherance of their tortious acts, amount to sufficiently continuous and systematic contacts with the United States to ensure that this Court's exercise of personal and extraterritorial jurisdiction over all Defendants is consistent with the Due Process Clause.

68.     Furthermore, on information and belief, Isbei hired, engaged, or recruited at least three former Afiniti employees who worked from the Washington, D.C. offices of Afiniti, Inc. and lived, and on information and belief continue to live, in the United States, now supporting Isbei on a continuing basis in its unlawful use and exploitation of the Afiniti Trade Secrets.

69.     The Court also has pendent personal jurisdiction over each Defendant for all claims, including the state law claims, because it has personal jurisdiction over each Defendant with

respect to at least one claim, and all claims asserted in this Complaint arise out of the common nucleus of operative facts described herein.

70.     As noted above, this Court has extraterritorial jurisdiction over the acts of Chishti, Pobereskin, Isbei, and Qinhe based on the facts described in this Complaint.  As detailed above and throughout this Complaint, the Defendants individually and collectively took acts in furtherance of espionage, theft, misappropriation, and related acts in the United States.  These acts include failure to return Afiniti devices and Afiniti Trade Secrets to Afiniti, Inc. in Washington, D.C., knowingly taking Afiniti Trade Secrets located at Afiniti facilities or systems in Washington, D.C., among other locations, and taking multiple acts to further the conspiracies, theft, misappropriation, and related RICO activities in Washington, D.C.  As described above, Chishti, Pobereskin, and on information and belief, Isbei, and Qinhe, individually and collectively, took acts in furtherance of the foregoing conduct in the United States.  Given the timing of the misappropriation, conversion, and unlawful use of Afiniti Trade Secrets, the locations of the Defendants as understood by the Plaintiffs when the misappropriation, conversion, and unlawful use occurred, and the Defendants' own statements regarding their location and residence, Isbei and Qinhe must have coordinated with and communicated with Chishti and Pobereskin while each was in Washington, D.C., to set up the Isbei and Qinhe entities to further the wanton conduct.

## VENUE

71.     As described above, which is incorporated below, a substantial part of the events or omissions giving rise to the claims in this Complaint occurred in this District.  Plaintiff Afiniti, Inc. maintained its principal place of business in this District, and Plaintiff Afiniti, Ltd. also maintained a place of business in this District, during all relevant events detailed in this Complaint. Afiniti, Inc. and Afiniti, Ltd. both have business operations in Washington, D.C. today.  Chishti primarily worked in Afiniti's Washington, D.C. office from March 2016 through November 2021.

At least while working in Afiniti's Washington, D.C. office, Chishti also maintained a residence in Washington, D.C., at 910 15th Street NW, and listed it as his registered address at least as of July 2022.  Plaintiffs understand that Chishti continued to reside in Washington, D.C. after November 2021, where he and Pobereskin planned and executed, at least in part, the conspiracies and tortious acts of the Defendants as described herein.  Thus, for some period of time after November 2021, Chishti and Pobereskin undertook tortious acts, attempts, and conspiracies that are described throughout this complaint in Washington, D.C.  Pobereskin has worked for ghSMART in Washington, D.C. since 2019.  On information and belief, Pobereskin undertook tortious acts, attempts, and conspiracies—including those wrongfully possessing, transmitting, and using Afiniti Trade Secrets—in Washington, D.C.  Discovery in this case will reveal further details on how Chishti and Pobereskin, without authorization, wrongfully attempted, conspired, converted, possessed, disclosed, and used Afiniti Trade Secrets with the assistance of other persons and entities, including individuals who were or would become affiliated with Isbei and Qinhe, while present in Washington, D.C.  In addition, Chishti consented in writing to Washington, D.C. law governing the Employment Agreement under which numerous of the instant claims are brought.  Further, a substantial part of the property that is the subject of this action is situated in Washington, D.C.  Lastly, Chishti and Pobereskin continue to represent they are ongoing residents of Washington, D.C.  Venue is therefore proper in the United States District Court for the District of Columbia pursuant to 28 U.S.C. § 1391(b)(1) and (2).  To the extent one or more Defendants contends that venue is not proper in this District pursuant to § 1391(b)(1) or (b)(2), venue is proper pursuant to § 1391(b)(3) at least because this Court has personal jurisdiction over Defendants.

## FACTS

### *The Afiniti System*

72.     Afiniti designs, develops, provides, and markets multiple technologies, including a contact center AI platform that outperforms traditional and "performance-based" routing systems when identifying and predicting best matches between agents and end customers (the "Afiniti System").

73.     Traditional call center routing methods connect people sequentially.  For example, inbound callers are usually matched to agents in the order in which their calls are received to the call center, regardless of the quality of the agent-caller match.  Other slightly more advanced systems might send more calls to higher-performing agents, but this approach tends to neglect lower-performing agents.  In contrast, the Afiniti System employs specialized AI and machine learning techniques to identify an agent's unique behavioral interaction history.  In parallel, the behavior, characteristics, and intent of a customer are also examined in order to predict which customer and agent pairing is most likely to optimize the performance of the contact center.  The Afiniti System identifies and predicts patterns from this data to determine better customer-agent pairings than traditional call center pairings.  The overall customer experience improves, each agent is optimally engaged on the basis of the agent's unique strengths, and the client's call center becomes more profitable.  And with pairings made in milliseconds, the Afiniti System is imperceptible to customers and agents alike.

74.     Successful results of the Afiniti System are proven with a proprietary benchmarking system that cycles the Afiniti System on and off in short increments throughout the day.  This benchmarking system allows clients to see clearly the benefit of the Afiniti System relative to the client's default pairing methodology.  It also controls for variables that might affect agent and customer behavior, such as the time of day of the call.

75.     In general, clients using the Afiniti System do not need to make any material changes to their existing contact center technology or agent recruitment, training, and compensation strategies.  In the typical Afiniti System deployment, clients bear no or minimal hardware, software, or professional services fees.

76.     Businesses in a wide range of sectors use the Afiniti System to boost customer and agent satisfaction, lower costs, and increase revenue through metrics including incremental sales, retention, upsells, and cross-sells.  This includes businesses involved in financial services, telecom and media, insurance, and healthcare.

77.     Afiniti was founded in 2005 in Washington, D.C., in part by Chishti and with the help of personnel at TRG.  Since then, Afiniti has remained a market leader in providing AI for use in contact centers.  Afiniti has done so through significant research and development expenditures, constant refinement and improvement of the Afiniti System, and substantial investments in advertising and marketing.

78.     Afiniti has won a number of awards and recognitions for or related to its technology, including:

- The Stevie Awards – International Business Awards: Silver in Company of the Year, Computer Software, Large (August 2021);

- Business Intelligence Group – Excellence in Customer Service Awards: Technology of the Year Award (Telecom) (April 2021);

- Corporate Vision Magazine – Technology Innovator Awards: Most Innovative AI & Behavioral Pairing Technology Company (April 2021);

- Deloitte Technology Fast 500: Fastest-growing technology companies (November 2019);

- GITEX Hero Awards: Best Use of AI in Enterprise (October 2019);

- Customer Magazine Awards: 2019 Contact Center Technology Award (October 2019);

- Frost & Sullivan Best Practices Award: 2019 Global Artificial Intelligence (AI)-powered Customer Routing Solutions for the Contact Center Visionary Innovation Leadership Award (July 2019);

- Insurtech 100 Awards: Mention in the list of 100 companies driving growth and innovation across insurance by rethinking today's products, services, technologies and business models (May 2019); and

- CB Insights AI 100: AI 100 Companies (December 2017).

### *Afiniti Protects Its Valuable Trade Secrets*

79.     Afiniti, Ltd. and its subsidiaries, including Afiniti, Inc., have expended substantial time, labor, and money to research and develop the Afiniti System, supporting source code, and the associated business and technical information that constitute a large number of trade secrets that have significant value, are not publicly known or readily ascertainable, and that Afiniti maintains as confidential and proprietary information (individually and collectively, the "Afiniti Trade Secrets").   Afiniti Trade Secrets, including those described below, are different from publicly known or readily ascertainable information, such as the techniques described in Afiniti's patents and published patent applications.   Thus, Afiniti Trade Secrets described herein and listed below are not publicly known or readily ascertainable by others.   Afiniti Trade Secrets include, but are not limited to, confidential and proprietary software including source code, object code, know-how, and negative know-how regarding the installation, configuration, and use of the following software:

- Software platforms including V5, V6, and Mega;

- Software and tools related to a data pipeline:

  o Talflow, for creating and managing stages of a data pipeline;

  o Dexter, for providing standardized names and categorizations of data features;

  o SME and ACA scripts, for extracting, translating, and loading data from data sources into modeling, runtime lookup, and reporting databases;

  o CRUX utility and scripts, for managing several sets of billing telephone number history data;

  o Fornax, a power business intelligence dashboard for extract, translate, and load processes;

  o Pictor, for sensing, detecting, and visualizing data consistency throughout the data pipeline;

  o ERIS, for transferring and consolidating service data to monitoring and reporting services; and

  o Lynx Data Loading, for automated ad-hoc data loading into one of several types of databases, using saved, inferred, or edited schemas for the data sets to be loaded;

- Modeling software and tools:

  o Afiniti Explorer, providing an interface for building, assessing, comparing, and storing diagonalized models, such as those that can be used for the V5 and V6 platforms;

- o Cerise, providing an interface for building, assessing, comparing, and storing diagonalized models and off-diagonal models, such as those that can be used for the V6 platform;

- o Balerion, providing a flexible script processor for building, assessing, and comparing diagonalized models and off-diagonal models, such as those that can be used for the V6 platform;

- o Simulator, for simulating and testing models in a simulated contact center environment on the V6 platform, and for configuring contact center environments, agents, contacts, and runtime pairing algorithms and strategies; and

- o Helix, for sampling data and providing an improved simulation environment for testing certain types of model and runtime configurations;

- Runtime software:

- o Switch Interface, for interoperability, integration, message and/or data passing, and instruction request/response between a contact center appliance/module and the contact center environment (for example, a switch such as an automatic call distributor);

- o Evaluator, for applying pairing strategies, including the many various runtime pairing optimizations, filters, and other techniques;

- o Engine, for managing state information and other information sent and received via the Switch Interface, interfacing with the Evaluator, and managing benchmarking;

- o Obsidian, comprising the runtime components of the V6 platform, including V6 versions of Switch Interface, Evaluator, and Engine;

- o V5 runtime components including V5 versions of Switch Interface, Evaluator, and Engine; and

- o Sensors, for detecting potential faults, error conditions, or other problems during runtime and to facilitate diagnosing, troubleshooting, and correction of runtime issues.

80.   Afiniti Trade Secrets also include proprietary and confidential algorithms, formulas, methods, techniques, know-how, and negative know-how that is different from the information disclosed in any of Afiniti's patents or published patent applications, including those related to:

- • Data:

  - o Data source selection;

  - o Identifying and filtering critical and preferred data features according to the contact center environment where the Afiniti Service will be deployed, and for measuring the quality of data availability for the contact center environment;

  - o Data extraction, translation, and loading (e.g., measurement and analysis of routing configurations and agent overlap);

  - o Data matching:

    - ▪ Techniques, scripts, methods, etc., for sequencing of joining data sources;

    - ▪ Techniques, scripts, methods, etc., related to scripts for joining client databases;

- Techniques, scripts, methods, etc., for effective and efficient changes to existing client scripts;

- Techniques, scripts, methods, etc., for evaluating data matching quality;

- Techniques, scripts, methods, etc., for data matching criteria that enable client-side performance validation; and

- Techniques, scripts, methods, etc., for data matching related to client-facing reporting;

o Data filtering:

- Techniques, scripts, methods, etc., for identifying and selecting a preferred date range;

- Techniques, scripts, methods, etc., for filtering using conditionals or predicates;

- Techniques, scripts, methods, etc., for identifying and filtering outliers; and

- Techniques, scripts, methods, etc., for filtering in environments with missing or incorrect data;

o Knowledge of effective and efficient feature selection;

o Feature engineering and related scripts for feature engineering, including for billing telephone number history, agent history, CRUX operations, manipulation of client-side customer relationship management data, optimizations, and slowly changing dimensions;

o Methods and techniques for sensing, detecting, and visualizing data consistency or errors throughout the data pipeline;

o Sensors for data pipeline errors such as missing data; and

- o   Runtime lookup database design and configuration;

- Modeling:

  - o   Methods for selecting data and/or features from an available database or databases to use in modeling:

    - ▪   Know-how and negative know-how regarding specific types of data and/or features selected for model training;

  - o   Know-how for sequencing and/or favoring agent-side or contact-side modeling;

  - o   Methods and techniques for defining types or groups of contacts/callers/calls:

    - ▪   Know-how and negative know-how regarding specific types of data and/or features in call group creation;

    - ▪   Configuration settings and parameter values for call groups; and

    - ▪   Methods and techniques for adjusting groups of calls;

  - o   Methods and techniques for determining one or more values and/or functions associated with each group of callers and ranking/percentiling the call groups for a diagonal model:

    - ▪   Specific formulas and techniques for determining caller group influenceability above and beyond the broader and different techniques in Afiniti's patents;

    - ▪   Know-how and negative know-how regarding selecting preferred formulas and techniques for determining caller group influenceability based on one or more values and/or functions associated with each group of callers and/or the selected types of data and/or features;

- Specific formulas and techniques for ranking call groups based on determined caller group influenceability;

- Visualizations and visualization techniques for caller group influenceability; and

- Formulas and techniques for adjusting caller group percentiles and/or ranks;

o Methods and techniques for determining one or more values and/or functions associated with each agent and ranking the agents for a diagonal model:

- Know-how and negative know-how regarding specific types of data and/or features for determining one or more values and/or functions associated with each agent;

o Methods and techniques for creating groups of agents:

- Know-how and negative know-how regarding specific types of data and/or features in agent group creation;

- Methods and techniques for adjusting groups of agents;

- Agent group skill configurations for off-diagonal models; and

- Know-how and negative know-how regarding agent groupings;

o The methods and techniques for determining one or more values and/or functions associated with each group of agents and ranking or percentiling the agent groups for a diagonal model;

o The methods and techniques for determining one or more values, measurements, and/or functions associated with each agent for off-diagonal models;

- o Methods, formulas, and techniques for optimization metric engineering for diagonalized and off-diagonal models:

    - Transformation and/or adjustment of features for optimization metric engineering; and

    - Know-how and negative know-how of effective and efficient optimization metric design;

- o Negative know-how regarding diagonal models;

- o Visualizations and visualization techniques for diagonalized models and off-diagonal models, including call group trees, agent trees, and model performance;

- o Visualizations and visualization techniques for off-diagonal models including call group trees, agent trees, payout matrices, and model performance;

- o Methods, formulas, and techniques for creating an off-diagonal model of a contact center environment, above and beyond the broader and different techniques disclosed in Afiniti patent applications:

    - Features and/or models that are used in an off-diagonal model; and

    - Adjustments to the payoff matrix;

- o Negative know-how regarding off-diagonal models;

- o Methods and techniques for modeling new agents and/or agents with low amounts of data and for selecting parameters, data, and/or features regarding the new agents for use in modeling:

    - Know-how and negative know-how regarding new agent modeling and parameter, data, and/or feature selection;

o Methods and techniques for selecting model configuration parameters and creating a call center pairing strategy model:

- Know-how and negative know-how regarding how configuration parameters interact with each other; and

- Methods and techniques for selecting run-time configuration parameters for the model;

o Methods, formulas, and techniques for validating a model above and beyond the broader and different techniques disclosed in Afiniti's patents or published patent applications:

- Parameter values for the methods, formulas, and techniques;

- Methods and techniques for analyzing model stability, including caller-side and agent-side stability metrics;

- Visualizations and visualization techniques for model validation:

- Know-how and negative know-how for interpreting the validation visualizations and other outputs;

- Sub-model comparisons;

- Methods and techniques for evaluating changes to the model, call groups, agent groups, call group ranking, agent group ranking, and/or agent ranking; and

- Methods and techniques for simulating call center performance and evaluating model performance based on the simulated call center performance;

    o  The methods, formulas, and techniques for determining gain estimation of a model:

        ▪  Visualizations and visualization techniques for gain estimation; and

        ▪  Know-how for when corrections are needed and which corrections should be applied;

- Runtime and Pairing:

    o  Parameter values, formulas, methods, and techniques for selecting among tie-breaking strategies per queue, per industry, per contact, per agent, based on time factors, and/or based on contact center state information;

    o  Methods, techniques, formulas, and scripts for selecting a batch of contacts and/or agents from available contacts and agents, and for using the selected batch to evaluate possible pairings:

        ▪  Parameter values, methods, and techniques for selecting a batch size;

        ▪  Parameter values, methods, and techniques for selecting a number of agents for inclusion in the batch:

            ▪  Parameter values, methods, and techniques for adjusting a number of agents selected based on time;

        ▪  Parameter values, methods, and techniques for selecting a number of callers for inclusion in the batch:

            ▪  Parameter values, methods, and techniques for adjusting a number of callers selected based on time;

        ▪  Parameter values, methods, and techniques for selecting a batch of contacts and agents among multiple queues;

- Parameter values, methods, and techniques for selecting a batch of contacts and agents among multiple priority levels;

- Parameter values, methods, and techniques for selecting a batch of contacts and agents among multiple pairing strategies; and

- Know-how and negative know-how regarding ordering of techniques for selecting a number of agents, a number of contacts, and/or a number of pairs;

o Methods, techniques, and formulas for adjusting pairing strategy time-out rules:

- Parameter values, formulas, methods, and techniques for adjusting time-out rules based on priority levels, place in queue, and other contact center state measurements;

o Methods, techniques, formulas for determining and/or adjusting agent bandwidth, ranking, and/or percentile based on a state of the contact center system:

- Methods and techniques for determining parameters, data, and/or features for adjusting agent bandwidth, ranking, and/or percentile:

  - Parameter values, formulas, methods, and techniques for optimal values of Kappa per queue, per industry, per client, per agent, and/or based on time; and

  - Specific parameter values, formulas, methods, techniques, know-how, and negative know-how for agent repercentiling;

- Parameter values, formulas, methods, and techniques for unknown agent bandwidth, ranking, and/or percentile;

- ▪ Specific parameter values, formulas, methods, techniques, know-how, and negative know-how for agent edge correction in a diagonal model; and

- ▪ Specific parameter values, formulas, methods, techniques, know-how, and negative know-how for agent edge correction in an off-diagonal diagonal model;

o Methods, techniques, and formulas for determining and/or adjusting caller bandwidth, ranking, and/or percentile based on adjustments to bandwidth, rankings and/or percentiles of callers:

- ▪ Methods and techniques for determining parameters, data, and/or features for adjusting agent bandwidth, ranking, and/or percentile:

  - ▪ Parameter values, formulas, methods, and techniques for optimal values of Rho per queue, per industry, per client, per caller, and/or based on time; and

  - ▪ Specific parameter values, formulas, methods, techniques, know-how, and negative know-how for contact repercentiling;

- ▪ Parameter values, formulas, methods, and techniques for unknown caller bandwidth, ranking, and/or percentile;

- ▪ Specific parameter values, formulas, methods, techniques, know-how, and negative know-how for caller edge correction in a diagonal model; and

- ▪ Specific parameter values, formulas, methods, techniques, know-how, and negative know-how for caller edge correction in an off-diagonal diagonal model;

- o Parameter values, formulas, methods, and techniques for evaluating and adapting to the state of the contact center system;

- o Specific formulas for determining expected values of potential pairings;

- o Methods and techniques for analyzing non-paired agents and callers;

- o Parameters, methods, techniques, and/or features used for initial lookups of caller data and/or agent data before pairings are selected;

- o Parameters, methods, techniques, and/or features used for subsequent lookups of caller data and/or agent data;

- o Methods and techniques for adjusting agent and/or caller priorities; and

- o Method and techniques for uploading new models during runtime and maintaining memory of contact center state;

- Know-how and negative know-how regarding benchmarking, including:

- o Parameter values, formulas, methods, and techniques for selecting among benchmarking strategies per queue, per industry, per contact, per agent, based on time factors, and/or based on contact center state information;

- o Preservation of benchmarking flag upon call transfers;

- o Merging of call transfer records for benchmarking reporting and measurement; and

- o Specific formulas, parameters, and scripts for collecting outcomes and calculating performances associated with multiple pairing strategies;

- Know-how and negative know-how regarding capabilities, integration, and interoperability with various manufacturers' contact center equipment, including Automatic Call Distributors and other switches, load balancers, data stores, and

Contact Center as a Service (CCaaS) and other cloud-based services integration with switches, such as:

o Private native integration and private Application Programming Interfaces (APIs) for interoperability of manufacturers' contact center equipment with Afiniti software and services, including on-premises and cloud implementations as relevant per manufacturer, and including the contact center equipment of a widely-used regional manufacturer in China;

o Methods, techniques, formulas, and scripts for data in a User-to-User Information string; and

o Methods, techniques, and scripts for remote pairing for centralized application of proprietary algorithms;

- Contact center node management:

o Methods and techniques for managing multiple nodes in a contact center system:

▪ Methods and techniques for determining node priority;

▪ Methods and techniques for determining node fail-over procedures; and

▪ Methods and techniques for syncing memory of contact state information among multiple nodes;

o Methods and techniques for providing high-availability contact center systems, including management of memory, state, objects, message passing, and processing modules to ensure high-capacity and high-throughput;

o Methods and techniques for managing agent state information;

o Methods and techniques for managing caller state information;

- o Methods and techniques for managing agent-caller interaction state information; and

- o Methods, techniques, and scripts for audio processing for serving media, managing SIP/VoIP connections, interactive voice response components and data, call treatment/scripting.

81. Afiniti Trade Secrets further include proprietary and confidential client-specific business and technical information, including but not limited to:

- Business contacts and compilations of contacts, such as those in Outlook and macOS address books, that are not publicly known or readily ascertainable;

- Identities of prospective, current, and former clients;

- Identities of specific client employee contacts and their contact information;

- Customer data including but not limited to customer relationship management databases, interaction records, and outcome databases;

- Data matching configurations;

- Models, including ordered sets of agent values or identifiers, ordered sets of caller group values or identifiers, and trees, each tree including a set of predicates for assigning a caller to a caller group;

- Optimization metric selection, calculation, and configuration;

- Model feature engineering and feature selection;

- Model agent trees, agent splits, caller trees, and caller splits;

- Runtime configurations and parameters;

- Gain estimations;

- Historical performance and reporting including daily gain reports;

- Product, pricing, and incentive information;

- Benchmarking configurations, parameters, and strategies;

- Routing configurations, including agent overlap determinations, agent measurements, agent modeling, skill configurations, agent clusters, caller measurements, caller modeling, and switch integrations;

- Know-how and negative know-how regarding run-time sensors;

- Historical run-time sensor issues and solutions; and

- Know-how and negative know-how possessed by and passed along by Afiniti client teams, software engineers, product managers, data analysts, AI teams, and R&D teams for each client.

82.     Afiniti Trade Secrets, described in paragraphs 79–81, relate to products and services used, sold, shipped, and/or ordered in interstate or foreign commerce.  Specifically, Afiniti operates globally, including on five continents.  Afiniti also operates out of and has a place of business in Washington, D.C.

83.     Afiniti's business has been built on the use and development of Afiniti Trade Secrets as well as the goodwill and client satisfaction developed over a period of time in connection therewith.

84.     Plaintiff Afiniti, Ltd. currently has and has had legal title to and/or a license to Afiniti Trade Secrets for all times relevant to the acts alleged herein, and a right to sue for misappropriation of those trade secrets.  Afiniti, Ltd. is also in lawful possession of Afiniti Trade Secrets and has been for all times relevant to the acts alleged herein.

85.     Plaintiff Afiniti, Inc. currently has and has had legal title to and/or a license to Afiniti Trade Secrets for all times relevant to the acts alleged herein, and a right to sue for

44

misappropriation of those trade secrets.  Afiniti, Inc. is also in lawful possession of Afiniti Trade

Secrets and has been for all times relevant to the acts alleged herein.

86.     Afiniti, Ltd. and Afiniti, Inc. also hold equitable title to or a right to enforce Afiniti

Trade Secrets.

87.     Consistent with 18 U.S.C. § 1839(3)(B) and D.C. Code § 36-401(4)(A), and as

described above, Afiniti Trade Secrets derive independent economic value, actual or potential,

from not being generally known to, and not being readily ascertainable (including through proper

means) by, another who can obtain economic value from its disclosure or use.  Although Afiniti

has patents that concern different aspects of the Afiniti System, those patents do not disclose Afiniti

Trade Secrets.

88.     Moreover, Afiniti Trade Secrets are subject to meaningful efforts to maintain them

as secret.  For example, these efforts include but are not limited to (a) requiring employees to sign

agreements prohibiting unauthorized disclosure of confidential information including the trade

secrets; (b) requiring employees to regularly review and affirm Afiniti's code of conduct and

information security policy, including confidentiality obligations therein; (c) imposing customary

non-competition and non-solicitation clauses on employees to mitigate the disclosure of trade

secrets following an employee's termination; (d) requiring employees to adhere to various policies

including that no Afiniti trade secret, or other confidential or proprietary information, will be

disclosed to any unauthorized third party; (e) requiring employees to return all company property

upon termination of an employment relationship; (f) reminding employees upon termination of

their employment of their ongoing confidentiality obligations to Afiniti; (g) where separation

agreements are signed, requiring terminated employees to affirm that, after conclusion of their

employment, they will continue to abide by the post-termination obligations in their employment

agreement, including regarding the non-disclosure of confidential Afiniti information including trade secrets; (h) limiting access to Afiniti's trade secrets by password-protecting its network and granting its employees different levels of access to confidential information, depending on their role with the company; (i) restricting internal dissemination of trade secrets, and conspicuously labeling documents with confidentiality legends; (j) developing and discussing Afiniti Trade Secrets and other intellectual property in closed-door sessions held with select Afiniti personnel; (k) periodically reminding current employees of confidentiality obligations through employee newsletters and other compliance protocols; (l) requiring badged access for entry to physical offices and providing locked file cabinets and confidential shredding bins to secure and dispose of confidential information; (m) requiring employees to execute additional legal documents such as special non-disclosure agreements in the case of certain highly sensitive projects; (n) requiring third parties to execute non-disclosure agreements protecting Afiniti confidential information before disclosure of such confidential information to them; (o) maintaining processes to review company websites and marketing collateral to avoid inadvertent disclosure of confidential information; and (p) establishing other procedures and protocols, as necessary, to protect Afiniti Trade Secrets.   These obligations require that Afiniti Trade Secret information be treated confidentially and be disclosed strictly on a "need-to-know" basis for the purpose of furthering Afiniti's business interests.

89.     Afiniti also protects Afiniti Trade Secrets from disclosure in its business dealings with customers through various means and agreements.  Afiniti processes customer data on its own systems to develop and revise models for each customer, and any know-how or negative know-how used in that process of model development and revision is maintained within Afiniti as Afiniti Trade Secrets and not shared with the customer.  Afiniti generally implements its service on a

dedicated network appliance or virtual computer that Afiniti, not the customer, has access to and control over.  Customer agreements include provisions related to confidentiality, ownership of intellectual property, and the destruction of data to ensure Afiniti Trade Secrets remain secret.

### Chishti's Employment with Afiniti and Access to Afiniti Trade Secrets

90.     In 2005, Chishti founded Afiniti in Washington, D.C., along with personnel at TRG.  Chishti served as Chairman of the Board of Directors and Chief Executive Officer of Afiniti until November 2021.

91.     During his employment at Afiniti, Chishti signed the March 29, 2016 Employment Agreement.

92.     The Employment Agreement is a valid, binding, and enforceable written contract supported by adequate consideration.  Afiniti has duly performed (or was excused from performing) all acts, conditions, covenants, and promises to be performed on its part as required by the Employment Agreement.

93.     Numerous provisions of the Employment Agreement were intended to maintain the secrecy of such Afiniti Trade Secrets and confidential information, including at least provisions related to non-disclosure and return of company property.

94.     During Chishti's employment as Chief Executive Officer of Afiniti, he was given virtually unfettered access to Afiniti Trade Secrets and confidential information.  Chishti, through a computer and/or other computer hardware and software, had access to Afiniti's confidential information, which included Afiniti Trade Secrets.  In particular, Chishti, through company property (including at least a computer and other Afiniti devices and systems), was able to access source code and business and confidential information related to the Afiniti System that included Afiniti Trade Secrets.  Given the timing of events, Plaintiffs infer from the use of Afiniti Trade Secrets by Isbei and Qinhe that after his departure in November 2021, Chishti wrongfully accessed,

caused others to access, and continues to access today (individually and collectively through co-conspirators and agents) copies of Afiniti Trade Secrets that were on Chishti's computer, on other Afiniti devices, hardware, software, or systems, or obtained through additional improper means.

95.     On November 18, 2021, Chishti stepped down from his roles at Afiniti.

96.     In violation of his Employment Agreement, upon resigning Chishti failed to return the computer, and on information and belief other devices and storage media, containing Afiniti's confidential information and Afiniti Trade Secrets.

97.     After his resignation, Afiniti presented Chishti with a Separation Agreement. Under the protection of the Age Discrimination in Employment Act, Chishti was entitled to three weeks to sign.   He never did.   During negotiations over the separation agreement, Chishti acknowledged his ongoing liability for not returning his Afiniti computer.   Through counsel, he repeatedly proposed language to expressly limit his personal liability for failure to return the computer to the value of "tangible property," meaning the computer itself, and not its electronically stored contents, such as intellectual property.   Further, he suggested clauses to affirmatively allow him to solicit Afiniti customers and employees and to maintain and use any Afiniti confidential information "already in his possession."   All such clauses were rejected by Afiniti.   The three-week deadline expired without a signed Separation Agreement.

98.     Nonetheless, according to his Employment Agreement, Chishti continues to be bound by a number of obligations, including but not limited to provisions requiring non-solicitation of employees, non-solicitation of customers, non-disparagement, and non-competition.

99.     Chishti further had obligations under the Employment Agreement to comply with Afiniti's company policies.   These policies governed a variety of topics, including proper handling of confidential information.

100.    Despite these ongoing contractual obligations, almost immediately upon termination of his employment, Chishti began illegally siphoning and soliciting employees and customers from Afiniti, and improperly converted and misappropriated Afiniti Trade Secrets to start competing companies.

101.    In particular, mere months after leaving Afiniti, Chishti and others conspired to, and successfully did, create and mobilize the Defendant competing companies to wrongfully perform call center pairing using Afiniti Trade Secrets without Afiniti's permission or authorization.

*Qinhe*

102.    Chishti, along with co-conspirators and likely other individuals acting at his direction, created a company called Qinhe (Hainan) Intelligent Technology Ltd. in the People's Republic of China on March 21, 2022 ("Qinhe"). Plaintiffs expect that discovery will confirm that Chishti is an angel investor in Qinhe or its related entities. According to Google Translate, the Chinese word "Qinhe" translates to the English word "Affinity" as shown below.



49

103.     Qinhe provides pairing algorithm services to its customers, who are primarily large-scale companies with customer service call centers.  On its website and in job advertisements, Qinhe listed an algorithm called "K2 Engine" as its key product.  Qinhe describes the "K2 Engine" as a precision marketing tool used by salespersons to optimize their conversion rate and enhance the quality of customer interactions.  The "K2 Engine" helps match incoming callers with the most suitable customer service officers, while for outgoing calls, the "K2 Engine" helps match the most suitable salespersons with potential clients.  Qinhe further claims that the "K2 Engine" triages calls by deploying a time-slicing mechanism to result in more precise pairings, a claim which mimics the benchmarking capability of the Afiniti solution.  Given these claims, and the timing of events as described herein, Plaintiffs infer that the "K2 Engine" is based on Afiniti Trade Secrets.  Qinhe appears to have already implemented the "K2 Engine" with former Afiniti clients.

104.     On information and belief, "K2" is a reference to the world's second-highest mountain, located in Pakistan.  The K2 base camp was the site of an internationally publicized Afiniti corporate trip.  Chishti uses one of the photos from that trip as the cover image on his LinkedIn profile.

### *Isbei*

105.     Isbei purports to be an AI company closely linked with Qinhe.  On its corporate website, Isbei claims to be the "sole interaction AI provider in China" with "roots in China and Pakistan."  On its website, Isbei describes its technology as including AI related to call routing and call centers, stating: "we are china's [sic] only company focused on predicting behavior and optimizing interactions between enterprises and their customers."[10]

---

[10]     Ex. 5 (accessed and downloaded February 2, 2023 and available at https://www.isbei.com/about).

106.     Isbei's logo is strikingly similar to Afiniti's.  Both logos use white lower-case text on a black background and color the mark over the each of the "i" letters, as shown below.

 

107.     At least three known entities fall under the corporate umbrella of Isbei.  Each was established in the days and months after Qinhe was established.   These entities include the following:

108.     Isbei Ltd. in the Cayman Islands, established on March 28, 2022;

109.     Isbei Hainan in the People's Republic of China, established on April 11, 2022; and

110.     Isbei Pakistan in Pakistan, established on July 26, 2022.

111.     As further evidence that Isbei is improperly using Afiniti's goodwill, Isbei's website claims Afiniti's history as its own.  For example, the Isbei website (www.isbei.com/about) includes the following diagram, which is nearly identical to diagrams used in marketing collateral used by Afiniti prior to Chishti's departure:



112.    Isbei's admission to using Afiniti technology that was developed before Isbei was even formed confirms that Isbei is improperly utilizing Afiniti Trade Secrets, the extent of which will be revealed through discovery.

### *The Chishti, Qinhe, Isbei, and Pobereskin Enterprise ("Isbei/Qinhe Enterprise")*

113.    Chishti is linked to both Qinhe and Isbei.  Chishti and long-term business partner (and former employee of Afiniti) Niazi incorporated Isbei Pakistan, respectively holding 99% and 1% of Isbei Pakistan's shares.  Chishti's wife Pobereskin is the sole director of Isbei Ltd. and the

100% shareholder of Isbei Hainan.  Chishti and Pobereskin were married in 2020.  Thus, Chishti has close ties to each of the three Isbei entities.

114.    Isbei and Qinhe are also connected.   Isbei's website (www.isbei.com/about) identifies Qinhe as its "exclusive delivery partner" in China, as shown below.



115.    Representatives of Isbei and Qinhe have together attended public ceremonies to celebrate contract signings with new clients.

116.    Qinhe and Isbei Hainan share three separate office spaces in China: in Haikou, Beijing, and Shanghai.  The Haikou office space previously was occupied by Afiniti.

117.    There is also substantial overlap in the persons who formed Qinhe and Isbei.  Qinhe's principals were involved in establishing Isbei Hainan just a few weeks after they established Qinhe.  For example:

118.    Liu Xiaoxin ("Liu") is a legal representative, Executive Director, and ultimate 25% shareholder in Qinhe.  Liu was also Isbei Hainan's founding legal representative.  Liu was formerly a finance director at Afiniti Shenzhen, an Afiniti entity;

119.    Zhao Jian ("Zhao") is CEO, General Manager, and 75% shareholder in Qinhe.  Zhao was also general manager of Isbei Hainan.  Zhao was formerly VP of commercial strategy at Afiniti (Hainan) Technologies Co. Ltd.; and

120.    Yan Min ("Yan") was a supervisor at Qinhe and has been identified as a deputy chairperson and president of Qinhe.  Yan was also a supervisor at Isbei Hainan.  Yan was formerly the deputy president at Afiniti Shenzhen.

121.     Isbei is also linked to other companies controlled by affiliates of Chishti and former employees of Afiniti.  For example, Isbei Pakistan and Tech Avenue Private Ltd. ("Tech Avenue") share an office space in Pakistan.  As shown in the below photograph, the office's entrance is flanked by two large signs—one of Isbei and the other of Tech Avenue.

 

122.     Tech Avenue is held by three individuals, Owais Ehsan ("Ehsan"), who owns 33.4%, Obaid Ul Haq ("Ul Haq"), who owns 33.3%, and Lalarukh Saud ("Saud"), who owns 33.3%.  Ehsan, Ul Haq, and Saud are siblings.  Saud is also the legal representative for Isbei Hainan.  Ul Haq worked at TRG with Chishti, and then joined Afiniti, serving as a vice president at Afiniti from 2007–2018.

123.     Chishti, Pobereskin, Isbei, Qinhe, Liu, Zhao, Yan, Saud, and Niazi formed this enterprise, also a RICO enterprise (the "Isbei/Qinhe Enterprise"), for the common purpose of selling contact center AI services that rely upon Afiniti Trade Secrets that were unlawfully misappropriated and converted from Afiniti.  Chishti, Pobereskin, Isbei, Qinhe, Liu, Zhao, Yan, Saud, and Niazi acted in furtherance of the Isbei/Qinhe Enterprise.  They attempted to, conspired to, and individually and collectively performed various acts to defraud Afiniti through the embezzlement of Afiniti Trade Secrets, convert Afiniti Trade Secrets, and engage in economic espionage through the conversion and unlawful transfer, duplication, retention, and/or transmission of Afiniti Trade Secrets for the benefit of a foreign instrumentality or agent.

124.    Chishti converted Afiniti Trade Secrets following the conclusion of his employment with Afiniti in violation of his Employment Agreement.  Plaintiffs can deduce he subsequently unlawfully transmitted, transferred, and communicated Afiniti Trade Secrets to other members of the Isbei/Qinhe Enterprise, and then directed and facilitated funding for the operations of the Isbei/Qinhe Enterprise, in coordination with the other Isbei/Qinhe Enterprise members, resulting in the creation of the Isbei and Qinhe entities in the Cayman Islands, China, and Pakistan. The Isbei and Qinhe entities were created and operated with the assistance of Pobereskin, Isbei, Qinhe, Liu, Zhao, Yan, Saud, and Niazi and formed for the purpose of supporting and participating in the Isbei/Qinhe Enterprise.  The Isbei and Qinhe entities, Liu, Zhao, Yan, Saud, and Niazi then fulfill the purpose of the Isbei/Qinhe Enterprise, which includes the unlawful use of converted Afiniti Trade Secrets to sell and deliver contact center AI services.

125.    The Isbei/Qinhe Enterprise relies on the experience of former Afiniti employees and close Chishti associates to exploit the converted Afiniti Trade Secrets in at least China and Pakistan.  Liu, Zhao, and Yan, who hold senior roles at Qinhe, were involved in the formation of both Isbei Hainan and Qinhe.  Niazi, a longtime associate of Chishti's, established Isbei Pakistan with Chishti, serving as its other director and CEO.   Saud is both Isbei Hainan's legal representative and a shareholder in Tech Avenue, which shares a physical address with Isbei Pakistan.  Liu, Zhao, and Yan also were employed by Afiniti and are familiar with Afiniti's business and technologies.  Liu, Zhao, and Yan use their familiarity with Afiniti Trade Secrets and their possession of Afiniti Trade Secrets to market Afiniti's technological resources and tools as Isbei and Qinhe's own.

### *Former Afiniti Employees Become Employees or Associates of Isbei and Qinhe*

126.    After Chishti's employment with Afiniti ended, Afiniti took steps to stabilize its global business, including by suspending its business operations in China in early 2022.  Afiniti

did not, however, fully close those business operations—for example, it never dissolved any legal entities in China—and certainly never authorized the wanton theft and exploitation of Afiniti Trade Secrets thereafter.

127.    Many former Afiniti employees who had worked for Afiniti in China joined Qinhe or Isbei almost immediately after their Afiniti employment ended in early to mid-2022.   Other former Afiniti employees have likewise made their way to Tech Avenue.   Together, these employees include:

128.    Liu—a finance director at Afiniti Shenzhen in the Beijing Branch between April 19, 2021 and March 21, 2022.  Liu incorporated two companies in Hainan—Qinhe and Shibei (Hainan) Consulting Co. Ltd.—in late March 2022, a week before her employment contract with Afiniti Shenzhen was formally terminated.  As noted above, Liu is a legal representative for Qinhe, and was briefly a legal representative and executive director of Isbei Hainan.

129.    Zhao—vice president of commercial strategy at Afiniti (Hainan) Technologies Co. Ltd. ("Afiniti Hainan") between April 1, 2021 and March 31, 2022.  Zhao is now CEO of Qinhe and was briefly general manager of Isbei Hainan.

130.    Yan—vice president of client services at Afiniti Hainan between June 5, 2021 and March 31, 2022.  Yan is Qinhe's deputy chairperson and president and was briefly supervisor for Isbei Hainan.

131.    Luan Yi ("Luan")—a director of business strategy at Afiniti between May 2021 and March 2022.  Given reviews of Qinhe and Luan's social media profiles, since leaving Afiniti in March 2022, Luan has served a similar role at Qinhe.

132.    Liu Hongjuan ("Hongjuan")—a data analytics VP at Afiniti Shenzhen between April 2021 and June 2022.  Hongjuan joined Qinhe since leaving Afiniti.

133.    Sissi Zhao Xiyun ("Xiyun")—a sales enablement specialist at Afiniti Hainan between September 2021 and March 2022.  Xiyun has joined Qinhe.

134.    Zoe Lu Chunyu ("Lu")—an administrative officer at Afiniti Hainan between December 2021 and March 2022.  Lu now has a position at Qinhe.

135.    Li Ping ("Ping")—an administrative officer at Afiniti Beijing from June 2021 until May 2022.  Ping is now in charge of the two recruitment websites, and is listed as a human resources manager of Qinhe.

136.    Zuo Cheng ("Zuo")—a system integration director at Afiniti Beijing between March 2020 and March 2022.  Zuo now works at Qinhe.

137.    Bao Lichen ("Bao")—an advanced analytics director at Afiniti Beijing between March 2021 and March 2022.  Bao now works at Qinhe.

138.    Bo Xie ("Xie")—a legal director at Afiniti Beijing between June 2021 and May 2022.  On information and belief, Xie now works at or otherwise provides services to Qinhe.  Xie was privy to Afiniti's attorney-client privileged information.   While employed at Afiniti, Xie participated in legal department meetings, attended meetings with outside patent prosecution counsel in China, and had access to the legal department file system, including at least contracts, leases, invention disclosures, pending patent application files in China and other countries, and other corporate information.

139.    Niazi—an Afiniti employee and Senior Vice President of Engineering Oversight from October 2, 2018 to March 15, 2022.  As noted above, Niazi is the CEO, Director, and 1% shareholder of Isbei Pakistan.  On information and belief, Niazi is a longtime business partner of Chishti.  Niazi appears to have known Chishti since at least the late-1990s.  Niazi has worked at

57

three other companies founded by Chishti: Align, AlgoTrek Technology, and OrthoClear. ("OrthoClear").

140.   Ul Haq—vice president of Afiniti from 2007–2018.  As noted above, Ul Haq is now the CEO of Tech Avenue.

141.   Abu Turab Suri—an Afiniti employee and Data Sciene Architect from October 1, 2018 to February 1, 2022.  While an Afiniti employee, Suri was assigned to and worked in the Afiniti office in Washington, D.C., and maintained a residence in Alexandria, VA.

142.   Yasir Zamir—an Afiniti employee and VP, Data Analytics, from August 3, 2015 to February 15, 2022.  While an Afiniti employee Zamir was assigned to the Afiniti office in Washington, D.C., and maintained a residence in Garland, TX.

143.   Muhammad Hussain Anwaar—an Afiniti employee and Data Scientist II from August 3, 2020 to March 31, 2022.  While an Afiniti employee Anwaar was assigned to the Afiniti office in Washington, D.C., and maintained a residence in College Station, TX.

144.   The above are known examples of Afiniti employees that Chishti and the Defendants pursued with the objective of wrongfully converting and exploiting Afiniti Trade Secrets.  Plaintiffs expect that discovery will reveal additional employees that Defendants attempted to solicit, or successfully recruited, to the Defendant entities or their affiliates.

145.   Consistent with Afiniti's standard business practices, Afiniti employees in China executed employment agreements and separation agreements with restrictive covenants similar to the Employment Agreement signed by Chishti and detailed in this Complaint.  Accordingly, each has contractual obligations to Afiniti (even after their employment terminated) including at least a duty of non-disclosure and a limited non-compete.

146.    Chishti, Pobereskin, Isbei, and Qinhe improperly accessed Afiniti Trade Secrets at least through the efforts of Chishti, Pobereskin, and likely others.  Plaintiffs expect that discovery will reveal that Afiniti employees (beyond Chishti), either during their employment at Afiniti or thereafter, conspired to and actually provided Afiniti Trade Secrets to Defendants Chishti, Pobereskin, Isbei, and Qinhe (and unknown other persons), who each knowingly misused them to Afiniti's detriment.

147.    Some former employees of Afiniti, including Zhao Jian, Hong Liu, Jovi Ma, and Joe Zhao, attempted to repudiate their respective legal and enforceable separation agreements. Some of these former employees of Afiniti had already joined Qinhe by that point, or joined Qinhe shortly thereafter.

### *Defendants Use Afiniti Trade Secrets to Further Isbei and Qinhe*

148.    Despite being formed only in March 2022, Qinhe and Isbei quickly obtained as clients a long list of companies, many of which are former Afiniti clients.  Qinhe and Isbei appear to have deployed a fully functional AI product that mirrors the functionality of the Afiniti technology.  Such rapid development and deployment could not have been possible without the benefit of Afiniti Trade Secrets, including a complete or near complete code base for the Afiniti System.  For example, it took Afiniti over five years to develop certain versions of the source code that is and/or relates to Afiniti Trade Secrets, requiring the efforts of scores of individuals.  Qinhe and Isbei could not have brought to market their competing AI solution, targeting Afiniti's clients in China, in such a short window of time absent heavy reliance on and misuse of Afiniti Trade Secrets.

149.    As set forth above, Chishti and the Defendants retained and accessed Afiniti Trade Secrets, including through an improperly retained device containing Afiniti source code and likely through other devices, sources, and persons.  Regardless of how the Defendants obtained Afiniti

Trade Secrets, they each knew or should have known that they were acquired by improper means. For example, Chishti obtained Afiniti Trade Secrets by unauthorized access to a computer, and on information and belief, other devices, storage media, and/or systems containing source code and confidential documents after his employment with Afiniti ended. Chishti retained this computer, and on information and belief, other devices, storage media, and/or systems, upon termination of his employment, in breach of his Employment Agreement. Chishti improperly used at least the below Afiniti Trade Secrets, among many others, to develop products and services currently marketed and distributed by Qinhe and Isbei:

- Source code for Afiniti's V5 platform;

- Data pipeline tools including SME and ACA scripts, and the CRUX utility and scripts;

- Modeling tools including Afiniti Explorer and Cerise;

- Runtime software including V5 runtime components, Switch Interface, Engine, and Evaluator;

- Data filtering algorithms, formulas, methods, know-how, and negative know-how including those described above for data filtering, effective and efficient feature selection, manipulation of client-side customer relationship management data, optimizations, and slowly changing dimensions;

- Methods, techniques, etc. for identifying and filtering critical and preferred data features according to the contact center environment where the Afiniti service will be deployed, and for measuring the quality of data availability for the contact center environment;

- All Afiniti Trade Secrets described above in paragraph 79 related to modeling;

- All Afiniti Trade Secrets described above in paragraph 79 related to runtime and pairing;

- Parameter values, formulas, methods, and techniques for selecting among benchmarking strategies per queue, per industry, per contact, per agent, based on time factors and/or based on contact center state information;

- Trade Secrets, know-how, and negative know-how regarding capabilities, integration, and interoperability with various manufacturers' contact center equipment; and

- Client-specific information including business contacts in Outlook and macOS address books such as identification of prospective, current, and former clients, and contact information of clients' employees, optimization metric selection, and historical performance and reporting, including information related to Sunshine Insurance Group, China Pacific Insurance, and China Mobile.

Plaintiffs expect that discovery will reveal additional misuse of Afiniti Trade Secrets by Chishti, the other Defendants, and other individuals or entities.

150.   Chishti and the other Defendants also knowingly and without authorization disclosed, used, or otherwise transmitted Afiniti Trade Secrets and confidential information to agents of Qinhe and Isbei.  Defendants have converted and misappropriated, and continue to misappropriate, Afiniti Trade Secrets, including to reduce the research and development expenses and time to develop and implement call distribution platforms such as the service Qinhe markets as the "K2 Engine."  Chishti's affiliations with Qinhe and Isbei, the fact that Qinhe and Isbei provide the same services as Afiniti, and the fact that Qinhe and Isbei apparently already have fully

operational products despite being established only months ago, show that Chishti and likely others must have transmitted Afiniti Trade Secrets to Qinhe and Isbei.

151.    Chishti disclosed and used Afiniti Trade Secrets without express or implied consent of Afiniti.  Plaintiffs infer that a number of other individuals also disclosed and used Afiniti Trade Secrets without express or implied consent of Afiniti.  At least Chishti knew that he did not have express or implied consent to disclose and use Afiniti Trade Secrets because he was bound by his Employment Agreement not to disclose or use those trade secrets.  Others likely involved in the unauthorized appropriation and use of Afiniti Trade Secrets were bound by similar contractual restrictions.

152.    Plaintiffs expect that discovery will confirm that Chishti and the Defendants likewise attempted and conspired to commit the foregoing and following offenses and conspired with one or more other persons to commit these offenses to effect the objects of the conspiracy as described in this Complaint.

153.    Chishti and the Defendants did so with intent to convert Afiniti Trade Secrets related to a product and service used in and intended for use in interstate and foreign commerce, to the economic benefit of someone other than the Plaintiffs, and intending or knowing that the offenses will injure the Plaintiffs.  For example, Chishti and the Defendants at all relevant times have been aware that the Defendant competing companies' wrongful conversion and use of Afiniti Trade Secrets would undermine Afiniti Trade Secrets and divert customers, employees, and business opportunities from Afiniti, thereby injuring Afiniti.

### *Isbei and Qinhe Solicit and Obtain Afiniti Customers with the Benefit of Afiniti Trade Secrets*

154.    Isbei and Qinhe transitioned the accounts of former Afiniti customers to Isbei and Qinhe.  Qinhe transitioned former Afiniti customers in banking, insurance, and telecommunication as new customers.  Based on publicly available information, Qinhe customers include Sunshine

Insurance Group ("SIG"), China Pacific Insurance ("CPIC"), and China Mobile.  Isbei also purports to count SIG, CPIC, and China Mobile as its customers.[11]  SIG, CPIC, and China Mobile are former customers of Afiniti.  Plaintiffs understand that China Mobile is an instrumentality of the People's Republic of China.[12]

> China Mobile Communications Corporation is a state-owned enterprise subject to the supervision of the State-Owned Assets Supervision and Administration Commission ("SASAC") of the State Council of the People's Republic of China.  SASAC is a government entity located at #26, Xuan Wu Men Xi Street, Xuan Wu District, Beijing, China 100053.  The Chinese government holds a direct 100 percent ownership interest in China Mobile Communications Corporation.

### *Chishti's Litigation History Regarding Infringement and Misappropriation of Intellectual Property*

155.    Chishti has previously been accused, by another company he founded, of leaving that company and using trade secrets to start a competing company.

156.    Specifically, Chishti founded Align in 1997.  Align is the maker of Invisalign, the invisible aligner and braces alternative.

157.    Chishti left Align in 2004 and started a competing company called OrthoClear.

158.    OrthoClear and Chishti faced a number of lawsuits from Align alleging patent infringement and trade secret misappropriation (among other claims).

159.    As noted, Niazi worked with Chishti at both Align and OrthoClear.

160.    The acts Chishti is accused of in the present Complaint are strikingly similar to what was alleged in the OrthoClear litigation.[13]

---

[11] Ex. 5 (accessed and downloaded February 2, 2023 and available at https://www.isbei.cn/about).
[12]   Ex.   6   (accessed   and   downloaded   February   1,   2023   and   available   at https://licensing.fcc.gov/myibfs/download.do?attachment_key=914438).
[13] In 1997, Chishti and others founded Align, the makers of Invisalign.  Chishti was eventually removed as CEO and Chairman of Align.  Soon after leaving Align, Chishti founded OrthoClear, a company based in Pakistan that competed against Align by also making clear dental braces (aligners).  Chishti and OrthoClear recruited hundreds of Align employees and converted hundreds of Align's customers (dentists) to prescribe OrthoClear instead of Align products.  Align sued

*Harm*

161.    As the direct and proximate result of Defendants' acts as described herein, Afiniti has suffered losses, damages, and irreparable harm, including to the value of Afiniti Trade Secrets and its business.  If Defendants' conduct is not stopped, Afiniti will continue to suffer irreparable injury and significant damages.

162.    In addition, as a direct and proximate result of Defendants' acts, Defendants have received ill-gotten gains and have been unjustly enriched.

163.    Because Afiniti's remedy at law is inadequate, Afiniti seeks, in addition to damages, injunctive relief and specific performance requiring Chishti's compliance with the Employment Agreement, to recover and protect Afiniti Trade Secrets and other confidential and proprietary information, the fruits of Afiniti Trade Secrets, confidential and proprietary information, and Afiniti's other legitimate business interests.  Afiniti's business relies on its reputation, its right to decide whether and how to distribute its proprietary technology, its ability to maintain and grow its client base in a competitive market, and its ability to attract and retain qualified personnel.  Afiniti will continue suffering irreparable harm absent injunctive relief.

### <u>FIRST CAUSE OF ACTION</u>
*Breach of Contract – Employment Agreement (Against Chishti)*

164.    Afiniti realleges and incorporates by reference the allegations of every paragraph of this Complaint.

165.    As set forth fully above, Chishti executed an Employment Agreement with Afiniti.

---

Chishti, OrthoClear, and others in a series of lawsuits starting in 2005, alleging misappropriation of trade secrets and patent infringement, among other claims.  On the eve of a hearing by the International Trade Commission ("ITC"), OrthoClear consented to the entry of an order by the ITC prohibiting the importation of OrthoClear aligners into the United States.  As part of the resolution of the dispute, OrthoClear agreed to globally cease all operations and Align acquired all OrthoClear intellectual property assets as well as any relevant intellectual property rights claimed by Chishti.

166.    The Employment Agreement is a valid, binding, and enforceable written contract supported by adequate consideration.

167.    Afiniti has duly performed (or was excused from performing) all acts, conditions, covenants, and promises to be performed on its part as required by the Employment Agreement. For example, Afiniti paid Chishti in exchange for Chishti's services.

168.    Chishti had and continues to have obligations and duties under that Employment Agreement and Chishti materially and intentionally breached and continues to breach those obligations and duties as described herein.

169.    Chishti intentionally breached and continues to breach his obligation of non-disclosure under the Employment Agreement by, among other things, intentionally disclosing Afiniti's confidential information to persons and entities outside of Afiniti as described above.

170.    Chishti intentionally breached and continues to breach his obligation to return company property under the Employment Agreement.  This company property is inclusive of and/or located on the computer(s) or other devices Chishti used while employed at Afiniti, which Chishti intentionally did not return.

171.    Chishti intentionally breached and continues to breach his obligation of non-solicitation of employees under the Employment Agreement.  Chishti intentionally solicited Afiniti employees as described above.   Plaintiffs expect discovery to reveal that Chishti solicited additional employees.  Many of these employees now work at competing companies affiliated with Chishti, including Isbei and Qinhe.

172.    Further, Chishti intentionally breached and continues to breach his obligation of non-solicitation of customers under the Employment Agreement.   The non-solicitation of customers provision of the Employment Agreement applies to past, present, and prospective

customers of Afiniti.  As described above, Chishti has intentionally solicited and continues to solicit Afiniti's customers to become customers of his affiliate companies, Isbei and Qinhe.

173.    Chishti intentionally breached and continues to breach his agreed non-compete under the Employment Agreement by his involvement with Qinhe and Isbei as described above.

174.    Finally, Chishti intentionally breached and continues to breach the non-disparagement provision of the Employment Agreement.  In order to solicit both employees and customers, Plaintiffs are informed and believe that Chishti must have made statements to such employees and customers that disparaged or criticized Afiniti.

175.    These breaches are intentional at least because Chishti performed them in order to further his own business interests and the business interests of the Defendant entities he is affiliated with.

176.    As a direct and proximate result of each of Chishti's breaches of the Employment Agreement with Afiniti, Afiniti has suffered and will continue to suffer irreparable harm, as well as general and special damages in an amount to be determined by the Court.  This harm includes damages suffered from Chishti's disclosure and wrongful use of Afiniti's confidential information and/or Afiniti Trade Secrets, as detailed in paragraph 149, as well as Chishti's affiliation with direct competitors.  It also includes damage to Afiniti's business and goodwill and loss of revenue that Afiniti would have received but for Chishti's breach of the Employment Agreement.  Afiniti seeks compensation for all damages and losses proximately caused by these breaches.

177.    Because Afiniti's remedy at law is inadequate, Afiniti seeks, in addition to damages, injunctive relief and specific performance requiring Chishti's compliance with the Employment Agreement.

## SECOND CAUSE OF ACTION
### *Defend Trade Secrets Act of 18 U.S.C. § 1836 ("DTSA") (Against All Defendants)*

178.    Afiniti realleges and incorporates by reference the allegations of every paragraph of this Complaint.

179.    As set forth fully above, each of the Defendants intentionally and willfully misappropriated Afiniti Trade Secrets.  Each Defendant has wrongfully acquired, disclosed, and misused Afiniti Trade Secrets, including in order to create and distribute a product Qinhe calls the "K2 Engine."

180.    In so doing, Defendants violated and continue to violate the DTSA.

181.    Defendants misappropriated Afiniti Trade Secrets related to a product or service used in, or intended for use in, interstate or foreign commerce.  For example, Afiniti Trade Secrets, described in paragraphs 79–81, relate to products and services used, sold, shipped, and/or ordered in interstate or foreign commerce.  Customers include China Mobile in both the Henan and Hainan provinces of the People's Republic of China.

182.    As alleged above, each of Afiniti, Ltd. and Afiniti, Inc. is an owner of Afiniti Trade Secrets, including as defined in 18 U.S.C. § 1839(4), because each holds legal title and/or a license to Afiniti Trade Secrets.  Each of Afiniti, Ltd. and Afiniti, Inc. also holds equitable title to or right to enforce Afiniti Trade Secrets.   Each of Afiniti, Ltd. and Afiniti, Inc. holds and held these at all relevant times.

183.    Afiniti has taken reasonable measures to keep Afiniti Trade Secrets secret, as described more fully above.  This includes, at least, execution of employment agreements and non-disclosure agreements with employees in order to protect the secrecy of Afiniti Trade Secrets.

184.    Afiniti Trade Secrets derive independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by,

another person who can obtain economic value from the disclosure or use of the information.  For example, Afiniti Trade Secrets would not derive independent economic value if they were known to other persons who could divert customers using such trade secrets.

185.    Chishti misappropriated the trade secrets because he knew or had reason to know he acquired Afiniti Trade Secrets by improper means.  Chishti perpetrated theft of Afiniti Trade Secrets and breached his duty to maintain secrecy of those trade secrets.  For example, Chishti obtained Afiniti Trade Secrets, including Afiniti Trade Secrets detailed in paragraph 149, by unauthorized use of a computer that is Afiniti company property, in addition to other electronic devices.  Chishti improperly retained copies of Afiniti Trade Secrets on the computer and other devices following termination of his employment in breach of his Employment Agreement, which required the return of the computer and which contained confidentiality clauses.  Chishti wrongfully accessed, caused others to access, and continues to access today (individually and collectively through co-conspirators and agents) copies of Afiniti Trade Secrets that were on Chishti's computer, on other devices, or obtained through additional improper means.  Chishti also breached his duty to maintain secrecy by so accessing Afiniti Trade Secrets and by disclosing Afiniti Trade Secrets to at least Pobereskin and representatives and employees of Isbei and Qinhe. Chishti knew that the means he used to obtain the Afiniti Trade Secrets were improper at least because they were in violation of his Employment Agreement and required his unauthorized access of Afiniti's systems and confidential information.

186.    Defendants and their agents acquired Afiniti Trade Secrets knowing, or having reason to know, that Afiniti Trade Secrets were acquired by improper means.  For example, Defendants received Afiniti Trade Secrets from former Afiniti employees (and additional individuals to be revealed in discovery), including Chishti.  Defendants would have known, or had

reason to know, that these individuals used improper means to acquire Afiniti Trade Secrets, and that these individuals owed a duty to Afiniti to maintain the secrecy of and limit the improper use of Afiniti Trade Secrets, at least because of Defendants' connections to Afiniti, which would have given them knowledge of Afiniti's standard practices and agreements regarding confidentiality. Defendants and their agents acquired Afiniti Trade Secrets by inducing those employees (and additional individuals to be revealed in discovery) to acquire Afiniti Trade Secrets by improper means and/or to breach their duty to maintain secrecy of those trade secrets. Even if Defendants did not induce those individuals to commit these acts, Defendants acquired Afiniti Trade Secrets from such individuals knowing, or with reason to know, that these individuals acquired them through improper means. For example, as described above, Defendants and their agents knew they were using and copying Afiniti Trade Secrets when offering the same service to prior customers of Afiniti only a few months after Chishti and former employees departed Afiniti. Further, Defendants and their agents knew or had reason to know the Afiniti Trade Secrets were acquired by improper means given that Defendants knew that Chishti and other former Afiniti employees had post-employment duties to Afiniti including a duty to maintain secrecy.

187. Defendants' misappropriation was not through lawful or contractually permissible reverse engineering, independent derivation, or any other lawful means of acquisition. As stated fully above, it would have taken substantially longer for Defendants to create a fully operational product offering the same service as that of Afiniti than the few short months they purportedly took to develop the "K2 Engine." This could only have been accomplished by Defendants' acquisition of Afiniti Trade Secrets through improper means and subsequent use of Afiniti Trade Secrets in their development.

188.   Chishti also misappropriated Afiniti Trade Secrets by disclosing or using Afiniti Trade Secrets without Afiniti's express or implied consent and acquired knowledge of Afiniti Trade Secrets through improper means.  For example, Chishti disclosed the Afiniti Trade secrets at least to Pobereskin, Isbei, and Qinhe in order to create and distribute Qinhe's product, the "K2 Engine."  Chishti knew that he did not have express or implied consent to disclose the trade secrets because he was bound by his Employment Agreement not to.  Chishti used improper means to acquire knowledge of Afiniti Trade Secrets as described above.

189.   Plaintiffs are informed and believe that Pobereskin similarly misappropriated Afiniti Trade Secrets by disclosing or using Afiniti Trade Secrets without Afiniti's express or implied consent and acquired knowledge of Afiniti Trade Secrets through improper means.  For example, Pobereskin disclosed Afiniti Trade Secrets to at least one of Isbei or Qinhe in order to create and distribute Qinhe's product, the "K2 Engine."  Pobereskin knew that she did not have express or implied consent because she acquired Afiniti Trade Secrets from former Afiniti employees (and others to be revealed during discovery), who she knew or should have known had a duty not to disclose those trade secrets.  Pobereskin used improper means to acquire knowledge of Afiniti Trade Secrets as described above.

190.   All Defendants misappropriated Afiniti Trade Secrets because each disclosed or used Afiniti Trade Secrets without Afiniti's express or implied consent and acquired knowledge of Afiniti Trade Secrets through improper means.  For example, Plaintiffs are informed and believe that Defendants and their agents use Afiniti Trade Secrets at least by providing a software service with the same or derivative source code as that described in paragraph 149 and by utilizing Afiniti's client-specific business and technical information to provide an identical service to Afiniti's former clients.  Development of such a service using Afiniti Trade Secrets would also include

Defendants disclosing Afiniti Trade Secrets to at least one another.  As described above, without Afiniti Trade Secrets, it would not have been possible for Defendants to create a usable version of their product in the time that they did.  Defendants and their agents knew that they did not have express or implied consent to use Afiniti Trade Secrets because they acquired Afiniti Trade Secrets from former Afiniti employees (or other individuals acting at Defendants' behest), who they knew or should have known had a duty not to disclose those trade secrets.  Defendants also used improper means to acquire knowledge of Afiniti Trade Secrets as described above.

191.    All Defendants and their agents also misappropriated Afiniti Trade Secrets because, as described above, they disclosed or used Afiniti Trade Secrets without Afiniti's express or implied consent.  And at the time of disclosure or use, Defendants and their agents knew or had reason to know that the knowledge of the trade secret was derived from or through a person who had used improper means to acquire the trade secret.  For example, as described above, Defendants were aware that the Afiniti Trade secrets they disclosed and used were derived from former Afiniti employees (or other individuals acting at Defendants' behest), who used improper means to acquire the trade secrets.  In particular, Defendants knew or had reason to know that Defendants' knowledge of Afiniti Trade Secrets that they disclosed and used was derived from or through Afiniti employees having exceeded their authorized access of Afiniti company property.  In addition, Defendants other than Chishti derived Afiniti Trade Secrets through Chishti who owed a duty to Afiniti to maintain the secrecy of and limit use of Afiniti Trade Secrets.

192.    All Defendants also misappropriated Afiniti Trade Secrets because, as described above, they disclosed or used Afiniti Trade Secrets without Afiniti's express or implied consent.  At the time of disclosure or use, Defendants and their agents knew or had reason to know that the knowledge of the trade secrets was acquired under circumstances giving rise to a duty to maintain

the secrecy of the trade secrets or limit the use of the trade secrets.  For example, as described above, Defendants and their agents were aware that Afiniti Trade Secrets they disclosed and used were acquired from former Afiniti employees (or other individuals acting at Defendants' behest), who acquired these trade secrets when they were bound, by their employment agreements, to maintain the secrecy and/or limit the use of Afiniti Trade Secrets.

193.    All Defendants also misappropriated Afiniti Trade Secrets because, as described above, they disclosed or used Afiniti Trade Secrets without express or implied consent.  And at the time of disclosure or use, Defendants or their agents knew or had reason to know that the knowledge of the trade secret was derived from or through a person who owed a duty to the person seeking relief to maintain the secrecy of the trade secret or limit the use of the trade secret.  For example, as described above, Defendants and their agents were aware that Afiniti Trade Secrets they disclosed and used were derived from former Afiniti employees (or other individuals acting at Defendants' behest), who acquired these trade secrets when, under their employment agreements, they had a duty to Afiniti to maintain the secrecy and/or limit the use of Afiniti Trade Secrets.

194.    Plaintiffs believe that other persons or entities, including agents of Defendants, to be revealed through discovery, improperly acquired, disclosed, or misused Afiniti Trade Secrets.

195.    As the direct and proximate result of Defendants' misappropriation, Afiniti has suffered damage and harm.  This harm includes damages suffered from Defendants' disclosure and wrongful use of Afiniti Trade Secrets.  It includes damage to Afiniti's business and goodwill and loss of revenue that Afiniti would have received but for the misappropriation of Afiniti trade Secrets.  If Defendants' conduct is not stopped, Afiniti will continue to suffer irreparable injury and significant damages, in an amount to be proven at trial.

196. In addition, as a direct and proximate result of Defendants' misappropriation, Defendants have been unjustly enriched in an amount as yet unknown.

197. Because Afiniti's remedy at law is inadequate, Afiniti seeks, in addition to damages, injunctive relief to recover and protect its confidential, proprietary, and trade secret information, the fruits of Afiniti's confidential, proprietary, and trade secret information, and Afiniti's other legitimate business interests. Afiniti's business relies on its reputation, its right to decide whether and how to distribute its proprietary technology, its ability to maintain and grow its client base in a competitive market, and its ability to attract and retain qualified personnel. Afiniti will continue suffering irreparable harm absent injunctive relief.

198. Moreover, Afiniti Trade Secrets were willfully and maliciously misappropriated by each Defendant. For example, Defendants conspired to intentionally misappropriate Afiniti Trade Secrets through unauthorized access of Afiniti company property and systems and with the intent to continue building a competing company and product.

**THIRD CAUSE OF ACTION**
*District of Columbia Uniform Trade Secrets Act, D.C. Code § 36-401, et seq. ("DCUTSA")*
*(Against All Defendants)*

199. Afiniti realleges and incorporates by reference the allegations of every paragraph of this Complaint.

200. As set forth fully above, each of the Defendants intentionally and willfully misappropriated Afiniti Trade Secrets. Each Defendant has wrongfully acquired, disclosed, and misused Afiniti's misappropriated Afiniti Trade Secrets, including in order to create and distribute a product Qinhe calls the "K2 Engine."

201. In so doing, Defendants violated and continue to violate the DCUTSA.

202. Afiniti Trade Secrets are trade secrets because they derive actual or potential independent economic value from not being generally known to, and not being readily

ascertainable by proper means by, another person who can obtain economic value from their disclosure or use.  For example, Afiniti Trade Secrets would not derive independent economic value if they were known to other persons who could divert customers using such trade secrets.

203.    Afiniti has taken reasonable efforts to maintain the secrecy of Afiniti Trade Secrets, as described more fully above and including execution of employment agreements and non-disclosure agreements with employees in order to protect the secrecy of Afiniti Trade Secrets.

204.    As alleged above, each of Afiniti, Ltd. and Afiniti, Inc. holds legal title and/or a license to Afiniti Trade Secrets.  Each of Afiniti, Ltd. and Afiniti, Inc. also holds equitable title to or a right to enforce Afiniti Trade Secrets, and was in lawful possession of Afiniti Trade Secrets at all times relevant to the wrongful acts described herein.

205.    Chishti misappropriated the trade secrets because he knew or had reason to know he acquired Afiniti Trade Secrets by improper means.  Chishti perpetrated theft of Afiniti Trade Secrets and breached his duty to maintain secrecy of those trade secrets. For example, Chishti obtained Afiniti Trade Secrets, including Afiniti Trade Secrets detailed in paragraph 149, by unauthorized use of a computer that is Afiniti company property, in addition to other electronic devices.  Chishti improperly retained copies of Afiniti Trade Secrets on the computer and other devices following termination of his employment in breach of his Employment Agreement, which required the return of the computer and which contained confidentiality clauses.   Chishti wrongfully accessed, caused others to access, and continues to access today (individually and collectively through co-conspirators and agents) copies of Afiniti Trade Secrets that were on Chishti's computer, on other devices, or obtained through additional improper means.  Chishti also breached his duty to maintain secrecy by so accessing Afiniti Trade Secrets and by disclosing Afiniti Trade Secrets to at least Pobereskin and representatives and employees of Isbei and Qinhe.

Chishti knew that the means he used to obtain the Afiniti Trade Secrets were improper at least because they were in violation of his Employment Agreement and required his unauthorized access of Afiniti's systems and confidential information.

206.   Defendants and their agents acquired Afiniti Trade Secrets knowing, or having reason to know, that Afiniti Trade Secrets were acquired by improper means.  For example, Defendants received Afiniti Trade Secrets from former Afiniti employees (and additional individuals to be revealed in discovery), including Chishti.  Defendants would have known, or had reason to know, that these individuals used improper means to acquire Afiniti Trade Secrets, and that these individuals owed a duty to Afiniti to maintain the secrecy of and limit the improper use of Afiniti Trade Secrets, at least because of Defendants' connections to Afiniti, which would have given them knowledge of Afiniti's standard practices and agreements regarding confidentiality. Defendants and their agents acquired Afiniti Trade Secrets by inducing those employees (and additional individuals to be revealed in discovery) to acquire Afiniti Trade Secrets by improper means and/or to breach their duty to maintain secrecy of those trade secrets.  Even if Defendants did not induce those individuals to commit these acts, Defendants acquired Afiniti Trade Secrets from such individuals knowing, or with reason to know, that these individuals acquired them through improper means.  For example, as described above, Defendants and their agents knew they were using and copying Afiniti Trade Secrets when offering the same service to prior customers of Afiniti only a few months after Chishti and former employees departed Afiniti.  Further, Defendants and their agents knew or had reason to know the Afiniti Trade Secrets were acquired by improper means given that Defendants knew that Chishti and other former Afiniti employees had post-employment duties to Afiniti, including a duty to maintain secrecy.

207.    Defendants' misappropriation was not through lawful or contractually permissible reverse engineering, independent derivation, or any other lawful means of acquisition.  As stated fully above, it would have taken substantially longer for Defendants to create a fully operational product offering the same service as that of Afiniti than the few short months they purportedly took to develop the "K2 Engine."  This could only have been accomplished by Defendants' acquisition of Afiniti Trade Secrets through improper means and subsequent use of Afiniti Trade Secrets in their development.

208.    Chishti also misappropriated Afiniti Trade Secrets by disclosing or using Afiniti Trade Secrets without Afiniti's express or implied consent and acquired knowledge of Afiniti Trade Secrets through improper means.  For example, Chishti disclosed the Afiniti Trade secrets at least to Pobereskin, Isbei, and Qinhe in order to create and distribute Qinhe's product, the "K2 Engine."  Chishti knew that he did not have express or implied consent to disclose the trade secrets because he was bound by his Employment Agreement not to.  Chishti used improper means to acquire knowledge of Afiniti Trade Secrets as described above.

209.    Plaintiffs are informed and believe that Pobereskin similarly misappropriated Afiniti Trade Secrets by disclosing or using Afiniti Trade Secrets without Afiniti's express or implied consent and acquired knowledge of Afiniti Trade Secrets through improper means.  For example, Pobereskin directly or indirectly disclosed Afiniti Trade secrets to at least one of Isbei or Qinhe in order to create and distribute Qinhe's product, the "K2 Engine."  Pobereskin knew that she did not have express or implied consent because she acquired Afiniti Trade Secrets from former Afiniti employees (and others to be revealed during discovery), who she knew or should have known had a duty not to disclose those trade secrets.  Pobereskin used improper means to acquire knowledge of Afiniti Trade Secrets as described above.

210.    All Defendants misappropriated Afiniti Trade Secrets because each disclosed or used Afiniti Trade Secrets without Afiniti's express or implied consent and acquired knowledge of Afiniti Trade Secrets through improper means.  For example, Plaintiffs infer based on the facts described herein that Defendants and their agents use Afiniti Trade Secrets at least by providing a software service with the same or derivative source code as that described in paragraph 149 and by utilizing Afiniti's client-specific business and technical information to provide an identical service to Afiniti's former clients.  Development of such a service using Afiniti Trade Secrets would also include Defendants disclosing Afiniti Trade Secrets to at least one another.  As described above, without Afiniti Trade Secrets, it would not have been possible for Defendants to create a usable version of their product—and certainly not one that could be deployed successfully with clients—in the time that they did.  Defendants and their agents knew that they did not have express or implied consent to use Afiniti Trade Secrets because they acquired Afiniti Trade Secrets from former Afiniti employees (or other individuals acting at Defendants' behest), who they knew or should have known had a duty not to disclose those trade secrets.  Defendants also used improper means to acquire knowledge of Afiniti Trade Secrets as described above.

211.    All Defendants and their agents also misappropriated Afiniti Trade Secrets because, as described above, they disclosed or used Afiniti Trade Secrets without Afiniti's express or implied consent.  And at the time of disclosure or use, Defendants and their agents knew or had reason to know that the knowledge of the trade secrets was derived from or through a person who had used improper means to acquire the trade secrets.  For example, as described above, Defendants were aware that the Afiniti Trade secrets they disclosed and used were derived from former Afiniti employees (or other individuals acting at Defendants' behest), who used improper means to acquire the trade secrets.  In particular, Defendants knew or had reason to know that

Defendants' knowledge of Afiniti Trade Secrets that they disclosed and used was derived from or through Afiniti employees having exceeded their authorized access of Afiniti company property . In addition, Defendants other than Chishti derived Afiniti Trade Secrets through Chishti who owed a duty to Afiniti to maintain the secrecy of and limit use of Afiniti Trade Secrets.

212.    All Defendants also misappropriated Afiniti Trade Secrets because, as described above, they disclosed or used Afiniti Trade Secrets without Afiniti's express or implied consent. At the time of disclosure or use, Defendants and their agents knew or had reason to know that the knowledge of the trade secret was acquired under circumstances giving rise to a duty to maintain the secrecy of the trade secret or limit the use of the trade secret.  For example, as described above, Defendants and their agents were aware that Afiniti Trade Secrets they disclosed and used were acquired from former Afiniti employees (or other individuals acting at Defendants' behest), who acquired these trade secrets when they were bound, by their employment agreements, to maintain the secrecy and/or limit the use of Afiniti Trade Secrets.

213.    All Defendants also misappropriated Afiniti Trade Secrets because, as described above, they disclosed or used Afiniti Trade Secrets without express or implied consent.  And at the time of disclosure or use, Defendants or their agents knew or had reason to know that the knowledge of the trade secret was derived from or through a person who owed a duty to the person seeking relief to maintain the secrecy of the trade secret or limit the use of the trade secret.  For example, as described above, Defendants and their agents were aware that Afiniti Trade Secrets they disclosed and used were derived from former Afiniti employees (or other individuals acting at Defendants' behest), who acquired these trade secrets when, under their employment agreements, they had a duty to Afiniti to maintain the secrecy and/or limit the use of Afiniti Trade Secrets.

214.   Plaintiffs believe that other persons or entities, including agents of Defendants, to be revealed through discovery, improperly acquired, disclosed, or misused Afiniti Trade Secrets.

215.   As the direct and proximate result of Defendants' misappropriation, Afiniti has suffered damage and harm.  This harm includes damages suffered from Defendants' disclosure and wrongful use of Afiniti Trade Secrets.  It includes damage to Afiniti's business and goodwill and loss of revenue that Afiniti would have received but for the misappropriation of Afiniti trade Secrets.  If  Defendants' conduct is not stopped, Afiniti will continue to suffer irreparable injury and significant damages, in an amount to be proven at trial.

216.   In addition, as a direct and proximate result of Defendants' misappropriation, Defendants have been unjustly enriched in an amount as yet unknown.

217.   Because Afiniti's remedy at law is inadequate, Afiniti seeks, in addition to damages, injunctive relief to recover and protect its confidential, proprietary, and trade secret information, the fruits of Afiniti's confidential, proprietary, and trade secret information, and Afiniti's other legitimate business interests.  Afiniti's business relies on its reputation, its right to decide whether and how to distribute its proprietary technology, its ability to maintain and grow its client base in a competitive market, and its ability to attract and retain qualified personnel. Afiniti will continue suffering irreparable harm absent injunctive relief.

218.   Moreover, Afiniti Trade Secrets were willfully and maliciously misappropriated by each Defendant.  For example, Defendants conspired to intentionally misappropriate Afiniti Trade Secrets through unauthorized access of Afiniti company property and systems and with the intent to continue building a competing company and product.

<u>FOURTH CAUSE OF ACTION</u>
*Computer Fraud and Abuse Act, 18 U.S.C. § 1030 (Against Chishti, Qinhe, and Isbei)*

219.    Afiniti realleges and incorporates by reference the allegations of every paragraph of this Complaint.

220.    As set forth fully above, Defendants and their agents intentionally violated and continue to violate 18 U.S.C. § 1030.

221.    Plaintiffs maintain this civil action because Plaintiffs have suffered a loss of at least $5,000 during a one-year period including the cost of responding to these offenses, conducting a damages assessment, the loss of Chishti's computer (and also potentially other devices), the costs of preventing unauthorized access to Afiniti's computer systems, and damages that flow from the foregoing and related acts described herein.

222.    Afiniti computers and other devices involved in the unauthorized access of Afiniti's network are "protected computers."  They are "computers" because they are high speed data processing devices performing logical, arithmetic, or storage computational functions, including personal computers, laptops, tablets, and smart phones, and they are data storage facilities or communications facilities used in conjunction therewith, including large-scale servers or other such network infrastructure.  Afiniti uses such devices in its operations in and affecting interstate or foreign commerce or communication.  As set forth fully above, such protected computers belong to and are used by Afiniti for their business of providing technology services across several states and multiple continents.   Plaintiffs' technology relies on the interstate and international transmission of data and other communications effected by the protected computers involved in this action.

223.    Chishti, and on information and belief, Isbei, Qinhe, and their agents (including former Afiniti employees and other individuals to be revealed during discovery) retain protected

computers and other devices given for their employment with Afiniti.  When employed by Afiniti, these individuals were able to access valuable source code and confidential information, as described in paragraph 149, stored on this and other protected computers belonging to Afiniti and save them locally to the computers or transmit them to other computers and devices in their possession or control.  Plaintiffs understand that Chishti, and on information and belief, former Afiniti employees, and other individuals have and continue to intentionally access Afiniti's protected computers without Afiniti's authorization and also exceeding authorized access given that these individuals are no longer Afiniti employees and/or access this information in violation of their employment agreements.  Through such unauthorized access, these individuals obtain Afiniti Trade Secrets, source code, and confidential documents from the protected computers.

224.    Chishti, and on information and belief, Isbei, Qinhe, and their agents' unauthorized access and damaging conduct have been made knowingly and with intent to defraud Afiniti.  These Defendants, or their agents, have acted and continue to act both for personal financial gain through Isbei and Qinhe and for financial loss to Afiniti, Chishti's previous employer and Isbei and Qinhe's competitor.  Further, efforts to access, save, use, and transmit Afiniti Trade Secrets, source code, and confidential documents by Chishti and former Afiniti employees are made with intent to defraud Afiniti because they are knowingly in violation of their employment agreements, outside the knowledge and permission of Afiniti, and to Afiniti's financial detriment through the loss of valuable confidential information and source code.

225.    As set forth fully above, Chishti, and on information and belief, Isbei, and Qinhe as well as their agents, also knowingly and with intent to defraud accessed protected computers without authorization, or exceeding authorized access, and by means of such conduct furthering the intended fraud and obtaining a value of more than $5,000 in any one-year period.  As noted,

Chishti and other agents of Isbei and Qinhe retain protected computers they used when employed by Afiniti, which contain or have the capability to access Afiniti source code and confidential information. Plaintiffs are informed and believe that Chishti and other agents of Isbei and Qinhe have and continue to knowingly access these protected computers with intent to defraud, and they do so without Afiniti's authorization and also exceeding authorized access given that they are no longer Afiniti employees, and/or because they do so in violation of their employment agreements. Through such unauthorized access, Chishti and agents of Isbei and Qinhe obtain Afiniti source code and confidential documents furthering the intended fraud of stealing Afiniti Trade Secrets and confidential information to support competing companies. The value of this information is more than $5,000 in any one-year period. Afiniti's proprietary information is the foundation for its revenue, which is materially above that threshold.

226. Chishti and other Isbei and Qinhe employees acted as agents of Qinhe and Isbei by intentionally performing the foregoing acts at Isbei and Qinhe's direction, encouragement, and inducement where Isbei and Qinhe did not themselves have authorization to access. For example, Isbei and Qinhe directed, encouraged, and induced their employees and other agents to commit the above acts in order to help Isbei and Qinhe circumvent the lengthy and expensive development process for the "K2 Engine" and to more quickly bring to market a competing product. Plaintiffs expect that the full extent of Defendants' agents and co-conspirators' acts will be revealed during discovery. Qinhe and Isbei ratified this activity by using Afiniti Trade Secrets, source code, and confidential information.

227. Defendants and their agents conspired with each other and with third parties to commit or attempt to commit the foregoing acts. Chishti, Qinhe, Isbei, and their agents would have known that Chishti and others in possession of devices capable of accessing Afiniti's

protected computers did not have Afiniti's authorization given their former employment status or conflicting interests in support of Qinhe and Isbei.  They nonetheless were party to agreements with these individuals at least through their employment arrangements, or their supervision, direction, or ratification of such unauthorized access.  Qinhe and Isbei additionally involve other third parties with no former affiliation to Afiniti, and therefore without any former or current authorization to access Afiniti's protected computers.  Chishti, Qinhe, Isbei, and their agents have additionally agreed to act in concert with such individuals in furtherance of their unauthorized access and fraudulent retrieval of valuable Afiniti information.

228.    The Defendants and their agents also knowingly took substantial steps in furtherance of committing these offenses and with intent to commit these offenses.  Defendants and their agents have at least retained and continue to use Chishti's and other employees' Afiniti computers or other Afiniti protected computers without Afiniti's authorization and with the intent to improperly gain valuable information in furtherance of their competing business.

229.    Plaintiffs seek compensatory damages, for at least the cost of responding to the offense, conducting a damages assessment, the known impairment and interruption, and any further impairment of Afiniti's protected computers in an amount to be determined by the Court. Plaintiffs also seek injunctive relief such that Defendants cease all unauthorized access of Afiniti's protected computers and disable any means for such unauthorized access, including the return of any Afiniti computer and the termination of any other ongoing unauthorized access to Afiniti's protected computers and siphoning of its information.

## FIFTH CAUSE OF ACTION
### *Unjust Enrichment (Against All Defendants)*

230.    Afiniti realleges and incorporates by reference the allegations of every paragraph of this Complaint.

231.    As set forth fully above, Defendants have been unjustly enriched by their actions alleged in this Complaint.  Afiniti conferred a benefit on Defendants, Defendants retain the benefit, and (under the circumstances) Defendants' benefit is unjust.

232.    Afiniti conferred a benefit on Chishti.  This benefit includes the value of the source code, confidential information, and Afiniti Trade Secrets that Afiniti conferred on Chishti by giving him access to Afiniti systems including through use of company property (a computer and other devices), which Chishti still retains.  Afiniti also conferred the benefit of tangible property such as the computer and other devices.

233.    Pobereskin knowingly received and possessed Afiniti Trade Secrets, including source code, at least by receiving them from Chishti and former Afiniti employees (as well as others to be confirmed in discovery), knowing that these individuals had stolen or appropriated them from Afiniti without authorization.  Plaintiffs infer that Pobereskin, without authorization, communicated and conveyed these trade secrets to agents of Isbei and Qinhe.

234.    Isbei, Qinhe, and their agents knowingly received and possessed Afiniti Trade Secrets, including source code, at least by receiving them from Chishti, Pobereskin, former Afiniti employees, and potentially others to be identified in discovery, knowing that the trade secrets were stolen or appropriated from Afiniti without authorization.

235.    Afiniti also conferred a benefit on Defendants by training employees and giving employees access to Afiniti Trade Secrets and confidential information, including the trade secrets described in paragraphs 79–81, in such a way that advantaged Defendants.  As discussed above, Afiniti trains its engineers to employ confidential, valuable, and client-specific techniques, including those to handle client data and produce beneficial models and algorithms, developed over years of aggregated experience and trial and error.  Defendants or their agents later hired these

employees and/or solicited them to transmit Afiniti confidential information and trade secrets to Defendants' own advantage and benefit in order to help Defendants build competing companies. This saved Defendants the time and expense of training a workforce and independently creating a competing product.

236.    Afiniti similarly conferred the benefit of its goodwill on Defendants.  As described more fully above, Defendants (in particular Isbei and Qinhe) claim Afiniti's history as their own. Qinhe is also the Chinese language equivalent of the word "Affinity."  And Isbei's logo bears a striking resemblance to Afiniti's.  As least these facts show that Defendants unjustly capitalize on Afiniti's goodwill in the marketplace.

237.    Defendants retain the benefit conferred by Afiniti.  For example, Chishti retains the computer, and Defendants retain Afiniti Trade Secrets and confidential information (obtained from Chishti and others as described above).  Defendants also retain the benefits provided by that confidential information and trade secrets in that they can use this information to develop a competing product and company.  Additionally, employees trained by Afiniti, who also have access to Afiniti Trade Secrets and confidential information, were solicited by Defendants or their agents, and Defendants therefore retain the benefit of a trained workforce that holds Afiniti Trade Secrets.  All Defendants retain the benefit of Afiniti's goodwill in the marketplace as described herein.

238.    Under the circumstances, Defendants' retention of the benefits is unjust. As described fully herein, Afiniti trained its workforce, provided computer devices, and invested significant time and money to develop and protect its source code, confidential information, trade secrets, and goodwill, which are entitled to protection under the law. Defendants intentionally and improperly circumvented those legal protections to retain the benefits described herein and did so

without providing any type of valuable consideration to Afiniti.  Defendants were thus unjustly enriched to their benefit and to the detriment of Plaintiffs.

239.    As a result of the foregoing unjust enrichment, Defendants should pay restitution to Plaintiffs.

## SIXTH CAUSE OF ACTION
### *Conversion (Against All Defendants)*

240.    Afiniti realleges and incorporates by reference the allegations of every paragraph of this Complaint.

241.    As set forth above, Defendants and their agents committed the common law offense of conversion.  Defendants and their agents intentionally and unlawfully exercised ownership, dominion, or control over Afiniti's personal property in denial or repudiation of Afiniti's rights thereto.

242.    As described more fully above, Afiniti's personal property includes intellectual property such as confidential business information, source code, and Afiniti Trade Secrets. Afiniti's personal property also includes tangible company property that Chishti and other agents of Isbei and Qinhe never returned to Afiniti after their employment with Afiniti terminated, including computers and other devices.  Afiniti owns this personal and intellectual property as described more fully elsewhere in this Complaint.

243.    Defendants intentionally exercised ownership, dominion, or control over Afiniti's personal property.  For example, Chishti and other individuals who have worked at Afiniti (who now work at Isbei or Qinhe) accessed and continue to access Afiniti's confidential information and Afiniti Trade Secrets in order to further their own business interests and the business interests of the Defendant entities.  Further, Plaintiffs expect discovery to reveal that Chishti and these other

Isbei and Qinhe agents have additional computers and other devices containing confidential information and Afiniti Trade Secrets that these individuals never returned to Afiniti.

244.    Pobereskin, Isbei, Qinhe, and/or their agents also intentionally exercised dominion, ownership, or control of Afiniti's personal property by receiving it from Chishti and other agents of Qinhe and Isbei, knowing that Chishti and those agents had stolen or appropriated them from Afiniti without authorization.

245.    The ownership, dominion, or control exercised by Defendants and their agents was unlawful.  For example, Defendants or their agents misappropriated the trade secrets in violation of 18 U.S.C. § 1836, *et seq*. and other laws described herein.  Chishti and other Isbei and Qinhe agents also violated one or more provisions of their employment agreements with Afiniti to obtain Afiniti's personal property.  For example, by not returning company property upon termination of employment, these former Afiniti employees violated the provision regarding return of company property.  And by using confidential information, including Afiniti Trade Secrets, former Afiniti employees violated the provision regarding non-disclosure.

246.    Defendants or their agents converted the personal property in denial or repudiation of Afiniti's rights.  For example, Afiniti is entitled to the return of company property when employees leave Afiniti according to their employment agreements.  Defendants or their agents exercise dominion, ownership, and control of this personal property in repudiation of that right.  Afiniti also has a right under the employment agreements to maintain the confidentiality and nondisclosure of Afiniti Trade Secrets.  Moreover, Afiniti has a right to have Afiniti Trade Secrets treated as secret.  Defendants' acts, or the acts of their agents, were also in denial and repudiation of those rights.

247.    Further, Chishti and other Isbei and Qinhe agents acted as agents of Qinhe and Isbei at least because they are employed by Isbei and Qinhe and/or have a relationship with those entities, as described more fully above.  Chishti and other Isbei and Qinhe agents were acting within the scope of that relationship when they converted Plaintiffs' personal property.  Qinhe and Isbei ratified the act of Chishti and other Qinhe and Isbei agents who took Afiniti company property and Afiniti Trade Secrets by using Afiniti Trade Secrets and confidential information, including source code, that had been accessed and downloaded by Chishti and these agents in order to form their competing companies.

248.    As a result of Defendants' conversion, Afiniti will suffer irreparable harm and is entitled to damages in an amount to be determined by the Court.

## SEVENTH CAUSE OF ACTION
### *Civil Conspiracy (Against All Defendants)*

249.    Afiniti realleges and incorporates by reference the allegations of every paragraph of this Complaint.

250.    As set forth fully above, Defendants or their agents had an agreement to participate in an unlawful act, or a lawful act in an unlawful manner, and an injury was caused by an unlawful overt act performed by one of the parties to the agreement, which overt act was done pursuant to and in furtherance of the common scheme.

251.    Defendants or their agents intentionally agreed to participate in the common scheme of perpetrating the acts outlined in this Complaint in order to build competing companies that otherwise would have taken years and a significant investment of time and resources to develop.  This common scheme includes, at least, misappropriating Afiniti Trade Secrets and confidential business information, breaching Afiniti employment agreements, and converting

Afiniti's personal property.  As described more fully throughout this Complaint, those acts were intentional and unlawful.

252.   Each Defendant, or their agents, as described fully in this Complaint, intentionally performed unlawful overt acts.  For example, each Defendant or their agents misappropriated Afiniti Trade Secrets and converted Afiniti's personal property.

253.   Defendants or their agents each intentionally performed these overt, unlawful acts pursuant to and in furtherance of the common scheme.  For example, these overt acts were performed in order to aid Defendants in creating a company that would compete with Afiniti, use Afiniti Trade Secrets, and take customers and potential customers away from Afiniti.

254.   The overt acts caused injury to Afiniti as described fully in this Complaint.  For example, Defendants' misconduct caused and will continue to cause Afiniti irreparable harm, in that Afiniti Trade Secrets and goodwill have been misappropriated by a competitor.

255.   As a direct and proximate result of Defendants' conspiring, Afiniti has suffered and will continue to suffer damages.

## EIGHTH CAUSE OF ACTION
*Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962*
*(Against All Defendants)*

256.   Afiniti realleges and incorporates by reference the allegations of every paragraph of this Complaint.

257.   All Defendants have violated and continue to violate the Racketeer Influenced and Corrupt Organizations Act ("RICO") (18 U.S.C. § 1962(c)).  All Defendants are employed by or associated with an enterprise engaged in, or the activities of which affect, interstate or foreign commerce, and conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity.

258.    Chishti, Pobereskin, Isbei, Qinhe, Niazi, Liu, Zhao, Yan, and Saud are a group of RICO persons associated together in fact for the common purpose of carrying out an ongoing criminal enterprise (the "Isbei/Qinhe Enterprise"), as described below.

259.    Chishti and Pobereskin, United States citizens who reside in the United States, are associated with and participated in the conduct of the Isbei/Qinhe Enterprise described below through a pattern of racketeering activity for the unlawful and intentional purposes of defrauding Afiniti, converting Afiniti Trade Secrets, and engaging in economic espionage by converting and unlawfully transferring, duplicating, or transmitting Afiniti Trade Secrets for the benefit of a foreign government, instrumentality, or agent.

260.    Isbei (including each of Isbei Ltd., Isbei Pakistan, and Isbei Hainan, both individually and collectively), Qinhe, Niazi, Liu, Zhao, Yan, and Saud, are associated with and participated in the conduct of the Isbei/Qinhe Enterprise described below through a pattern of racketeering activity for the unlawful and intentional purposes of defrauding Afiniti, converting Afiniti Trade Secrets, and engaging in economic espionage by converting and unlawfully transferring, duplicating, or transmitting Afiniti Trade Secrets for the benefit of a foreign government, instrumentality, or agent.

261.    The Isbei/Qinhe Enterprise is an association-in-fact enterprise engaged in and whose illegal activities affect interstate and foreign commerce, such as by selling and delivering contact center AI services to customers worldwide, including in China, based on Afiniti Trade Secrets unlawfully converted, copied, and transferred from the United States, and to the primary benefit of Chishti, Pobereskin, Isbei, and Qinhe.  Chishti and Pobereskin conduct business as part of the Isbei/Qinhe Enterprise in at least the United States, Pakistan, China, and the Cayman Islands. Isbei conducts business as part of the Isbei/Qinhe Enterprise in at least China, Pakistan, and the

Cayman Islands.  Qinhe conducts business as part of the Isbei/Qinhe Enterprise in at least China. Upon information and belief, Isbei and Qinhe also conduct business in the United States, at least through the activities of their principals and agents, including Chishti and Pobereskin, in at least Washington, D.C. and Puerto Rico.

262.    Chishti, Pobereskin, Isbei, Qinhe, Niazi, Liu, Zhao, Yan, and Saud are each associated with the Isbei/Qinhe Enterprise, and combined and coordinated efforts with one another and others for the unlawful and intentional purposes of defrauding Afiniti, converting Afiniti Trade Secrets, and engaging in economic espionage by converting and unlawfully transferring, copying, duplicating, or transmitting Afiniti Trade Secrets for the benefit of a foreign government, instrumentality, or agent.

263.    The Isbei/Qinhe Enterprise forms an association distinct from the separate operations of Chishti, Pobereskin, Isbei, Qinhe, Niazi, Liu, Zhao, Yan, and Saud.  The association was formed for the common and continuing purpose of selling and delivering contact center AI services based on the converted Afiniti Trade Secrets.

264.    Chishti, Pobereskin, Isbei, Qinhe, Niazi, Liu, Zhao, Yan, and Saud each served different roles in the Isbei/Qinhe Enterprise and, as described above and below, coordinated, implemented, and carried out, formally and informally, the objectives of the association and different racketeering acts and other activities on an ongoing, continuous basis.

265.    While in the United States and as a resident of the United States, Chishti conducted and participated in the affairs of the Isbei/Qinhe Enterprise by, *inter alia*, appropriating, retaining, taking, and/or stealing Afiniti Trade Secrets obtained in the United States following the conclusion of Chishti's employment with Afiniti in violation of his Employment Agreement; establishing, overseeing, and directing Isbei Pakistan, of which Chishti is a director and 99% owner, including

with respect to the converted Afiniti Trade Secrets; improperly and unlawfully transferring, transmitting, duplicating, uploading, delivering, mailing, communicating, or copying the converted Afiniti Trade Secrets from the United States to others involved with the Isbei/Qinhe Enterprise, including Pobereskin, Isbei, Qinhe, Niazi, Liu, Zhao, Yan, and/or Saud; and using the converted Afiniti Trade Secrets to sell and deliver contact center AI services to customers at least through Qinhe, Isbei's "exclusive delivery partner" in China.

266.    While in the United States and as a resident of the United States, Pobereskin conducted and participated in the affairs of the Isbei/Qinhe Enterprise by, *inter alia*, improperly possessing Afiniti Trade Secrets in the United States that she received, downloaded, or copied from at least her husband, Chishti, knowing them to be the property of Afiniti unlawfully taken by Chishti; establishing, overseeing, and/or directing Isbei Ltd. in the Cayman Islands, of which Pobereskin is the sole director, and its wholly owned subsidiary Isbei Hainan, including with respect to the converted Afiniti Trade Secrets; improperly and unlawfully transferring, transmitting, duplicating, uploading, delivering, mailing, communicating, and/or copying the converted Afiniti Trade Secrets to others involved with the Isbei/Qinhe Enterprise from the United States, including Isbei, Qinhe, Niazi, Liu, Zhao, Yan, and/or Saud, as inferred by her control and direction of Isbei Ltd., by extension to wholly owned Isbei Hainan, and by the marketing of contact center AI services by Isbei and Qinhe based on Afiniti Trade Secrets; directing the operations of Isbei Ltd. and Isbei Hainan, including with respect to the converted Afiniti Trade Secrets; and using the converted Afiniti Trade Secrets to sell and deliver contact center AI services to customers at least through Qinhe, Isbei's "exclusive delivery partner" in China.

267.    Isbei (including each of Isbei Ltd., Isbei Pakistan, and Isbei Hainan, both individually and collectively) conducted and participated in the affairs of the Isbei/Qinhe

Enterprise by, *inter alia*, improperly and unlawfully possessing Afiniti Trade Secrets received from Chishti, Pobereskin, Isbei, Qinhe, Liu, Zhao, Yan, Saud, and/or Niazi, knowing them to be the property of Afiniti unlawfully taken by Chishti and others; improperly and unlawfully transmitting the converted Afiniti Trade Secrets to others involved with the Isbei/Qinhe Enterprise, including at least Qinhe; and using the converted Afiniti Trade Secrets to sell and deliver contact center AI services to customers at least through Qinhe, Isbei's "exclusive delivery partner" in China that shares an office with Isbei Hainan at the same registered address and principal place of business.

268.    Plaintiffs understand that Isbei is the engineering backbone of the Isbei/Qinhe Enterprise. Isbei supplies Qinhe with technological resources and tools derived from the converted Afiniti Trade Secrets. Through their initial acts of trade secret theft and economic espionage through the theft of Afiniti Trade Secrets in the United States and solicitation of Afiniti employees possessing Afiniti Trade Secrets, Chishti and Pobereskin have granted Isbei unlawful access to the converted Afiniti Trade Secrets from the United States. On information and belief, Isbei uses Afiniti Trade Secrets to develop, market, and distribute its "K2 Engine," which derives from Afiniti Trade Secrets, including those comprising at least its V5 software platform, modeling algorithms and tools, and runtime software.

269.    Qinhe conducted and participated in the affairs of the Isbei/Qinhe Enterprise by, *inter alia*, improperly and unlawfully possessing Afiniti Trade Secrets received from Chishti, Pobereskin, Isbei, Liu, Zhao, Yan, Saud, and/or Niazi, knowing them to be the property of Afiniti unlawfully taken by Chishti and others; improperly and unlawfully transmitting the converted Afiniti Trade Secrets to others involved with the Isbei/Qinhe Enterprise; and using the converted

Afiniti Trade Secrets to sell and deliver contact center AI services to customers around the world, including foreign instrumentalities, including at least SIG, CPIC, and China Mobile.

270.    Plaintiffs deduce that Qinhe is the client-facing branch of the Isbei/Qinhe Enterprise because Qinhe identifies itself as Isbei's "exclusive delivery partner" and employs ex-Afiniti engineers and product supervisors who utilize Afiniti Trade Secrets converted in the United States to implement their call pairing service according to former Afiniti clients' unique infrastructure requirements.  Qinhe therefore uses Afiniti Trade Secrets, particularly data collection and manipulation methods and techniques, benchmarking techniques, equipment integration and interoperability know-how, and other client-specific information.

271.    Liu, Zhao, and Yan, individually and collectively, conducted and participated in the affairs of the Isbei/Qinhe Enterprise by, *inter alia*, improperly and unlawfully possessing Afiniti Trade Secrets received from each other and Chishti, Pobereskin, Isbei, Saud, and/or Niazi, knowing, as former Afiniti employees, that the converted Afiniti Trade Secrets were the property of Afiniti and unlawfully converted; each playing a role in establishing, overseeing, and directing Isbei Hainan, including with respect to the converted Afiniti Trade Secrets, of which Liu was formerly a legal representative, Zhao was formerly General Manager, and Yan was formerly a supervisor; establishing, overseeing, and directing Qinhe, including with respect to the converted Afiniti Trade Secrets, of which Liu now is a legal representative, Executive Director, and 25% owner, Zhao now is CEO, General Manager, and 75% owner, and Yan now is a supervisor, deputy chairperson and president; improperly and unlawfully transmitting the converted Afiniti Trade Secrets to others involved with the Isbei/Qinhe Enterprise, including at least Qinhe; and using the converted Afiniti Trade Secrets to sell and deliver contact center AI services at least through Qinhe to a number of customers, including at least SIG, CPIC, and China Mobile.

272.    Niazi conducted and participated in the affairs of the Isbei/Qinhe Enterprise by, *inter alia*, improperly and unlawfully possessing Afiniti Trade Secrets received from Chishti, Pobereskin, Isbei, Qinhe, Liu, Zhao, and/or Yan, knowing as a longtime business colleague of Chishti, an experienced businessman, and former Afiniti employee, that the converted Afiniti Trade Secrets were the property of Afiniti and unlawfully converted; establishing, overseeing, and directing Isbei Pakistan, of which Niazi is a director and 1% owner, including with respect to the converted Afiniti Trade Secrets; improperly and unlawfully transmitting the converted Afiniti Trade Secrets to others involved with the Isbei/Qinhe Enterprise; and using the converted Afiniti Trade Secrets to sell and deliver contact center AI services to customers at least through Qinhe, Isbei's "exclusive delivery partner" in China.

273.    Saud conducted and participated in the affairs of the Isbei/Qinhe Enterprise by, *inter alia*, improperly and unlawfully possessing Afiniti Trade Secrets received from Chishti, Pobereskin, Isbei, Qinhe, Liu, Zhao, Niazi and/or Yan, knowing that the converted Afiniti Trade Secrets were the property of Afiniti and unlawfully converted; establishing, overseeing, and directing Isbei Hainan, of which Saud is a legal representative, including with respect to the converted Afiniti Trade Secrets; improperly and unlawfully transmitting the converted Afiniti Trade Secrets to others involved with the Isbei/Qinhe Enterprise, including at least Isbei and Qinhe; and using the converted Afiniti Trade Secrets to sell and deliver contact center AI services at least through Qinhe, Isbei's "exclusive delivery partner" in China.

274.    Discovery will reveal that the Isbei/Qinhe Enterprise also includes other, currently unknown, persons and entities.

275.    The Isbei/Qinhe Enterprise is currently ongoing and of sufficient duration to achieve its purpose of selling and delivering contact center AI services based on the converted

Afiniti Trade Secrets to at least three former customers in China, including SIG, CPIC, and China Mobile, resulting in substantial ill-gotten gains and causing significant harm to Afiniti in the United States through the unauthorized use of Afiniti Trade Secrets.

276.     The Isbei/Qinhe Enterprise is continuous, has an ascertainable structure, and is distinct from the alleged predicate acts themselves.  The members of the Isbei/Qinhe Enterprise hold differing roles in the Isbei/Qinhe Enterprise.  Chishti converted Afiniti Trade Secrets when he left Afiniti in the United States.  He then established, facilitated funding for, and oversaw the creation of the Isbei and Qinhe entities and the Isbei/Qinhe Enterprise.  At least Chishti, Pobereskin, and Isbei facilitated the transfer of these converted Afiniti Trade Secrets from the United States to other members of the Isbei/Qinhe Enterprise.  At least Isbei, Qinhe, Niazi, Liu, Zhao, Yan, and Saud market services and technology directly or through Isbei and Qinhe based upon the converted Afiniti Trade Secrets on a continuing basis, generating revenue for the Isbei/Qinhe Enterprise from the converted Afiniti Trade Secrets.

277.     Pursuant to and in furtherance of their scheme to defraud Afiniti and convert Afiniti Trade Secrets, Chishti, Pobereskin, Isbei, Qinhe, Niazi, Liu, Zhao, Yan, and Saud each committed multiple acts and worked in concert together as the Isbei/Qinhe Enterprise, to commit multiple predicate acts of racketeering activity as defined in 18 U.S.C. § 1961(1) on multiple occasions and in violation of multiple federal statutes, including the Economic Espionage Act, 18 U.S.C. §§ 1831–1832 and the federal Wire Fraud Statute, 18 U.S.C. § 1343.

### *Economic Espionage Predicate Acts*

278.     At various points in time, each of Chishti, Pobereskin, Isbei, Qinhe, Niazi, Liu, Zhao, Yan, and Saud worked in concert with one or more of the others involved in the Isbei/Qinhe Enterprise to carry out economic espionage, through intentional and unlawful means, in violation of 18 U.S.C. § 1831.

279.     Specifically, despite being under an obligation to maintain the secrecy of Afiniti Trade Secrets, Chishti knowingly stole or without authorization appropriated Afiniti Trade Secrets while in the United States, including source code and others, at least by retaining and accessing without authorization a computer containing Afiniti Trade Secrets following the conclusion of his employment with Afiniti.  Chishti, without authorization, knowingly copied, duplicated, and/or replicated the converted Afiniti Trade Secrets and also knowingly transmitted, delivered, sent, communicated, and/or conveyed the converted Afiniti Trade Secrets to others involved with the Isbei/Qinhe Enterprise, including at least Pobereskin, Isbei Pakistan, and Niazi.  Chishti continues to possess the converted Afiniti Trade Secrets knowing he appropriated them without authorization.  Chishti knew the protected nature of Afiniti Trade Secrets that he possessed as co-founder and former CEO of Afiniti with extensive and regular access to Afiniti Trade Secrets and an Employment Agreement with Afiniti that included specific provisions regarding the protection of confidential information.  The Employment Agreement further required Chishti to return, at the end of his employment, any company equipment to Afiniti, Inc., with a primary place of business in Washington, D.C., upon his departure, including a computer containing Afiniti Trade Secrets.  Yet when Chishti resigned in November 2021, Chishti took at least this computer and failed to return it to Afiniti at Afiniti's offices in Washington, D.C., or any other Afiniti office, knowing that it contained Afiniti Trade Secrets.  Chishti continues to possess the computer containing Afiniti Trade Secrets.

280.     Chishti, without authorization, knowingly copied, duplicated, and/or replicated the converted Afiniti Trade Secrets and also knowingly transmitted, delivered, sent, communicated, and/or conveyed the converted Afiniti Trade Secrets to others involved with the Isbei/Qinhe Enterprise while he resided in the United States, in particular, Washington, D.C., including at least

Pobereskin, Isbei Pakistan, and Niazi.  Prior to transfer of the converted Afiniti Trade Secrets by Chishti, the other Defendants associated with the Isbei/Qinhe Enterprise would not have had direct access to the converted Afiniti Trade Secrets that the members now use to market contact center AI services to customers.

281.   Chishti continues to possess the converted Afiniti Trade Secrets obtained in the United States, knowing he appropriated them without authorization, by at least continuing to possess the Afiniti computer containing the converted Afiniti Trade Secrets and other data, documents, and devices containing Afiniti confidential information and Afiniti Trade Secrets.

282.   Plaintiffs infer, based in part on the facts below, that Pobereskin knowingly received and possessed the converted Afiniti Trade Secrets, including source code, at least by receiving them from Chishti, her husband and fellow director of an Isbei entity, knowing that Chishti had stolen or appropriated Afiniti Trade Secrets from Afiniti without authorization.  Prior to Chishti's resignation from Afiniti, Pobereskin attended social and business gatherings with Afiniti personnel, and was familiar with Afiniti's business activities, including its product offerings to customers.  Pobereskin, as an experienced management consultant and former senior executive of a publicly traded company, understood the value of a company's intellectual property, including its trade secrets.

283.   Plaintiffs infer, based in part on the facts above, that Pobereskin, without authorization and while residing in the United States, knowingly copied, duplicated, and/or replicated the converted Afiniti Trade Secrets and also knowingly transmitted, delivered, sent, communicated, and/or conveyed the converted Afiniti Trade Secrets to others involved with the Isbei/Qinhe Enterprise, including at least Isbei Ltd., Isbei Hainan, Liu, Zhao, Yan, and Saud.  On knowledge and belief, none of the Isbei/Qinhe Enterprise entities, with whom Pobereskin is

affiliated, conduct business outside of that which relies on the use of Afiniti's confidential information and the converted Afiniti Trade Secrets.

284.   The only reasonable conclusion is that Isbei knowingly received and possessed converted Afiniti Trade Secrets, including source code, at least by receiving them from Chishti and/or Pobereskin, knowing that Chishti had stolen or appropriated Afiniti Trade Secrets from Afiniti without authorization and while in the United States.  Plaintiffs infer that agents of Isbei, without authorization, knowingly copied, duplicated, and/or replicated the converted Afiniti Trade Secrets and also knowingly transmitted, delivered, sent, communicated, and/or conveyed the converted Afiniti Trade Secrets to others involved with the Isbei/Qinhe Enterprise, including at least Qinhe.  Both Chishti and Pobereskin established, own, control, or oversee the various Isbei entities, at least from the United States.  The Isbei and Qinhe entities all were created in 2022, Isbei Pakistan as late as July 2022.  Plaintiffs believe discovery will show that Isbei did not have, and could not have developed in such little time, its own similar contact center AI technology, especially technology of the sort it now provides to Qinhe.  Isbei would have known that it possessed and relied upon the converted Afiniti Trade Secrets received from other Isbei/Qinhe Enterprise members.  It, therefore, also knew that it transmitted, delivered, sent, communicated, and/or conveyed the converted Afiniti Trade Secrets when it marketed Afiniti Trade Secrets as its own technology to customers and other third parties, including Qinhe, whom Isbei refers to as its "exclusive delivery partner."

285.   Plaintiffs infer that Qinhe knowingly received and possessed Afiniti Trade Secrets, including source code, at least by receiving them from Chishti, Pobereskin, and/or Isbei, knowing that Chishti had stolen or appropriated Afiniti Trade Secrets from Afiniti without authorization and while in the United States.  Plaintiffs understand that agents of Qinhe, without authorization,

knowingly copied, duplicated, and/or replicated the converted Afiniti Trade Secrets and also knowingly transmitted, delivered, sent, communicated, and/or conveyed the converted Afiniti Trade Secrets to others involved with the Isbei/Qinhe Enterprise.  Qinhe was created by and continues to be led by individuals who previously held important management positions with Isbei before setting up and incorporating Qinhe.  Liu was a legal representative, Zhao the General Manager, and Yan a former supervisor of Isbei Hainan before setting up and incorporating Qinhe. Liu, Zhao, and Yan all also previously worked for Afiniti, having knowledge of Afiniti's technology and operations in China.  Qinhe did not have its own contact center AI technology, and relied upon Isbei as its "exclusive delivery partner" to provide the technology it marketed and sold to customers.  Qinhe knew it received and possessed converted Afiniti Trade Secrets when the same individuals responsible for transmitting, delivering, sending, communicating, and/or conveying the converted Afiniti Trade Secrets to Qinhe also operate Qinhe.

286.    Plaintiffs infer that Niazi knowingly received and possessed the converted Afiniti Trade Secrets, including source code, at least by receiving them from Chishti, knowing that Chishti had stolen or appropriated Afiniti Trade Secrets from Afiniti without authorization and while in the United States.  On information and belief, Niazi communicated with Chishti, while Chishti was in the United States, regarding Afiniti Trade Secrets.  Plaintiffs can only conclude that Niazi, without authorization, knowingly copied, duplicated, and/or replicated the converted Afiniti Trade Secrets and also knowingly transmitted, delivered, sent, communicated, and/or conveyed the converted Afiniti Trade Secrets to others involved with the Isbei/Qinhe Enterprise.  As a director, 1% owner, and CEO of Isbei Pakistan and former Afiniti employee, Niazi has knowledge of the source of Isbei's technology.

287.    Plaintiffs infer that Liu knowingly received and possessed converted Afiniti Trade Secrets, including source code, at least by receiving them from Chishti, Pobereskin, and/or Isbei, knowing that Chishti had stolen or appropriated Afiniti Trade Secrets from Afiniti without authorization and while in the United States.  Plaintiffs infer that Liu, without authorization, knowingly copied, duplicated, and/or replicated the converted Afiniti Trade Secrets and also knowingly transmitted, delivered, sent, communicated, and/or conveyed the converted Afiniti Trade Secrets to others involved with the Isbei/Qinhe Enterprise, including at least Qinhe.  As both Isbei Hainan's former legal representative and current Qinhe legal representative, director, and 25% owner, and as a former Afiniti employee, Liu knew the source of Isbei's technology that forms the basis of Qinhe's services.

288.    Plaintiffs infer that Zhao knowingly received and possessed the converted Afiniti Trade Secrets, including source code, at least by receiving them from Chishti, Pobereskin, and/or Isbei, knowing that Chishti had stolen or appropriated Afiniti Trade Secrets from Afiniti without authorization and while in the United States.  Plaintiffs infer that Zhao, without authorization, knowingly copied, duplicated, and/or replicated the converted Afiniti Trade Secrets and also knowingly transmitted, delivered, sent, communicated, and/or conveyed the converted Afiniti Trade Secrets to others involved with the Isbei/Qinhe Enterprise, including at least Qinhe.  As both Isbei Hainan's former General Manager and current Qinhe General Manager, and as a former Afiniti employee, Zhao knew the source of Isbei's technology that forms the basis of Qinhe's services.

289.    Plaintiffs infer that Yan knowingly received and possessed converted Afiniti Trade Secrets, including source code, at least by receiving them from Chishti, Pobereskin, and/or Isbei, knowing that Chishti had stolen or appropriated Afiniti Trade Secrets from Afiniti without

authorization and while in the United States.  Plaintiffs infer that Yan, without authorization, knowingly copied, duplicated, and/or replicated the converted Afiniti Trade Secrets and also knowingly transmitted, delivered, sent, communicated, and/or conveyed the converted Afiniti Trade Secrets to others involved with the Isbei/Qinhe Enterprise, including at least Qinhe.  As both a former supervisor at Isbei Hainan and a current supervisor at Qinhe, and as a former Afiniti employee, Yan knew the source of Isbei's technology that forms the basis of Qinhe's services.

290.     Plaintiffs infer that Saud knowingly received and possessed converted Afiniti Trade Secrets, including source code, at least by receiving them from Chishti, Pobereskin, and/or Isbei, knowing that Chishti had stolen or appropriated Afiniti Trade Secrets from Afiniti without authorization and while in the United States.  Plaintiffs infer that Saud, without authorization, knowingly copied, duplicated, and/or replicated the converted Afiniti Trade Secrets and also knowingly transmitted, delivered, sent, communicated, and/or conveyed the converted Afiniti Trade Secrets to others involved with the Isbei/Qinhe Enterprise, including at least Qinhe.  As legal representative of Isbei Hainan, Saud would know the source of Isbei's technology that Isbei provides to Qinhe.

291.     Plaintiffs infer each of Chishti, Pobereskin, Isbei, Qinhe, Niazi, Liu, Zhao, Yan, and Saud committed these acts of economic espionage with the intention and/or knowledge that they would benefit one or more business organizations, corporations, firms, or entities that are substantially owned, controlled, sponsored, commanded, managed, or dominated by a foreign government.  For example, the Isbei/Qinhe Enterprise has sold and delivered contact center AI services based on converted Afiniti Trade Secrets to the customer China Mobile.  China Mobile is a Chinese state-owned company.  Therefore, each of Chishti, Pobereskin, Isbei, Qinhe, Niazi, Liu,

Zhao, Yan, and Saud knowingly and intentionally sold contact center AI services based on converted Afiniti Trade Secrets to state-owned China Mobile to benefit China Mobile.

292.    Each of Chishti, Pobereskin, Isbei, Qinhe, Niazi, Liu, Zhao, Yan, and Saud also knowingly and intentionally attempted to unlawfully and without authorization appropriate and convert Afiniti Trade Secrets in the manner described for the Isbei/Qinhe Enterprise predicate acts above as part of the Isbei/Qinhe Enterprise, reasonably believing Afiniti Trade Secrets to be trade secrets.

293.    Each of Chishti, Pobereskin, Isbei, Qinhe, Niazi, Liu, Zhao, Yan, and Saud also knowingly and intentionally conspired with one or more of the others involved in the Isbei/Qinhe Enterprise when each of Chishti, Pobereskin, Isbei, Qinhe, Niazi, Liu, Zhao, Yan, and Saud knowingly agreed, and acted in furtherance of that agreement, to unlawfully or without authorization appropriate, take, copy, transmit, receive, and possess Afiniti Trade Secrets in the manner described for the Isbei/Qinhe Enterprise predicate acts above, reasonably believing Afiniti Trade Secrets to be trade secrets, for the benefit of a foreign government or foreign instrumentality, which at least includes China Mobile.

294.    Each of Chishti, Pobereskin, Isbei, Qinhe, Niazi, Liu, Zhao, Yan, and Saud also committed multiple acts in furtherance of the foregoing economic espionage, including in the United States.

### *Theft of Trade Secrets Predicate Acts*

295.    At various points in time, each of Chishti, Pobereskin, Isbei, Qinhe, Niazi, Liu, Zhao, Yan, and Saud worked in concert with one or more of the others involved in the Isbei/Qinhe Enterprise to carry out the theft of Afiniti Trade Secrets, through intentional and unlawful means, in violation of 18 U.S.C. § 1832.

296.     Specifically, despite being under an obligation to maintain the secrecy of Afiniti Trade Secrets, Chishti knowingly stole or without authorization appropriated Afiniti Trade Secrets while in the United States, including source code and others, at least by possessing without authorization a computer containing Afiniti Trade Secrets following the conclusion of his employment with Afiniti.  Chishti, without authorization, knowingly copied, duplicated, and/or replicated the converted Afiniti Trade Secrets and also knowingly transmitted, delivered, sent, communicated, and/or conveyed the converted Afiniti Trade Secrets to others involved with the Isbei/Qinhe Enterprise, including at least Pobereskin, Isbei Pakistan, and Niazi.  Chishti continues to possess the converted Afiniti Trade Secrets knowing he appropriated them without authorization.  Chishti knew the protected nature of Afiniti Trade Secrets that he possessed as co-founder and former CEO of Afiniti with extensive and regular access to Afiniti Trade Secrets and an Employment Agreement with Afiniti that included specific provisions regarding the protection of confidential information.  The Employment Agreement further required Chishti to return, at the end of his employment, any company equipment, to Afiniti in Washington, D.C.  Yet when Chishti resigned in November 2021, Chishti took at least this computer and failed to return it to Afiniti at Afiniti's offices in Washington, D.C., or any other Afiniti office, knowing that it contained Afiniti Trade Secrets.  Chishti continues to possess the computer containing Afiniti Trade Secrets.

297.     Chishti, without authorization, knowingly copied, duplicated, and/or replicated, the converted Afiniti Trade Secrets and also knowingly transmitted, delivered, sent, communicated, and/or conveyed the converted Afiniti Trade Secrets to others involved with the Isbei/Qinhe Enterprise while he resided in the United States, in particular, Washington, D.C., including at least Pobereskin, Isbei Pakistan, and Niazi.  Prior to transfer of the converted Afiniti Trade Secrets by Chishti, the other Defendants associated with the Isbei/Qinhe Enterprise would not have had direct

access to the converted Afiniti Trade Secrets that the members now use to market contact center AI services to customers.

298.    Chishti continues to possess the converted Afiniti Trade Secrets obtained in the United States, knowing he appropriated them without authorization, at least by continuing to possess the Afiniti computer containing the converted Afiniti Trade Secrets and other data, documents, and devices containing Afiniti confidential information and Afiniti Trade Secrets.

299.    Plaintiffs infer, based in part on the facts below, that Pobereskin knowingly received and possessed the converted Afiniti Trade Secrets, including source code, at least by receiving them from Chishti, her husband and fellow director of an Isbei entity, knowing that Chishti had stolen or appropriated Afiniti Trade Secrets from Afiniti without authorization.  Prior to Chishti's resignation from Afiniti, Pobereskin attended social and business gatherings with Afiniti personnel, and was familiar with Afiniti's business activities, including its product offerings to customers.  Pobereskin, as an experienced management consultant and former senior executive of a publicly traded company, understood the value of a company's intellectual property, including its trade secrets.

300.    Plaintiffs infer based, in part, on the facts above, that Pobereskin, without authorization, while she resided in the United States, knowingly copied, duplicated, and/or replicated the converted Afiniti Trade Secrets and also knowingly transmitted, delivered, sent, communicated, and/or conveyed the converted Afiniti Trade Secrets to others involved with the Isbei/Qinhe Enterprise, including at least Isbei Ltd., Isbei Hainan, Liu, Zhao, Yan, and Saud.  On knowledge and belief, none of the Isbei/Qinhe Enterprise entities, with whom Pobereskin is affiliated, conduct business outside of that which relies on the use of Afiniti's confidential information and the converted Afiniti Trade Secrets.

301.    The only reasonable conclusion is that Isbei knowingly received and possessed converted Afiniti Trade Secrets, including source code, at least by receiving them from Chishti and/or Pobereskin, knowing that Chishti had stolen or appropriated Afiniti Trade Secrets from Afiniti without authorization and while in the United States.  Plaintiffs infer that agents of Isbei, without authorization, knowingly copied, duplicated, and/or replicated the converted Afiniti Trade Secrets and also knowingly transmitted, delivered, sent, communicated, and/or conveyed the converted Afiniti Trade Secrets to others involved with the Isbei/Qinhe Enterprise, including at least Qinhe.  Both Chishti and Pobereskin established, own, control, or oversee the various Isbei entities, at least from the United States.  The Isbei and Qinhe entities all were created in 2022, Isbei Pakistan as late as July 2022.  Plaintiffs believe discovery will show that Isbei did not have, and could not have developed, in such little time, its own similar contact center AI technology, especially technology of the sort it now provides to Qinhe.  Isbei would have known that it possessed and relied upon converted Afiniti Trade Secrets received from other Isbei/Qinhe Enterprise members.  It, therefore, also knew that it transmitted, delivered, sent, communicated, and/or conveyed the converted Afiniti Trade Secrets when it marketed Afiniti Trade Secrets as its own technology to customers, including Qinhe, whom Isbei refers to as its "exclusive delivery partner."

302.    Plaintiffs infer that Qinhe knowingly received and possessed Afiniti Trade Secrets, including source code, at least by receiving them from Chishti, Pobereskin, and/or Isbei, knowing that Chishti had stolen or appropriated Afiniti Trade Secrets from Afiniti without authorization and while in the United States.  Plaintiffs infer that agents of Qinhe, without authorization, knowingly copied, duplicated, and/or replicated the converted Afiniti Trade Secrets and also knowingly transmitted, delivered, sent, communicated, and/or conveyed the converted Afiniti

Trade Secrets to others involved with the Isbei/Qinhe Enterprise.  Qinhe was created by and continues to be led by individuals who previously held important management positions with Isbei before setting up and incorporating Qinhe.  Liu was a legal representative, Zhao the General Manager, and Yan a former supervisor of Isbei Hainan before setting up and incorporating Qinhe. Liu, Zhao, and Yan all also previously worked for Afiniti, having knowledge of Afiniti's technology and operations in China.  Qinhe did not have its own contact center AI services, and relied upon Isbei as its "exclusive delivery partner" to provide the technology it marketed and sold to customers.  Qinhe knew it received and possessed converted Afiniti Trade Secrets when the same individuals responsible for transmitting, delivering, sending, communicating, and/or conveying converted Afiniti Trade Secrets to Qinhe also operate Qinhe.

303.   Plaintiffs infer that Niazi knowingly received and possessed the converted Afiniti Trade Secrets, including source code, at least by receiving them from Chishti, knowing that Chishti had stolen or appropriated Afiniti Trade Secrets from Afiniti without authorization and while in the United States.  On information and belief, Niazi communicated with Chishti, while Chishti was in the United States, regarding Afiniti Trade Secrets.  Plaintiffs can only conclude that Niazi, without authorization, knowingly copied, duplicated, and/or replicated the converted Afiniti Trade Secrets and also knowingly transmitted, delivered, sent, communicated, and/or conveyed the converted Afiniti Trade Secrets to others involved with the Isbei/Qinhe Enterprise.  As a director, 1% owner, and CEO of Isbei Pakistan, and former Afiniti employee, Niazi has knowledge of the source of Isbei's technology.

304.   Plaintiffs infer that Liu knowingly received and possessed converted Afiniti Trade Secrets, including source code, at least by receiving them from Chishti, Pobereskin, and/or Isbei, knowing that Chishti had stolen or appropriated Afiniti Trade Secrets from Afiniti without

authorization and while in the United States.  Plaintiffs infer that Liu, without authorization, knowingly copied, duplicated, and/or replicated the converted Afiniti Trade Secrets and also knowingly transmitted, delivered, sent, communicated, and/or conveyed the converted Afiniti Trade Secrets to others involved with the Isbei/Qinhe Enterprise, including at least Qinhe.  As both Isbei Hainan's former legal representative and current Qinhe legal representative, director, and 25% owner, and as a former Afiniti employee, Liu knew the source of Isbei's technology that forms the basis of Qinhe's services.

305.    Plaintiffs infer that Zhao knowingly received and possessed Afiniti Trade Secrets, including source code, at least by receiving them from Chishti, Pobereskin, and/or Isbei, knowing that Chishti had stolen or appropriated Afiniti Trade Secrets from Afiniti without authorization and while in the United States.  Plaintiffs infer that Zhao, without authorization, knowingly copied, duplicated, and/or replicated the converted Afiniti Trade Secrets and also knowingly transmitted, delivered, sent, communicated, and/or conveyed converted Afiniti Trade Secrets to others involved with the Isbei/Qinhe Enterprise, including at least Qinhe.  As both Isbei Hainan's former General Manager and current Qinhe General Manager, and as a former Afiniti employee, Zhao knew the source of Isbei's technology that forms the basis of Qinhe's services.

306.    Plaintiffs infer that Yan knowingly received and possessed Afiniti Trade Secrets, including source code, at least by receiving them from Chishti, Pobereskin, and/or Isbei, knowing that Chishti had stolen or appropriated Afiniti Trade Secrets from Afiniti without authorization and while at least in the United States.  Plaintiffs infer that Yan, without authorization, knowingly copied, duplicated, and/or replicated the converted Afiniti Trade Secrets and also knowingly transmitted, delivered, sent, communicated, and/or conveyed the converted Afiniti Trade Secrets to others involved with the Isbei/Qinhe Enterprise, including at least Qinhe.  As both a former

supervisor at Isbei Hainan and a current supervisor at Qinhe, and as a former Afiniti employee, Yan knew the source of Isbei's technology that forms the basis of Qinhe's services.

307.    Plaintiffs infer that Saud knowingly received and possessed converted Afiniti Trade Secrets, including source code, at least by receiving them from Chishti, Pobereskin, and/or Isbei, knowing that Chishti had stolen or appropriated Afiniti Trade Secrets from Afiniti without authorization and while in the United States.  Plaintiffs infer that Saud, without authorization, knowingly copied, duplicated, and/or replicated the converted Afiniti Trade Secrets and also knowingly transmitted, delivered, sent, communicated, and/or conveyed the converted Afiniti Trade Secrets to others involved with the Isbei/Qinhe Enterprise, including at least Qinhe.  As legal representative of Isbei Hainan, Saud would know the source of Isbei's technology that Isbei provides to Qinhe.

308.    Plaintiffs infer each of Chishti, Pobereskin, Isbei, Qinhe, Niazi, Liu, Zhao, Yan, and Saud knowingly and intentionally committed these acts of trade secrets theft in concert for the economic benefit of the Isbei/Qinhe Enterprise, intending or knowing that the offenses have injured, are injuring, and will continue to injure Afiniti in the United States.  The Isbei/Qinhe Enterprise received and continues to receive revenue from selling and delivering contact center AI services to customers, including SIG, CPIC, and China Mobile.  These technologies were based on the converted Afiniti Trade Secrets.  Each of Chishti, Pobereskin, Isbei, Qinhe, Niazi, Liu, Zhao, Yan, and Saud have further been aware, at all relevant times, that the Isbei/Qinhe Enterprise improperly and unlawfully is using Afiniti Trade Secrets with former Afiniti customers, whom Afiniti could choose to pursue at any future point in time, thereby injuring Afiniti in at least the United States.

309.    Each of Chishti, Pobereskin, Isbei, Qinhe, Niazi, Liu, Zhao, Yan, and Saud also knowingly and intentionally attempted to unlawfully and without authorization appropriate and convert Afiniti Trade Secrets in the manner described for the Isbei/Qinhe Enterprise predicate acts above as part of the Isbei/Qinhe Enterprise, reasonably believing Afiniti Trade Secrets to be trade secrets.

310.    Each of Chishti, Pobereskin, Isbei, Qinhe, Niazi, Liu, Zhao, Yan, and Saud also knowingly and intentionally conspired with one or more of the others involved in the Isbei/Qinhe Enterprise when each of Chishti, Pobereskin, Isbei, Qinhe, Niazi, Liu, Zhao, Yan, and Saud knowingly agreed, and acted in furtherance of that agreement, unlawfully or without authorization, to appropriate, take, copy, transmit, receive, and possess knowingly converted Afiniti Trade Secrets in the manner described above for the Isbei/Qinhe Enterprise predicate acts, reasonably believing Afiniti Trade Secrets to be trade secrets, for the benefit of the Isbei/Qinhe Enterprise, when the true owner of the trade secrets is Afiniti.

311.    Each of Chishti, Pobereskin, Isbei, Qinhe, Niazi, Liu, Zhao, Yan, and Saud also committed multiple acts in furtherance of the foregoing theft of Afiniti Trade Secrets, including in the United States.

### *Wire Fraud Predicate Acts*

312.    Chishti, Liu, Zhao, and Yan participated in a scheme that operated as a fraud or deceit upon Afiniti in the United States, appropriating Afiniti Trade Secrets obtained in the United States and defrauding Afiniti out of appropriate compensation for its use of Afiniti intellectual property, including Afiniti Trade Secrets, through and for the objectives of the Isbei/Qinhe Enterprise, in violation of 18 U.S.C. § 1343.

313.    Chishti, as the former CEO of Afiniti, knew that Afiniti Trade Secrets were Afiniti intellectual property.  Plaintiffs must infer that Chishti transmitted Afiniti Trade Secrets at least to

Pobereskin, Isbei, Qinhe, Niazi, Liu, Zhao, Yan, and/or Saud through wire communications that originated in the United States.

314.    Afiniti gave Chishti access to Afiniti Trade Secrets during the course of his employment with Afiniti, which occurred primarily in the United States, with the explicit and implicit understanding that the information would, in good faith, be kept confidential and used solely as part of Chishti's employment for the purpose of developing Afiniti's contact center AI technology and providing that technology to Afiniti's customers.   For example, Chishti's Employment Agreement with Afiniti specified Chishti's obligation not to reveal Afiniti confidential information, including Afiniti Trade Secrets, even after the conclusion of his employment.  That Employment Agreement also required Chishti to return any company property, including his computer and any Afiniti Trade Secrets contained on that computer or any other media, following the conclusion of his employment with Afiniti.

315.    Plaintiffs infer, and expect discovery to show, that Liu, Zhao, and Yan knowingly received, transmitted, and used converted Afiniti Trade Secrets as they were all former Afiniti employees who were instrumental in the creation of Isbei Hainan and Qinhe around the same time. They would have understood Afiniti Trade Secrets, including their purpose and use, would have known Isbei Hainan and Qinhe did not have their own comparable technologies and tools, and then would have directed their use with Qinhe customers.

316.    As alleged herein, Chishti, Liu, Zhao, and Yan as part of the Isbei/Qinhe Enterprise and following the conclusion of their employment with Afiniti, improperly appropriated, replicated, transmitted, and communicated, without authorization, Afiniti Trade Secrets to others involved with the Isbei/Qinhe Enterprise.  Chishti did so at least through retaining his computer following the conclusion of his employment, which contained Afiniti source code with Afiniti

Trade Secrets that Chishti obtained access to in the United States. He then unlawfully transmitted Afiniti Trade Secrets while residing in the United States to at least Pobereskin, Isbei, Qinhe, Liu, Zhao, Yan, Saud, and/or Niazi through wire communications so that Afiniti Trade Secrets could be unlawfully used as part of the Isbei/Qinhe Enterprise.

317.    Plaintiffs expect discovery to show that Liu, Zhao, and Yan unlawfully transmitted Afiniti Trade Secrets obtained from other members of the Isbei/Qinhe Enterprise and on information and belief independently obtained from Afiniti to at least Isbei, Qinhe, Saud, and/or Niazi through wire communications so that Afiniti Trade Secrets could be unlawfully used as part of the Isbei/Qinhe Enterprise.

318.    Chishti, Liu, Zhao, and Yan knew that Afiniti Trade Secrets constituted Afiniti intellectual property, yet they embezzled Afiniti Trade Secrets for their own use, particularly by enriching themselves through the Isbei/Qinhe Enterprise's sale and delivery of contact center AI technology to customers, including in China. Chishti, Liu, Zhao, and Yan received and continue to receive the benefits of the Isbei/Qinhe Enterprise, Chishti receiving those benefits in the United States where he continues to reside. Chishti knew and intended that he would be enriched through his actions, as he is the 99% owner of Isbei Pakistan, and Liu, Zhao, and Yan knew and intended they would be enriched as founders and shareholders of Isbei Hainan and Qinhe. Chishti, Liu, Zhao, and Yan also knew and intended that their deceit would deprive Afiniti of Afiniti Trade Secrets, other intellectual property rights, and business opportunities.

319.    Chishti, Liu, Zhao, and Yan reasonably foresaw that the wires would be used as part of their scheme to defraud Afiniti of its trade secrets and other intellectual property. Chishti was located in the United States during the course of relevant events. He had Afiniti Trade Secrets stored in electronic form, including as part of the Afiniti source code, on his unlawfully retained

Afiniti computer, which was stored in the United States. He would have reasonably foreseen that he would need to use wire communications to transmit Afiniti Trade Secrets to others involved with the Isbei/Qinhe Enterprise both in and outside the United States, including Pobereskin, Isbei Pakistan, and Niazi. Liu, Zhao, and Yan worked with Qinhe and Isbei, the latter of which had entities in China, Pakistan, and the Cayman Islands. Liu, Zhao, and Yan's participation in the scheme to defraud necessitated the use of wires to communicate, transmit, and/or retransmit Afiniti Trade Secrets between Chishti, Pobereskin, Niazi, Qinhe, and/or the various Isbei entities and their agents, across jurisdictions. Additionally, on information and belief, when Liu, Zhao, and/or Yan, and their agents, sought to independently obtain Afiniti Trade Secrets from Afiniti without authorization they would have reasonably foreseen that these actions would involve the use of wire communications to retrieve, obtain, download, and/or retransmit the Afiniti Trade Secrets.

320.    Chishti actually used wire communications to transmit Afiniti Trade Secrets to at least Pobereskin, Isbei, Qinhe, Liu, Zhao, Yan and/or Niazi, as well as others involved with the Isbei/Qinhe Enterprise. Plaintiffs expect discovery to show that Liu, Zhao, and Yan also unlawfully and without authorization retained, retrieved, and/or transmitted Afiniti Trade Secrets, in addition to communications regarding the use of Afiniti Trade Secrets, through the wires to at least Chishti, Pobereskin, Niazi, and others. The wires also were used for the subsequent delivery of contact center AI services to customers of the Isbei/Qinhe Enterprise, those contact center AI technologies unlawfully incorporating and using Afiniti Trade Secrets converted by Chishti in the United States. This past and ongoing use of the wires by the Isbei/Qinhe Enterprise to deliver contact center AI services to customers was in furtherance of the Isbei/Qinhe Enterprise scheme of converting Afiniti Trade Secrets and defrauding Afiniti out of appropriate compensation for use of Afiniti intellectual property, including Afiniti Trade Secrets.

321.    Each affirmative misrepresentation and omission in furtherance of the conversion and appropriation of Afiniti Trade Secrets, as well as any associated embezzlement, also constitute separate acts of wire fraud by Chishti, Liu, Zhao, and Yan in furtherance of their scheme to defraud Afiniti, including by converting Afiniti Trade Secrets for the benefit of the Isbei/Qinhe Enterprise.

322.    As a direct and proximate result of the pattern of racketeering activity, by and through each of the unlawful acts detailed above, Afiniti, which has a primary place of business in Washington, D.C., has been injured in the United States, at least in Washington, D.C., in its business and property, including, but not limited to, by loss or degradation of Afiniti Trade Secrets, other Afiniti intellectual property, protected business information, business opportunities, reputation, and profits.

*Pattern of Racketeering Activity*

323.    Each predicate act identified above is interrelated with the other predicate acts, having the same or similar purpose, results, participants, victims, and methods of commission.  All of the predicate acts involve unlawful appropriation and/or conversion of Afiniti Trade Secrets for use in the development, sale, and marketing of contact center AI services by defrauding Afiniti through embezzlement of Afiniti Trade Secrets, theft of Afiniti Trade Secrets, and economic espionage through the conversion and unlawful transfer, copying, duplication, or transmission of Afiniti Trade Secrets that were obtained in the United States for the benefit of a foreign government, instrumentality, or agent.

324.    These multiple illegal predicate acts occurred over the course of more than a year and are ongoing to this day, including continuing acts by the Isbei/Qinhe Enterprise in the United States.  The illegal predicate acts alone and in combination achieved and furthered the improper objectives of the Isbei/Qinhe Enterprise, to their benefit but at the expense of causing Afiniti significant harm in the United States, at least in Washington, D.C.

325.    Chishti, Pobereskin, Isbei, Qinhe, Niazi, Liu, Zhao, Yan, and Saud's predicate acts are so numerous and pervasive that they show a specific threat of repetition extending indefinitely into the future and therefore constitute both a close-ended and open-ended pattern of racketeering. These persons and entities are likely to continue illegally possessing and using Afiniti Trade Secrets that have been taken.  The Isbei/Qinhe Enterprise has already sold contact center AI services to a number of customers, including at least SIG, CPIC, and China Mobile.   The Isbei/Qinhe Enterprise is dependent on use of Afiniti Trade Secrets to deliver contact center AI services to customers.  Without Afiniti Trade Secrets, the Isbei/Qinhe Enterprise would be unable to operate.  Isbei and Qinhe also have substantial capitalization to support their ongoing operations. For example, Isbei Hainan has registered capital of 16 million USD, and Qinhe has registered capital of 50 million RMB.

326.    As a direct and proximate result of the pattern of racketeering activity, by and through each of the unlawful acts detailed above, Afiniti's business and property, including in the United States, has been injured, including, but not limited to, the loss of Afiniti Trade Secrets, and damage to Afiniti's reputation.

### NINTH CAUSE OF ACTION
### *RICO Conspiracy, 18 U.S.C. § 1962(d) (Against All Defendants)*

327.    Afiniti realleges and incorporates by reference the allegations of every paragraph of this Complaint.

328.    On information and belief, Chishti, Pobereskin, Isbei, Qinhe, Niazi, Liu, Zhao, Yan, and Saud conspired to violate 18 U.S.C. § 1962(c) ("RICO Conspiracy").

329.    On information and belief and as Plaintiffs can deduce from the facts described above, Chishti, Pobereskin, Isbei, Qinhe, Niazi, Liu, Zhao, Yan, and Saud each agreed to join the RICO Conspiracy knowing of its objective to conduct or participate, directly or indirectly, in the

conduct of the Isbei/Qinhe Enterprise's affairs through a pattern of racketeering activity and intending to join together with at least each other to achieve that objective.  On information and belief and as Plaintiffs can deduce from the facts described above, Chishti, Pobereskin, Isbei, Qinhe, Niazi, Liu, Zhao, Yan, and Saud shared a unity of purpose and the intent to achieve the objective of conducting or participating in the conduct of an enterprise's affairs through a pattern of racketeering activity.

330.    The objective of the conspiracy was, and continues to be, to market, sell, and deliver contact center AI services to customers worldwide, including in China, based on Afiniti Trade Secrets unlawfully converted, copied, and transferred from at least the United States by defrauding Afiniti, converting Afiniti Trade Secrets, and engaging in economic espionage through conversion and unlawful receipt, possession, transfer, duplication, and/or transmission of Afiniti Trade Secrets for the benefit of a foreign government, instrumentality, or agent.

331.    In furtherance of their RICO Conspiracy, Chishti, Pobereskin, Isbei, Qinhe, Niazi, Liu, Zhao, Yan, and Saud each agreed that one or more of Chishti, Pobereskin, Isbei, Qinhe, Niazi, Liu, Zhao, Yan, and Saud would commit various predicate acts of economic espionage, theft of trade secrets, and/or wire fraud for the unlawful and intentional purposes of defrauding Afiniti, in at least the United States, and converting Afiniti Trade Secrets obtained at least in Washington, D.C., as discussed, *supra*, paragraphs 256–326.

332.    In furtherance of their RICO Conspiracy, Chishti, Pobereskin, Isbei, Qinhe, Niazi, Liu, Zhao, Yan, and Saud each agreed that one or more of Chishti, Pobereskin, Isbei, Qinhe, Niazi, Liu, Zhao, Yan, and Saud would commit various predicate acts of economic espionage, theft of trade secrets, and/or wire fraud in relation to selling and delivering contact center AI services to

customers worldwide, including in China, based on converted Afiniti Trade Secrets as discussed, *supra*, paragraphs 256–326.

333.    The Isbei/Qinhe Enterprise's RICO Conspiracy is currently ongoing in the United States, Pakistan, and China, resulting in substantial ill-gotten gains and causing significant harm to Afiniti.  The harm includes damage to Afiniti's reputation, the loss of Afiniti Trade Secrets, and current and future losses to Afiniti resulting from the unlawful use of Afiniti Trade Secrets to market contact center AI services directly competitive with Afiniti and the sale of services and technology using Afiniti Trade Secrets to former Afiniti customers, at least in China, with whom Afiniti may choose to reengage in the future.

334.    As a direct and proximate result of the pattern of the Isbei/Qinhe Enterprise's RICO Conspiracy, by and through each of the unlawful acts detailed above, Afiniti has been injured in its business and property within the United States, including, but not limited to, the loss of Afiniti Trade Secrets and damage to Afiniti's reputation.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that the Court enter judgment granting relief, including, without limitation, the following:

a)  For a judgment in Plaintiffs' favor and against Defendants on all causes of action alleged herein;

b)  Specific performance and/or a permanent injunction (i) prohibiting Defendants and those in concert with them from operating each and every component of the "K2 Engine" and any component thereof and any related services which are found to have been copied, used, derived from, created or developed in whole or in part or whose creation or development has been aided or enhanced by reason of the acts complained of herein; (ii) prohibiting Defendants from using, accessing, disclosing, or continuing to possess Afiniti Trade

Secrets and confidential information and information derived therefrom; (iii) prohibiting Defendants from using, accessing, disclosing, or continuing to possess information copied or derived from Afiniti's platform and services; (iv) ordering the return or destruction under the supervision of a court-appointed forensic expert at Defendants' expense of Afiniti Trade Secrets and confidential information and information copied or derived from Afiniti's platform and services; (v) ordering that Chishti comply with his Employment Agreement including that he refrain from disclosing Afiniti confidential information, return company property, cease solicitation of Afiniti employees and customers, and cease disparagement of Afiniti; (vi) ordering a forensic evaluation at Defendants' expense confirming that Defendants have returned or properly destroyed all of Afiniti's information described herein and are not using it, including as part of its platform, and a forensic report at Defendants' expense to determine whether the information has been shared and with whom; (vii) requiring any future development work to be conducted under true "clean room" conditions with required auditing to ensure compliance; (viii) ordering any person to divest themselves of any interest, direct or indirect, in any enterprise; (ix) imposing reasonable restrictions on the future activities or investments of any person, including, but not limited to, prohibiting any person from engaging in the same type of endeavor as the enterprise engaged in, the activities of which affect interstate or foreign commerce; and/or (x) ordering dissolution or reorganization of any enterprise, making due provision for the rights of innocent persons;

c)  Restitution, a disgorgement, or a constructive trust for a sum equivalent to the amount by which Defendants were unjustly enriched, directly or indirectly, from the facts alleged, according to proof;

d) Damages in an amount to be determined at trial including compensatory damages, enhanced damages, exemplary damages, punitive damages, and up to the maximum amount permitted by law;

e) Pre-judgment and post-judgment interest at the rates prescribed by law;

f) Plaintiffs' reasonable attorneys' fees and costs;

g) All other relief at law or in equity, if and to the extent supported by the evidence, to which Plaintiffs may be entitled; and

h) Such other and further relief as the Court may deem proper.

## **JURY DEMAND**

Plaintiffs demand trial by jury in this action of all issues so triable.

DATED:   February 2, 2023                    Respectfully submitted,

                                             PAUL HASTINGS LLP

                                             By: */s/ Igor V. Timofeyev*
                                             _____

                                                 Igor V. Timofeyev
                                                 DC Bar No. 998291
                                                 igortimofeyev@paulhastings.com
                                                 Jeffrey A. Pade (*admission pending*)
                                                 DC Bar No. 492030
                                                 jeffpade@paulhastings.com
                                                 Brian Wilmot (*admission pending*)
                                                 DC Bar No. 1027995
                                                 brianwilmot@paulhastings.com
                                                 David Valente (*admission pending*)
                                                 DC Bar No. 1618330
                                                 davidvalente@paulhastings.com
                                                 Richard Rothman (*admission pending*)
                                                 DC Bar No. 1616717
                                                 richardrothman@paulhastings.com
                                                 2050 M Street NW
                                                 Washington, DC 20036
                                                 Telephone: 1(202) 551-1700
                                                 Facsimile:  1(202) 551-1705

                                                 Elizabeth L. Brann (to be admitted *pro hac vice*)
                                                 elizabethbrann@paulhastings.com
                                                 Ariell N. Bratton (to be admitted *pro hac vice*)
                                                 ariellbratton@paulhastings.com
                                                 4747 Executive Drive
                                                 12th Floor
                                                 San Diego, California  92121
                                                 Telephone: 1(858) 458-3000
                                                 Facsimile:  1(858) 458-3005

                                                 Thomas A. Counts (to be admitted *pro hac vice*)
                                                 tomcounts@paulhastings.com
                                                 101 California Street
                                                 Forty-Eighth Floor
                                                 San Francisco, California  94111
                                                 Telephone:  1(415) 856-7000
                                                 Facsimile:  1(415) 856-7100

                                             Attorneys for Plaintiffs
                                             AFINITI, LTD. and AFINITI, INC.