**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| AFINITI, INC., *et al.*,<br><br>　　　　　　*Plaintiffs*,<br><br>　　v.<br><br>MUHAMMAD ZIAULLAH KHAN CHISHTI, *et al.*,<br><br>　　　　　　*Defendants.* | Civil Action No. 23-303 (RDM) |

## <u>MEMORANDUM OPINION AND ORDER</u>

This case concerns an intellectual property dispute between Afiniti, Inc., a technology company, and its former Chief Executive Officer ("CEO"), Muhammad Ziaullah Khan Chishti. Following Chishti's departure from the company, Afiniti alleges that he orchestrated the creation of several enterprises which used misappropriated Afiniti trade secrets to develop and sell software products to former Afiniti clients and other customers.  Plaintiffs—Afiniti, Inc. and two related companies—bring this suit against Chishti, his wife Sarah Pobereskin, former Afiniti employee Yasir Zamir Ahmad, and four companies that, Plaintiffs allege, commercially exploit their stolen trade secrets under Chishti's direction.  Following jurisdictional discovery, Defendants have filed a renewed motion to dismiss and to strike, arguing that the Court lacks personal jurisdiction over any Defendant other than Mr. Chishti himself, that the complaint fails to state a claim for relief, and that Plaintiffs have waived any right to a jury trial in this case.  *See* Dkt. 78-1.  After that motion was fully briefed, Plaintiffs filed their own motion to supplement the record and sought sanctions for asserted discovery abuses by Defendants during the jurisdictional discovery process.  *See* Dkt. 122.

For the following reasons, the Court will **GRANT** in part and **DENY** in part Defendants' motion to dismiss; will **GRANT** in part and **DENY** in part without prejudice Defendants' motion to strike; will **GRANT** Plaintiffs' motion to supplement; and will **DENY** Plaintiffs' motion for sanctions.

## I. BACKGROUND

**A.    Factual Background**

The following factual allegations giving rise to this suit are taken from Plaintiffs' amended complaint, Dkt. 70-2 (Am. Compl.), which Plaintiffs filed following the completion of jurisdictional discovery.  The Court also, where appropriate, refers to portions of the parties' evidentiary submissions regarding personal jurisdiction.

Plaintiffs Afiniti, Inc., Afiniti AI Holdings LLC, and Afiniti AI Limited (collectively, "Afiniti") "provide applied artificial intelligence ('AI') services and other technologies to help their clients improve interactions in contact centers, such as call centers."[1] *Id.* at 4 (Am. Compl. ¶ 2).  Chishti founded Afiniti in 2005 and served as CEO until November 2021.  *Id.* at 17 (Am. Compl. ¶ 44).  For the majority of that time, Chishti worked and resided in Washinton, D.C.  *Id.*; Dkt. 78-2 at 2 (Chishti Decl. ¶¶ 5–6).  In 2016, Chishti signed an employment agreement ("Employment Agreement") with Afiniti—which, at the time, also operated under the name SATMAP Incorporated.  *See* Dkt. 78-7.  Among other provisions, the Employment Agreement forbade the unauthorized disclosure of Afiniti's confidential information, required that Chishti return any company property in his possession at the time of the termination of his employment, and prohibited him from soliciting Afiniti employees or customers for a two-year period

---

[1] A further related entity, Afiniti Ltd., also brought claims in this case but voluntarily dismissed its claims in November 2025.  *See* Dkt. 103.

following the termination of his employment. *Id.* at 7–8; Dkt. 70-2 at 17, 121–22 (Am. Compl. ¶¶ 45, 348–51).

In November 2020, while still employed by Afiniti, Chishti moved from Washington, D.C. to the British Overseas Territory of Bermuda. Dkt. 70-2 at 12–13 (Am. Compl. ¶ 30); Dkt. 78-2 at 2 (Chishti Decl. ¶ 6). Shortly afterwards, he married Sarah Pobereskin in Bermuda. Dkt. 78-2 at 2 (Chishti Decl. ¶ 8); Dkt. 78-3 at 2 (Pobereskin Decl. ¶ 7); Dkt. 70-2 at 12–13 (Am. Compl. ¶¶ 30, 32). Pobereskin, an employee of the management consulting company ghSMART, had previously worked in the United States, where her employee biography described her as living in New York City and Washington, D.C. Dkt. 70-2 at 13 (Am. Compl. ¶ 31). Like Chishti, she moved to Bermuda in November 2020. *Id.* at 12 (Am. Compl. ¶ 30); Dkt. 78-3 at 2 (Pobereskin Decl. ¶ 5). Although both Chishti and Pobereskin attest that they intended for Bermuda to become their domicile at that time, Dkt. 78-2 at 2 (Chishti Decl. ¶ 6); Dkt. 78-3 at 2 (Pobereskin Decl. ¶ 5), they listed Chishti's former Washington, D.C. address as their address in several subsequent documents, including their marriage certificate, Dkt. 70-2 at 12–13 (Am. Compl. ¶ 30). Chishti and Pobereskin attest that all such uses of the D.C. address, as well as other representations that they still resided in Washington, D.C. after November 2020, were outdated and erroneous. Dkt. 78-9 at 2 (Pobereskin Supp. Decl. ¶¶ 2–3); Dkt. 78-11 at 5–6 (Chishti Supp. Decl. ¶¶ 13–14).

Chishti's tenure as Afiniti CEO ended in November 2021, a year after he relocated to Bermuda, following reports of an alleged sexually abusive relationship between Chishti and a former Afiniti employee. Dkt. 70-2 at 4 & n.1 (Am. Compl. ¶ 3). Plaintiffs allege that Chishti retained Afiniti property following his resignation, including one or more computers that contained Afiniti trade secrets. *Id.* at 74–75 (Am. Compl. ¶¶ 183–84). During negotiations over

3

a proposed separation agreement, Chishti requested that Afiniti limit his liability for failure to return one or more computers to the value of the computers themselves (excluding the value of their content, including trade secrets); allow him to maintain and use Afiniti confidential information already in his possession; and allow him to solicit Afiniti customers and employees. *Id.* at 74–75 (Am. Compl. ¶ 184). Afiniti refused those requests. *Id.* According to Plaintiffs, by January 2022 Chishti was nonetheless "solicit[ing] investment" for a proposed venture to license Afiniti's intellectual property in China and to provide services to former Afiniti customers. *Id.* at 19, 124 (Am. Compl. ¶¶ 51, 360).

In February 2022, three months after his leaving Afiniti, Chishti and Pobereskin relocated once again, this time to Puerto Rico. *Id.* at 12 (Am. Compl. ¶ 30). Both Chishti and Pobereskin attest that they are currently residents of Puerto Rico. Dkt. 78-2 at 2 (Chishti Decl. ¶ 2); Dkt. 78-3 at 2–3 (Pobereskin Decl. ¶¶ 2, 12). Plaintiffs allege that, shortly after moving to Puerto Rico, Chishti (and others working with him) began establishing a network of businesses to commercialize products developed using Afiniti's intellectual property. Dkt. 70-2 at 74 (Am. Compl. ¶ 181).

First, on March 21, 2022, the Qinhe company was incorporated in the People's Republic of China. *Id.* at 14 (Am. Compl. ¶ 33). Qinhe, which means "affinity" in Chinese, *id.* at 80 (Am. Compl. ¶ 202), was initially established with a single shareholder, Xiaoxin "Yolanda" Liu, *id.* at 22, 43 (Am. Compl. ¶¶ 59, 134). Liu had previously worked for an Afiniti-controlled company in China. *Id.* at 87, 96 (Am. Compl. ¶¶ 225, 254). Qinhe's current CEO and General Manager, Zhao Jian, also previously worked as an executive at one of Afiniti's Chinese affiliates. *Id.* at 44, 87 (Am. Compl. ¶¶ 135, 227).

4

Second, on March 28, 2022, Isbei Ltd. ("Isbei") was formed in the Cayman Islands. *Id.* at 14 (Am. Compl. ¶ 34). Pobereskin is the sole listed director of Isbei. *Id.* at 19 (Am. Compl. ¶ 53); Dkt. 78-3 at 3 (Pobereskin Decl. ¶ 15). Chishti transferred millions of dollars of his own money to Isbei to fund its operations. Dkt. 70-2 at 27–28 (Am. Compl. ¶ 79). Although much (if not all) of that funding went directly from Chishti's accounts to Isbei, *id.*, Chishti claims that those transfers were part of "$15 million in gifts" that he had made to Pobereskin, Dkt. 78-11 at 5 (Chishti Supp. Decl. ¶ 12). According to Chishti, Pobereskin decided on her own accord to invest the gifted money in Isbei and requested that he "transfer the money [he] was gifting her to fund her investment in Isbei." *Id.* Osman Ali Kahn Niazi, a friend of Chishti's who had previously worked for Afiniti, was later named Isbei Chief Operating Officer ("COO"). Dkt. 70-2 at 75–76 (Am. Compl. ¶ 188).

Third, around April 6, 2022, Yasir Zamir Ahmad ("Zamir") visited Chishti and Pobereskin in Puerto Rico. Dkt. 78-11 at 9 (Chishti Supp. Decl. ¶ 23); Dkt. 78-8 at 6 (Zamir Decl. ¶ 23). Zamir had worked for Afiniti in Washington, D.C. from August 2015 until February 2022, maintaining residences in Maryland and Virginia, and then left Afiniti to join Isbei around the time of his visit to Puerto Rico.[2] Dkt. 70-2 at 14 (Am. Compl. ¶ 36); Dkt. 78-8 at 2 (Zamir Decl. ¶¶ 5–6). During the visit on April 6, Chishti sent an email from his Isbei email address (zia.chishti@isbei.com) to Zamir's Isbei email address (yasir.zamir@isbei.com) with the subject line "R scripts," which included several attachments of computer code in the "R" programming

---

[2] According to Zamir, he resigned from Afiniti in December 2021 but his employment with Afiniti did not officially end until February 15, 2022. Dkt. 78-8 at 2 (Zamir Decl. ¶ 5). Zamir attests that he began working as a "Freelance Service Provider" for Isbei on May 1, 2022. *Id.* at 5 (Zamir Decl. ¶ 15). Plaintiffs' complaint alleges the same date. Dkt. 70-2 at 14 (Am. Compl. ¶ 36). As noted below, however, it appears that Zamir had a functioning Isbei email address several weeks before then.

language.  Dkt. 70-2 at 20 (Am. Compl. ¶ 55); Dkt. 78-8 at 6 (Zamir Decl. ¶ 23); *see* Dkt. 78-11 at 20–38.  Plaintiffs allege that those attachments contained "source code . . . which disclosed, used, or incorporated Afiniti Trade Secrets."  Dkt. 70-2 at 20 (Am. Compl. ¶ 55).  Chishti and Zamir, in contrast, claim that the scripts were created when Chishti, while discussing "data analysis" and programming using R with Zamir, decided to "brush[] up on his coding skills by creating some short R scripts."  Dkt. 78-8 at 6 (Zamir Decl. ¶ 23); *see also* Dkt. 78-11 at 9 (Chishti Supp. Decl. ¶¶ 23–24).  Chishti and Zamir deny that the scripts included Afiniti's confidential information or trade secrets or that Isbei used the scripts afterwards, Dkt. 78-8 at 6–7 (Zamir Decl. ¶¶ 25–27); Dkt. 78-11 at 8–9 (Chishti Supp. Decl. ¶ 22), although Chishti does admit that the scripts "embody portions of a method" used by Afiniti in its business—albeit a method that, Chishti attests, had already been "publicly disclosed," Dkt. 78-11 at 9 (Chishti Supp. Decl. ¶ 25).

Fourth, on April 11, 2022, Isbei established a wholly owned subsidiary, Isbei (Hainan) Technology Co., Ltd. ("Isbei Hainan"), in the People's Republic of China.  Dkt. 70-2 at 14 (Am. Compl. ¶ 35).  Yolanda Liu, the sole shareholder of Qinhe, was Isbei Hainan's founding executive director.  *Id.* at 22 (Am. Compl. ¶ 59).  One week later, Liu sent Chishti a draft master services agreement between Qinhe and Isbei for his review.  *Id.* (Am. Compl. ¶¶ 59–60).  The final agreement between Isbei Hainan and Qinhe granted Qinhe an exclusive license to use Isbei's technology, in return for which Qinhe agreed to pay Isbei Hainan 98% of all revenue Qinhe "generated from Isbei[-] Derived Business."  *Id.* at 82 (Am. Compl. ¶ 205).  For its part, Isbei Hainan agreed to cover all of Qinhe's expenses, including "personnel, marketing, management, deployment, and other operational costs."  *Id.*  In May 2022, Pobereskin—who was Isbei's "sole shareholder"—appointed Lalarukh Saud as the head of Isbei Hainan.  *Id.* at 23 (Am.

6

Compl. ¶ 64).  From May to September of 2022, both Isbei and Qinhe agreed to "pilot programs" to provide services to former Afiniti clients.  *Id.* at 118–19 (Am. Compl. ¶¶ 329–330).

Fifth, in late 2023 Zamir "co-founded Dataquartz, a company that he leads and spun out of Isbei." *Id.* at 8 (Am. Compl. ¶ 14).  Beginning on November 1, 2023, Dataquartz provided technical services to Isbei under a "Manpower Service Provider contract." *Id.* at 15 (Am. Compl. ¶ 38).  As part of the agreement, Dataquartz pledged that "it would not work for any company other than [Isbei] so long as [Isbei] had sufficient work for Dataquartz." *Id.* at 32 (Am. Compl. ¶ 99).  In essence, Plaintiffs allege, Zamir continued to develop code for Isbei, only now through a separate corporate structure.  *Id.* at 47 (Am. Compl. ¶ 145).  It is undisputed that Dataquartz is incorporated in Canada.  *Id.* at 15 (Am. Compl. ¶ 38); *see* Dkt. 78-8 at 5 (Zamir Decl. ¶ 16).  Plaintiffs allege that, following his meeting with Chishti in Puerto Rico, Zamir moved from Maryland (where he most recently resided when working for Afiniti) to Texas, where he now works for Dataquartz.  Dkt. 70-2 at 31, 52 (Am. Compl. ¶¶ 97, 155).  Zamir disputes this and attests that he actually moved from Maryland to Pakistan, where he has been domiciled since 2022, and that he has never resided in Texas.  Dkt. 78-8 at 3 (Zamir Decl. ¶¶ 7–8).  Furthermore, although Plaintiffs allege that Dataquartz's website listed a "local presence" in both Texas and Washington D.C., as well as a Texas phone number, Dkt. 70-2 at 15 (Am. Compl. ¶ 38), Zamir attests that Dataquartz has no offices or employees in the United States and that the Texas phone number listed on Dataquartz's website "is a Google Voice number associated with [Zamir's] Google account" that he continues to use in Pakistan, Dkt. 78-8 at 5–6 (Zamir Decl. ¶¶ 18, 20).  Zamir does not explain why his Google Voice number has a Texas area code, when the only connection to Texas mentioned in his declaration is that his sister resides in Garland, Texas.  *See id.* at 3 (Zamir Decl. ¶ 7).

Throughout this period, Plaintiffs allege that Chishti worked with Pobereskin and others in directing the "Isbei/Qinhe enterprise." *See* Dkt. 70-2 at 36 (Am. Compl. ¶ 118). Beyond funding Isbei (and, indirectly, Qinhe), Chishti allegedly provided technical instructions to Isbei and Qinhe staff, oversaw the selection of Isbei's COO, established payment mechanisms for Isbei employees, communicated with clients on behalf of both Isbei and Qinhe, and routinely approved expenditures for both Isbei and Qinhe (using Pobereskin's email address to do so). *Id.* at 20–21, 23–24, 26, 31 (Am. Compl. ¶¶ 57, 66–67, 73, 93). Plaintiffs also allege that Chishti worked with Zamir and others to prepare patent applications on behalf of Isbei. *Id.* at 28–29 (Am. Compl. ¶¶ 81, 83). Isbei filed the first patent application in China on June 28, 2023, and the second application on November 30, 2023. *Id.* at 103, 110 (Am. Compl. ¶¶ 293, 308). Both applications list Abdullah Asghar Sheikh, a former Afiniti employee who subsequently worked for Isbei and Dataquartz, as an inventor. *Id.*; *see also id.* at 42 (Am. Compl. ¶ 130). Chishti had previously sent draft patent applications to Sheikh, which also listed Sheikh as the named inventor. *Id.* at 29 (Am. Compl. ¶ 83). Plaintiffs allege that those patents both rely on and disclose Afiniti trade secrets. *Id.* at 42, 103 (Am. Compl. ¶¶ 130, 292). Chishti denies making any "substantive contribution" to either Isbei patent application. Dkt. 78-11 at 17 (Chishti Supp. Decl. ¶ 61).

Defendants also deny that Chishti has had any direct responsibility for Isbei or Qinhe's operations. Dkt. 78-1 at 30 ("Chishti is not an officer, director, shareholder, or employee of Qinhe, Isbei Hainan, or Isbei Ltd."). Chishti attests that he has only "offered occasional and uncompensated advice" to Defendants, "including to [his] wife, Sarah Pobereskin, who is the majority owner of Isbei Ltd., and to [his] long-time friend Osman Niazi, who is the Chief Operating Officer of Isbei Ltd." Dkt. 78-11 at 2 (Chishti Supp. Decl. ¶ 4). Although Chishti

8

admits to "hav[ing] provided . . . business advice" to Isbei, Qinhe, and their officers and to "hav[ing] made suggestions to some of Isbei Ltd.'s and Qinhe's technical people," he claims that he did so only because "[w]hen a friend calls for business advice, I try to be helpful and to provide advice," which is "not the same thing as running a company." *Id.* at 3 (Chishti Supp. Decl. ¶ 6).

## B.    Procedural History

Plaintiffs filed their original complaint in this case in February 2023, naming Chishti, Pobereskin, Qinhe, Isbei, and Isbei Hainan as Defendants.[3] *See* Dkt. 1 (Compl.).  Defendants moved to dismiss, arguing (among other things) that the Court lacked personal jurisdiction over any Defendant other than Chishti.  Dkt. 35-1 at 9.  At a hearing on the motion, the Court granted Plaintiffs' request for jurisdictional discovery in light of the conflicts between the facts alleged in the complaint and the declarations accompanying Defendants' first motion to dismiss.  Dkt. 44 at 65–66.  Following the completion of jurisdictional discovery, Plaintiffs filed the operative, amended complaint.  *See* Dkt. 70-2 (Am. Compl.).  The amended complaint names Chishti, Zamir, Pobereskin, Isbei, Isbei Hainan, Qinhe, and Dataquartz as Defendants, *see generally id.*, and asserts the following claims:

- Count I: Breach of contract claim against Chishti, alleging that Chishti violated the Employment Agreement.  *Id.* at 121–23 (Am. Compl. ¶¶ 343–56).

- Count II: Misappropriation of trade secrets claim against all Defendants, brought under the Defend Trade Secrets Act, 18 U.S.C. § 1836.  *Id.* at 123–31 (Am. Compl. ¶¶ 357–79).

---

[3] Plaintiffs' complaint also listed Isbei AI (Private) Ltd. ("Isbei Pakistan") as a defendant.  Dkt. 1 at 9 (Compl. ¶ 21).  Isbei Pakistan is a Pakistani company of which Chishti owns 99 percent.  *Id.* The claims against Isbei Pakistan have since been withdrawn.  Dkt. 70-2 at 15 (Am. Compl. ¶ 39).

- Counts III, V, and VI: Misappropriation of trade secrets claims against all Defendants, brought under District of Columbia, Texas, and Puerto Rico law. *Id.* at 131–38, 140–46, 147–54 (Am. Compl. ¶¶ 380–402, 10–31, 1–26).

- Count IV: Claim against Chishti for unauthorized access of Afiniti's computer network, brought under the Computer Fraud and Abuse Act ("CFAA"), 18 U.S.C. § 1030. *Id.* at 138–40 (Am. Compl. ¶¶ 1–9).

For relief, Plaintiffs request (among other things) an injunction prohibiting Defendants from operating the products alleged to rely on Afiniti trade secrets, the return or destruction of those trade secrets in Defendants' possession, the specific performance of Chishti's Employment Agreement, restitution, and damages. *Id.* at 154–56. (Am. Compl.). Plaintiffs "demand trial by jury in this action of all issues so triable." *Id.* at 156 (Am. Compl.).

In response, Defendants filed a renewed motion to dismiss and to strike. *See* Dkt. 78. That motion, once again, argues that the Court lacks personal jurisdiction over all Defendants other than Chishti, Dkt. 78-1 at 17–40; that Plaintiffs have failed to comply with Rule 8 and Rule 12 as the complaint only contains vague, speculative, and conclusory allegations, *id.* at 42–48; that Plaintiffs' claim under the CFAA fails as a matter of law, *id.* at 48–52; and that Chishti's Employment Agreement waives Plaintiffs' right to a jury trial, *id.* at 52.

The Court scheduled a hearing on the motion to dismiss for Monday, January 12, 2026. Min. Order (Dec. 15, 2025). On the Friday evening before that hearing, Plaintiffs filed a motion asking for supplemental briefing because of what they characterized as Defendants "discovery omissions and untrue representations." Dkt. 106-2 at 4. Specifically, Plaintiffs highlighted statements made by Chishti while testifying in separate litigation in Bermuda, as well as Chishti and Pobereskin's testimony in a proceeding before Judge Rakoff in the Southern District of New

10

York, that, Plaintiffs claimed, contradicted Chishti and Pobereskin's sworn statements during jurisdictional discovery in this case. *See generally id.* Because Plaintiffs' original motion to supplement was filed entirely under seal, despite including many materials that were publicly available and non-confidential, the Court directed Plaintiffs to re-file the motion after reassessing which portions could and could not be filed on the public docket. Dkt. 108 at 45–46; *see* Min. Order (Jan. 14, 2026). The Court also directed Plaintiffs to include in their resubmission a more detailed explanation of the trade secrets that they alleged that Chishti had misappropriated. Dkt. 108 at 58. Plaintiffs then renewed their motion to supplement the record, *see* Dkt. 122, and also requested that the Court impose sanctions on Chishti and Pobereskin for their "material omissions, contradictions, obfuscations and misleading statements" during jurisdictional discovery, *id.* at 22, and Defendants opposed the motion, *see* Dkt. 127-2. After the motion to supplement was fully briefed, Plaintiffs filed two additional "notices of supplemental authority" raising for the Court's attention further proceedings in the Southern District of New York case. *See* Dkt. 136; Dkt. 138.

Defendants' motion to dismiss and to strike, Dkt. 78, and Plaintiffs' motion to supplement the record and for sanctions, Dkt. 122, are now before the Court.

## II. ANALYSIS

### A.    Motion to Supplement

Before turning to the merits of Defendants' motion to dismiss, the Court must first decide whether it will consider that motion with the benefit of the additional material included in Plaintiffs' motion to supplement the record. *See* Dkt. 106; Dkt. 109; Dkt. 122. The Court has "discretion to allow parties to supplement the record of a case," *Marsh v. Johnson*, 263 F. Supp. 2d 49, 53 (D.D.C. 2003), when the additional evidence is helpful to the Court and was presented "in a timely manner," *Pao Tatneft v. Ukraine*, No. 17-cv-582, 2020 WL 2476034, at *3 (D.D.C.

May 13, 2020), particularly if the evidence was not previously available to the moving party. Defendants argue that Plaintiffs' motion to supplement should be rejected as untimely, because it rests on testimony given by Chishti and Pobereskin in separate proceedings in November and December 2025 but was not filed until early January 2026.  Dkt. 127-2 at 9, *see* Dkt. 106.

The Court agrees with Defendants that Plaintiffs could have moved with (slightly) greater dispatch and that Plaintiffs' decision to file hundreds of pages of new exhibits the Friday evening before the long-scheduled Monday hearing on Defendants' motion to dismiss at least potentially placed Defendants at an unfair disadvantage.  It is safe to assume that, were the shoe on the other foot, Plaintiffs would raise equally vehement opposition to the last-minute filing.  For several reasons, however, the Court will nevertheless grant Plaintiffs' motion to supplement the record.

First, the substance of the materials at issue could not have come as a surprise to Defendants.  Chishti appeared and testified at the proceeding before the Supreme Court of Bermuda, *see* Dkt. 106-4, and Chishti and Pobereskin appeared and testified at the proceeding before the U.S. District Court for the Southern District of New York, *see* Dkt. 106-5; Dkt. 106-6. Second, Plaintiffs' brief delay in bringing this evidence to the Court's attention has not interfered with the timely adjudication of the pending motions.  Finally, and most importantly, Defendants have had ample opportunity to respond to Plaintiffs' supplemental filing, *see* Dkt. 127-2, and they have suffered no undue prejudice resulting from Plaintiffs' delay.

That leaves the question whether Plaintiffs have, nonetheless, engaged in sandbagging with the purpose of obtaining a strategic advantage at the hearing that the Court held on January 12, 2026.  That is a serious charge and one that the Court is not prepared to accept based on nothing more than the timing, which, while far from ideal, did permit defense counsel to prepare over the weekend and to file at least a preliminary response before the hearing.  *See* Dkt. 107;

12

Dkt. 108 at 21.  The Court cautions the parties, however, that it will not tolerate unfair gamesmanship or lack of professional courtesy as this case proceeds.

The Court will, accordingly, grant Plaintiffs' motion to supplement the record.

**B.    Personal Jurisdiction**

Turning to the merits of the dispute, the primary question presented by Defendants' motion to dismiss is which, if any, of the non-Chishti Defendants are properly subject to the Court's personal jurisdiction.  Defendants do not dispute that the Court may exercise personal jurisdiction over Chishti, *see* Dkt. 78-1 at 9, 17, who, in the Employment Agreement, agreed to "submit to the exclusive jurisdiction" of "[t]he federal or state courts of the District of Columbia" in the event of litigation arising out of or relating to the Employment Agreement, Dkt. 78-7 at 5; *see also In re Sealed Case*, 932 F.3d 915, 922 (D.C. Cir. 2019) ("Unlike subject-matter jurisdiction, however, personal jurisdiction 'can . . . be waived,' meaning a party may 'consent' to a court's personal jurisdiction." (alteration in original) (quoting *Ins. Corp. of Ireland v. Compagnie des Bauxites de Guinee*, 456 U.S. 694, 703 (1982)).  Defendants do, however, maintain that the Court lacks personal jurisdiction over Pobereskin, Zamir, or any of the corporate defendants: Isbei, Isbei Hainan, Qinhe, and Dataquartz.  Dkt. 78-1 at 17.

1.    *Legal Standard*

Before turning to the parties' respective arguments, the Court pauses to identify the appropriate legal standard.  When the defense is timely raised, the plaintiff generally bears the burden of establishing personal jurisdiction as to each objecting defendant.  *See FC Inv. Grp. LC v. IFX Mkts., Ltd.*, 529 F.3d 1087, 1091 (D.C. Cir. 2008); *see also Crane v. N.Y. Zoological Soc'y*, 894 F.2d 454, 456 (D.C. Cir. 1990) (In opposing a Rule 12(b)(2) motion, "[t]he plaintiff has the burden of establishing a factual basis for the exercise of personal jurisdiction over the defendant[s].").  "[T]he showing a plaintiff must make to defeat a defendant's claim that the

court lacks personal jurisdiction," however, "varies depending on the procedural posture of the litigation." *Dorchester Fin. Sec., Inc. v. Banco BRJ, S.A.*, 722 F.3d 81, 84 (2d Cir. 2013) (citation modified); *see also Grayson v. Anderson*, 816 F.3d 262, 268 (4th Cir. 2016). "[W]hen the court addresses the personal jurisdiction question by reviewing only the parties' motion papers, affidavits attached to the motion, supporting legal memoranda, and the allegations in the complaint, a plaintiff need only make a *prima facie* showing of personal jurisdiction to survive the jurisdictional challenge." *Grayson*, 816 F.3d at 268; *see also Mwani v. bin Laden*, 417 F.3d 1, 6 (D.C. Cir. 2005) (same). At this stage of the proceeding, "plaintiffs are not limited to evidence that meets the standards of admissibility required by the district court" and, instead, "may rest their argument on their pleadings, bolstered by such affidavits and other written materials as they can otherwise obtain." *Mwani*, 417 F.3d at 7. In this context, "[u]ncontroverted allegations in the complaint must be taken as true, and conflicts between parties over statements contained in affidavits must be resolved in the plaintiff's favor." *Will Co. v. Lee*, 47 F.4th 917, 921 (9th Cir. 2022).

Alternatively, the Court may hold an evidentiary hearing, at which the plaintiff typically bears the burden of proving personal jurisdiction by a preponderance of the evidence, *see IMAPizza, LLC v. At Pizza Ltd.*, 334 F. Supp. 3d 95, 108 (D.D.C. 2018), or may defer the question of personal jurisdiction to trial on the merits, *Dorchester Fin. Sec., Inc.*, 722 F.3d at 85. Under either of these approaches, the Court no longer assumes the truth of the plaintiff's jurisdictional allegations and no longer views the evidence in the light most favorable to the plaintiff. The plaintiff, instead, bears the burden of "establish[ing] facts supporting jurisdiction over the defendant by a preponderance of the evidence." *Grayson*, 816 F.3d at 268; *see also*

14

*Edmond v. U.S. Postal Serv. Gen. Counsel*, 949 F.2d 415, 424 (D.C. Cir. 1991) (prima facie showing suffices, "unless the trial court holds an evidentiary hearing").

A further option lies between these poles:  A defendant contesting personal jurisdiction may move for summary judgment under Federal Rule of Civil Procedure 56.  *See* 5B *Federal Practice and Procedure* § 1351 (4th ed. Apr. 2026 update) ("Wright & Miller").  If the defendant does so, the Court must assess the motion in the same manner as any other summary judgment motion.  *See Dorchester Fin. Sec., Inc.*, 722 F.3d at 85.  The movant "bears the initial responsibility" of "identifying those portions" of the record that "demonstrate the absence of a genuine issue of material fact."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  A fact is "material" if it could affect the outcome of the litigation under governing law, *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986), and a dispute is "genuine" if the evidence is such that a reasonable jury could return a verdict for the nonmoving party, *see Scott v. Harris*, 550 U.S. 372, 380 (2007).  Although the movant is entitled to prevail in the absence of any evidence supporting personal jurisdiction, the Court must view whatever evidence exists in the light most favorable to the nonmoving party and must draw all reasonable inferences in that party's favor. *See Talavera v. Shah*, 638 F.3d 303, 308 (D.C. Cir. 2011).

Here, Defendants have not moved for summary judgment; they oppose holding an evidentiary hearing, Dkt. 100-2 at 31; and they oppose deferring resolution of the jurisdictional dispute until trial on the merits.  Plaintiffs, for their part, have not cross-moved for summary judgment on personal jurisdiction and, instead, urge the Court to defer resolution of the jurisdictional issue for trial.  Dkt. 89-2 at 9–10.  Similarly, although Plaintiffs acknowledge in a footnote that an evidentiary hearing might be warranted "[i]f the Court requires a complete

evidentiary basis for every jurisdictional fact," *id.* at 16 n.8, they do not affirmatively request an evidentiary hearing.

There are good reasons, moreover, not to hold an evidentiary hearing at this time. To be sure, holding an early evidentiary hearing on disputed questions of fact relating to personal jurisdiction is often advisable. *See Grayson*, 816 F.3d at 268; 5B Wright & Miller § 1351(4th ed. Apr. 2026 update). Doing so permits the court to resolve the question of personal jurisdiction once and for all before the parties incur additional expense and, more importantly, before foreign parties are put to the burden of litigating in a jurisdiction with which they lack the requisite connection. Here, however, at least two considerations weigh against holding an early evidentiary hearing.

First, Defendants—that is, those who have the greatest stake in obtaining an early and final resolution of the question whether they should be required to defend a suit brought against them in a foreign jurisdiction—oppose holding an evidentiary hearing. Dkt. 100-2 at 31. And, as explained above, Defendants have made the strategic decision to oppose an evidentiary hearing even though doing so would force Plaintiffs to overcome a higher burden to establish personal jurisdiction over the nonresident Defendants.

The Court, of course, is not bound by Defendants' opposition and could nonetheless order the parties to appear. That, however, leads to the second, and more substantial, reason not to attempt to reach a final resolution of the parties' jurisdictional dispute at this stage of the proceeding. As the discussion below will illustrate, Plaintiffs have made a substantial showing that the Court has personal jurisdiction over most (although not all) of the Defendants; this is not a case, in other words, in which a plaintiff is dragging foreign defendants into a distant court without a substantial claim of personal jurisdiction. To be sure, material disputes of fact still

16

exist, but, for the most part, those disputes are intertwined with the merits of the case. It follows that an evidentiary hearing on personal jurisdiction would quickly devolve into a minitrial (and perhaps a full trial) on the merits, and it would do so without the benefit of full discovery and factual development. *See Adams v. Bain*, 697 F.2d 1213, 1219 (4th Cir. 1982) (if "the jurisdictional facts are intertwined with the facts central to the merits of the dispute," "[i]t is the better view that . . . the entire factual dispute is appropriately resolved only by a proceeding on the merits"). Under these circumstances, conducting an early evidentiary hearing on personal jurisdiction would disserve the judicial interest in fairly and accurately adjudicating potentially dispositive questions of fact. *See United States v. Swiss Am. Bank, Ltd.*, 274 F.3d 610, 638 (1st Cir. 2001) (Lipez, J., dissenting).

It is true that at least two decisions from this Court assert that "where the parties are permitted to conduct discovery on the jurisdictional issue," as has occurred here, "a plaintiff must prove that personal jurisdiction exists by a preponderance of the evidence." *Shapiro, Lifschitz & Schram, P.C. v. Hazard*, 90 F. Supp. 2d 15, 20 (D.D.C. 2000); *see also Alkanani v. Aegis Def. Servs., LLC*, 976 F. Supp. 2d 13, 22 (D.D.C. 2014). Defendants, citing both those decisions, have correspondingly argued that Plaintiffs must satisfy that standard to overcome the motion to dismiss. Dkt. 78-1 at 18. On closer examination, however, neither decision requires holding Plaintiffs to their ultimate burden of proof—without a hearing or trial—merely because the court has authorized jurisdictional discovery.

The first of these cases, the *Hazard* case, 90 F. Supp. 2d at 20, cites the Second Circuit's decision in *Landoil Resources Corporation v. Alexander & Alexander Services, Inc.*, which, in fact, says that the preponderance standard applies after a district court allows the parties to conduct discovery, 918 F.2d 1039, 1043 (2d Cir. 1990). But that same decision goes on to say

17

that because "the district court did not hold a hearing or a trial on the merits, all pleadings and affidavits must be construed in the light most favorable" to the plaintiff. *Id.* That qualification mirrors the prima facie showing requirement and is consistent with subsequent Second Circuit precedent, which recognizes that, "[a]fter discovery, the plaintiff's prima facie showing, necessary to defeat a jurisdiction testing motion, must include an averment of facts that, if credited by the trier [of fact], would suffice to establish jurisdiction over the defendant," and that the "*prima facie* showing must be factually supported," *Dorchester Fin. Sec., Inc.*, 722 F.3d at 85 (quoting *Ball v. Metallurgie Hoboken-Overpelt, S.A.*, 902 F.2d 194, 197 (2d Cir. 1990)).

The second decision from this Court, *Alkanani*, 976 F. Supp. 3d at 22, is to similar effect. Although it quotes *Hazard* for the proposition that the plaintiff bears the burden of proving "the existence of personal jurisdiction by the preponderance of the evidence" after "the parties have engaged in jurisdictional discovery," it notes that the court may consider "the allegations in the complaint," along with "declarations and evidence produced during the course of jurisdictional discovery," and it stresses that "the court still must resolve any factual discrepancies in the plaintiff's favor." *Id.* That is, the court must apply the prima facie standard.

In any event, the Court need not decide for present purposes whether it is ever appropriate to hold a plaintiff to its ultimate burden of proving the relevant jurisdictional facts by a preponderance of the evidence without first holding an evidentiary hearing or trial on the merits. *Cf. Grayson*, 816 F.3d at 267–69 (treating consideration of post-discovery evidentiary submissions as the equivalent of holding an evidentiary hearing). As discussed below, the parties dispute a variety of important factual premises, and the resolution of many of those disputes will turn, at least in part, on the factfinder's assessment of the credibility of the witnesses. The Court would not resolve those disputes against the non-moving party at summary

18

judgment, and it certainly cannot do so in the context of a threshold Rule 12(b)(2) motion resolved on the bare record. *See Alkanani*, 976 F. Supp. 2d at 22 (observing that after "the parties have engaged in jurisdictional discovery, the plaintiff's burden is to prove the existence of personal jurisdiction by the preponderance of the evidence," but also noting that "the court still must resolve any factual discrepancies in the plaintiff's favor").

At the same time, however, the Court is persuaded that the availability of jurisdictional discovery, and the development of a factual record in the context of a Rule 12(b)(2) motion, imposes a greater burden on a plaintiff than presented by a facial motion to dismiss. At this point, the plaintiff can no longer rest on the legal sufficiency of the allegations contained in its complaint and must, instead, make a prima facie showing that the court has personal jurisdiction over each defendant. *See Swiss Am. Bank, Ltd.*, 274 F.3d at 618–19. This requires an affirmative showing, supported by declarations and other evidence and/or undisputed allegations, sufficient to support "every fact required to satisfy both the [relevant] long-arm statute and the Due Process Clause of the Constitution." *Id.* at 618 (citation modified). Because Defendants have submitted declarations that dispute specific jurisdictional allegations contained in Plaintiffs' amended complaint, *see* Dkt. 78-11 at 2–19 (Chishti Supp. Decl.); Dkt. 78-9 at 2–4 (Pobereskin Supp. Decl.), the Court cannot rely on those controverted allegations without requiring some evidentiary support.

In this posture, the district court is not acting as the factfinder, *see Swiss Am. Bank, Ltd.*, 274 F.3d at 619, and, instead, must draw all reasonable inferences in favor of the plaintiff, *see Dorchester Fin. Sec., Inc.*, 722 F.3d at 85. But Plaintiffs must make a prima facie showing—based on either undisputed factual allegations or proffers of evidence—that the Court has personal jurisdiction over each Defendant. Notably, this standard presents a one-way ratchet of

19

sorts.  If the Court grants the motion, the issue is finally resolved, and the Defendant is dismissed from the case.  If the Court denies the motion, however, and merely concludes that Plaintiffs have made the requisite prima facie showing, the issue is not finally resolved, and Defendants are free to raise the defense again at summary judgment or at trial on the merits.

With this framing in mind, the Court turns to the parties' jurisdictional arguments.

2.    *Rule 4(k)(2)*

The Court ordinarily engages in a two-part inquiry to determine if it has jurisdiction over a nonresident party.  *GTE New Media Servs. Inc. v. BellSouth Corp.*, 199 F.3d 1343, 1347 (D.C. Cir. 2000).  First, the Court must determine whether it has personal jurisdiction by reference to the law of the forum state, here, the District of Columbia.  *United States v. Ferrara*, 54 F.3d 825, 828 (D.C. Cir. 1995); *see Fuld v. Palestine Liberation Org.*, 606 U.S. 1, 11 (2025) ("[F]ederal courts ordinarily follow state law in determining the bounds of their jurisdiction over persons." (citation modified)).  Second, if the first step is satisfied, the Court must assess "whether a finding of jurisdiction satisfies the constitutional requirements of due process."  *GTE New Media Servs.*, 199 F.3d at 1347.

In this case, however, Afiniti relies primarily on an alternative route to personal jurisdiction.  Dkt. 89-2 at 20–21.  Federal Rule of Civil Procedure 4(k)(2) provides that "serving a summons or filing a waiver of service establishes personal jurisdiction over a defendant" for "a claim that arises under federal law" if two conditions are met.  Fed. R. Civ. P. 4(k)(2).  First, the defendant must "not [be] subject to jurisdiction in any state's courts of general jurisdiction."  *Id.* 4(k)(2)(A).  Second, the Court's exercise of personal jurisdiction must be "consistent with the United States Constitution and laws."  *Id.* 4(k)(2)(B).  Rule 4(k)(2) is "effectively a federal long-arm statute," *Cent. Am. Bank for Econ. Integration v. Mossi*, No. 24-cv-2544, 2025 WL 2732731, at *5 (D.D.C. Sep. 25, 2025) (citation modified), that "corrects a gap in the

20

enforcement of federal law" in a case where "the defendant [is] a non-resident of the United States having contacts with the United States sufficient to justify the application of United States law . . . but having insufficient contact with any single state to support jurisdiction under state long-arm legislation or [to] meet the requirements of the Fourteenth Amendment," *Mwani*, 417 F.3d at 10 n.9 (quoting Fed. R. Civ. P. 4(k) advisory committee's notes to 1993 amendments).  It "permits a federal court to exercise personal jurisdiction in a federal question case over a defendant who is not within the reach of any state's long-arm statute when doing so would not violate due process or federal law."  4 Wright & Miller § 1068.1 (4th ed. Apr. 2026 update).

> The D.C. Circuit has recognized a four-part test for the application of Rule 4(k)(2):
>
> Rule 4(k)(2) . . . permits a federal court to exercise personal jurisdiction over a defendant (1) for a claim arising under federal law, (2) where a summons has been served, (3) if the defendant is not subject to the jurisdiction of any single state court, (4) provided that the exercise of federal jurisdiction is consistent with the Constitution (and laws) of the United States.

*Mwani*, 417 F.3d at 10.  The first two elements are easily met here for all Defendants.  Afiniti alleges that each Defendant "intentionally and willfully misappropriated Afiniti Trade Secrets" in violation of 18 U.S.C. § 1836, Dkt. 70-2 at 123 (Am. Compl. ¶ 358), and it has thus brought "a claim arising under federal law" against each Defendant, *Mwani*, 417 F.3d at 10.  Moreover, although Rule 4(k)(2) does not explicitly provide for personal jurisdiction over foreign defendants with respect to claims brought under state law, courts generally agree that, if a court may exercise personal jurisdiction as to a federal claim, "pendent or supplemental jurisdiction may [also] be asserted over related state law claims against the same defendant[s]." *Doe v. WebGroup Czech Republic, a.s.*, 93 F.4th 442, 450 n.5 (9th Cir. 2024) (collecting cases); *see also* 4 Wright & Miller § 1068.1 (4th ed. Apr. 2026 update) ("When federal courts do exercise personal jurisdiction over defendants based on [Rule 4(k)(2)], most federal courts will allow the

21

exercise of pendent personal jurisdiction over any joined state law claims [if] the state law claims are part of a common nucleus of operative fact.").  Plaintiffs have also served summons on the Defendants.  *See* Dkts. 22, 23, 24, 25, 26, 27, 96, 97.

As for the third element, because demonstrating that a defendant is not subject to the jurisdiction of any state court might otherwise require "ponderously 'traips[ing] through the 50 states, asking whether each could entertain the suit,'" the D.C. Circuit has endorsed the "burden-shifting framework" established by the Seventh Circuit in *ISI International, Inc. v. Borden Ladner Gervais LLP*, 256 F.3d 548 (7th Cir. 2001).  *Mwani*, 417 F.3d at 11 (quoting *ISI Int'l, Inc.*, 256 F.3d at 552).  Under that framework, "[a] defendant who wants to preclude use of Rule 4(k)(2) has only to name some other state in which the suit could proceed."  *Id*. (quoting *ISI Int'l, Inc.*, 256 F.3d at 552).  "If, however, the defendant contends that he cannot be sued in the forum state and refuses to identify any other where suit is possible, then the federal court is entitled to use Rule 4(k)(2)."  *Id*. (quoting *ISI Int'l, Inc.*, 256 F.3d at 552).  Here, among the non-Chishti Defendants, only Pobereskin, who attests that she is domiciled in Puerto Rico, has responded to Plaintiffs' arguments under Rule 4(k)(2) by conceding to jurisdiction in another state.[4]  Dkt. 100-2 at 22 ("[W]ith the exception of Mr. Chishti and Ms. Pobereskin, the courts in Puerto Rico do not have personal jurisdiction over the other Defendants.").

The Court, accordingly, may exercise personal jurisdiction over Zamir and the corporate defendants under Rule 4(k)(2) if doing so also complies with the fourth requirement: that exercising jurisdiction "is consistent with the Constitution (and laws) of the United States."  *Mwani*, 417 F.3d at 10.  That question "turns on whether a defendant has sufficient contacts with

---

[4] Although Puerto Rico is not a "state," courts routinely treat it as such for the purposes of Rule 4.  *See, e.g.*, *Calderon Serra v. Banco Santander P.R.*, 747 F.3d 1, 8 (1st Cir. 2014); *Caribbean Mgmt. Grp., Inc. v. Koeniger*, 495 F. Supp. 2d 243, 244 (D.P.R. 2007).

22

the nation as a whole to satisfy due process." *Id*. at 11.  "Pleading specific personal jurisdiction under Rule 4(k)(2) requires demonstrating a close nexus between the United States, the foreign defendant's conduct, and the plaintiff's claim."  *Bernhardt v. Islamic Republic of Iran*, 47 F.4th 856, 864 (D.C. Cir. 2022).  One possibility is that a foreign defendant may have sufficient "specific, *physical* contacts" with the forum (here, the nation as a whole) to satisfy due process. *Mwani*, 417 F.3d at 12 (emphasis in original).  However, physical contacts are not required if the defendant has "'purposefully directed [its] activities at residents' of the United States," so long as plaintiffs' injuries "arise out of or relate to those activities."  *Id.* at 13 (citation modified) (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472 (1985)).  Although the Plaintiffs' injuries must "ar[i]se out of or relate[] to" the foreign defendant's forum contacts, "it is not necessary to demonstrate 'a strict causal relationship between the defendant's [domestic] activity and the litigation.'"  *Bernhardt*, 47 F.4th at 864 (alteration in original) (quoting *Ford Motor Co. v. Mont. Eighth Jud. Dist. Ct.*, 592 U.S. 351, 362 (2021)).  Instead, "[b]ecause it is sufficient for the injuries to 'relate to' the defendant's activities, 'some relationships will support jurisdiction without a causal showing.'"  *Id.* (quoting *Ford Motor Co.*, 592 U.S. at 362).

With those principles in mind, the Court proceeds to analyze whether it may exercise personal jurisdiction over the disputed defendants.

   a. <u>Isbei</u>

The Court begins with Isbei.  For the purpose of establishing personal jurisdiction, a corporation's presence in a forum can generally be demonstrated by reference to "those activities of the corporation's agent[s] within the [forum] which courts will deem to be sufficient to satisfy the demands of due process."  *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 317 (1945). Although Defendants represent that Isbei "has never had any offices in the United States" and does not sell services, maintain bank accounts, or own real property in the United States, Dkt.

23

78-1 at 13–14, they also concede that Pobereskin, the "sole director" of Isbei, has her "principal place of business" in Puerto Rico, Dkt. 78-3 at 2–3 (Pobereskin Decl. ¶¶ 10, 15).  Whether or not Pobereskin's base of operations is formally classified as an Isbei "office," the record includes ample evidence that, as a practical matter, Pobereskin directs Isbei's activities from the United States.  *See, e.g.*, Dkt. 78-9 at 4 (Pobereskin Supp. Decl. ¶¶ 13–14) (Pobereskin deciding whether to renew Isbei employee contracts and whether to create an Isbei "Board of Advisors"); Dkt. 89-12 (Pobereskin signing Isbei COO's renewal contract); Dkt. 89-15 (Pobereskin authorizing herself and Chishti to confirm bank transactions on behalf of Isbei); Dkt. 100-2 at 14 (Pobereskin is one of "only two people with signature authority and control at Isbei."); Dkt. 108 at 9 (Defendants' counsel conceding that Pobereskin makes "very high[-]level decisions" for Isbei.).

The fact that Isbei's sole director oversees and exercises certain management authority over the company from Puerto Rico more than suffices to establish that Isbei has sufficient contacts with the United States, in the form of "significant activities" and "territorial presence" within the country, to satisfy due process.  *Burger King Corp.*, 471 U.S. at 476 (citation modified); *cf. Holland Am. Line Inc. v. Wartsila N. Am. Inc.,* 485 F.3d 450, 462 (9th Cir. 2007) (finding no personal jurisdiction under Rule 4(k)(2) where the foreign corporation lacked "employees, or other related connections in the United States").  And Plaintiffs' claims "arise out of or relate to" Isbei's contacts with the United States because Pobereskin, from Puerto Rico, helped oversee the development of the products and broader corporate strategy that, Plaintiffs allege, rely on their misappropriated trade secrets.  *See* Dkt. 70-2 at 115 (Am. Compl. ¶ 318) ("Defendants have converted and misappropriated, and continue to misappropriate, Afiniti Trade Secrets . . . to develop and implement [the Isbei product] 'Artificial Intelligence Pairing.'").

24

Because many of Isbei's management activities occur in the United States, the Court concludes that it may exercise personal jurisdiction over Isbei under Rule 4(k)(2).  Given this conclusion, the Court need not reach Plaintiffs' further argument that Chishti acted as an agent for Isbei while domiciled in Puerto Rico.  The Court notes, however, that the record includes substantial evidence supporting that contention.

b.  Zamir

The Court next addresses the question of personal jurisdiction over Zamir under Rule 4(k)(2).  Zamir has significant prior contacts with the United States, including working for Afiniti in the country for many years.  Dkt. 70-2 at 98 (Am. Compl. ¶ 267); Dkt. 78-8 at 2 (Zamir Decl. ¶¶ 5–6).  Personal jurisdiction over Zamir would thus be simple if Plaintiffs' claims arose out of or related to his employment with Afiniti in Washington, D.C.  *See Bernhardt*, 47 F.4th at 864.  The sole federal claim that Plaintiffs have brought against Zamir that might anchor Rule 4(k)(2) jurisdiction, however, is their claim under the Defend Trade Secrets Act, 18 U.S.C. § 1836.  Dkt. 70-2 at 123–31 (Am. Compl. ¶¶ 357–79).  Although Plaintiffs allege that Zamir "disclosed Afiniti Trade Secrets to at least one of Isbei, Qinhe, or Dataquartz" to help create Defendants' commercial products, *id.* at 127 (Am. Compl. ¶ 369), Plaintiffs do not appear to allege that Zamir stole Afiniti trade secrets in the course of his employment with Afiniti.  To the degree that Zamir's alleged tortious actions occurred only after he ceased working for Afiniti—at which point, Zamir attests, he had moved to Pakistan, Dkt. 78-8 at 3 (Zamir Decl. ¶ 8)—any resulting claim would not "arise out" of Zamir's employment-related contacts with the United States for the purpose of Rule 4(k)(2).

To be sure, it is possible that those claims could "relate to" those contacts even without a "strict causal relationship" between Zamir's contacts with the United States and the litigation.  *Ford Motor Co.*, 592 U.S. at 362 (citation modified); *see also Bernhardt*, 47 F.4th at 864.  For

25

example, if Zamir had (lawfully) learned of Afiniti trade secrets while an Afiniti employee in the United States, and then, following his departure, disclosed them from a foreign jurisdiction, that scenario might plausibly establish the requisite "'connection' between a plaintiff's suit and a defendant's activities" in the forum. *Ford Motor Co.*, 592 U.S. at 361 (quoting *Bristol-Myers Squibb Co. v. Superior Ct. of Cal., S.F. Cnty.*, 582 U.S. 255, 260 (2017)); *see also Stolle Mach. Co., LLC v. RAM Precision Indus.*, 605 F. App'x 473, 480–81 (6th Cir. 2016) (finding personal jurisdiction where the defendant acquired the misappropriated trade secrets in the forum state). And Plaintiffs do allege that Zamir, as an Afiniti employee, had access to Afiniti trade secrets and, from Washington, D.C., transmitted Afiniti trade secrets, "including source code, received from Afiniti and/or Chishti . . . to other persons and entities, including [Isbei], Qinhe, and Dataquartz."[5]  Dkt. 70-2 at 31, 46 (Am. Compl. ¶¶ 95, 142).

Some of those allegations, however, are inconsistent with the evidence produced following jurisdictional discovery, as well as with other allegations in the amended complaint, and Plaintiffs offer no other evidence to meet their prima facie burden.  For example, it is not clear when or how Zamir, from Washington, D.C., could have transmitted Afiniti trade secrets to companies such as Isbei, Qinhe, or Dataquartz that did not yet exist at the time that his employment with Afiniti in Washington, D.C., concluded.  Plaintiffs agree that Zamir's work for Afiniti in Washington, D.C., ended in February 2022, Dkt. 70-2 at 14 (Am. Compl. ¶ 36); *see also* Dkt. 78-8 at 2 (Zamir Decl. ¶¶ 5–6), and Qinhe and Isbei were not incorporated until March 2022, Dkt. 70-2 at 14 (Am. Compl. ¶¶ 33–34).  Moreover, although Plaintiffs allege that Chishti, even after his Afiniti employment concluded, retained access to Afiniti trade secrets through the

---

[5] Zamir, for his part, disputes that he had access to Afiniti trade secrets—in particular, the "source code" used in Afiniti's software.  Dkt. 78-8 at 4–5 (Zamir Decl. ¶ 13).

Afiniti computers that he refused to return, they do not explain if or how Zamir would have had similar access when he no longer worked for Afiniti.

For present purposes, however, the Court need not decide whether Zamir's contacts with the United States involving his prior employment with Afiniti suffice for personal jurisdiction, because Plaintiffs have also proffered an alternative, more promising theory. They allege that Zamir "acquired Afiniti Trade Secrets from Afiniti or former Afiniti employees . . . who [he] knew or should have known had a duty not to disclose those trade secrets," Dkt. 70-2 at 127 (Am. Compl. ¶ 369), and, more specifically, that Chishti disclosed Afiniti trade secrets to Zamir in the United States, *id.* at 18 (Am. Compl. ¶ 48). Zamir concedes that, while he was still a resident of Maryland, he traveled to Puerto Rico to visit Chishti and Pobereskin and that, during this visit, he received in an email from Chishti the computer code scripts that Chishti created during their conversations—which, Plaintiffs allege, contained and disclosed Afiniti trade secrets. Dkt. 78-8 at 3, 6 (Zamir Decl. ¶¶ 8, 23–24); *see* Dkt. 70-2 at 20 (Am. Compl. ¶ 55); Dkt. 78-11 at 20–38.

Particularly when viewed in combination with Zamir's other activities in the United States, the Court is persuaded that this evidence of claim-related activity in Puerto Rico suffices to satisfy Plaintiffs' prima facia burden. "In some cases, a single act may suffice to bring the defendant within the forum's personal jurisdiction, if the act is 'neither irregular nor casual.'" *Brit UW, Ltd. v. Manhattan Beachwear, LLC*, 235 F. Supp. 3d 48, 56 (D.D.C. 2017) (quoting *Int'l Shoe*, 326 U.S. at 319–20). Although Defendants argue that a brief visit like the Puerto Rico trip is insufficient to demonstrate minimum contacts with Puerto Rico (and, by extension, the United States as a whole), Dkt. 100-2 at 23, their cited authority is inapposite. Defendants rely on *Dean v. Walker*, 756 F. Supp. 2d 100 (D.D.C. 2010), where the Court held that a four-day

tourist trip and attendance at a few conferences was "sporadic" and "simply insufficient" to permit the exercise of personal jurisdiction under the D.C. long-arm statute. *Id.* at 104. The Court in that case, however, determined that the relevant travel was insufficient to establish personal jurisdiction because "none of these contacts relate[d] to the allegations contained in [that] lawsuit." *Id.* Zamir's travel to Puerto Rico to visit Chishti, discuss computer programming, and receive computer code that allegedly unlawfully disclosed Plaintiffs' trade secrets, in contrast, directly "relates to" the claims at issue in this case.

The Court, accordingly, concludes that it may exercise personal jurisdiction over Zamir.

    c.  <u>Isbei Hainan</u>

The Court turns next to Isbei's Chinese affiliate. Isbei Hainan is incorporated in the People's Republic of China, Dkt. 70-2 at 14 (Am. Compl. ¶¶ 33, 35); Dkt. 78-5 at 2 (Saud Decl. ¶ 4), and its general manager attests that it lacks any U.S. offices, employees, customers, or revenue, Dkt. 78-5 at 2 (Saud Decl. ¶¶ 6–7). Despite its lack of apparent U.S. contacts, Plaintiffs nevertheless offer several theories by which this Court might exercise personal jurisdiction over Isbei Hainan.

First, Plaintiffs argue that Chishti has acted as an agent for Isbei Hainan, such that his U.S. contacts may be imputed to the company.[6] Dkt. 89-2 at 12. The record readily demonstrates that Chishti has had extensive case-relevant contacts with the United States, including both his work for Afiniti in Washington, D.C., and his subsequent work in Puerto Rico developing computer code and providing other supervision/business advice for Defendants' activities. The question is which, if any, of those activities can be attributed to Isbei Hainan.

---

[6] Although Plaintiffs do not press the point, the same might also be said of Pobereskin.

For an agency relationship to exist, the parties must consent to establish a principal-agent relationship and the agent's activities must be subject to the principal's control.[7] *Alkanani v. Aegis Def. Servs.*, 976 F. Supp. 2d 1, 11 (D.D.C. 2013) (citing *Henderson v. Charles E. Smith Mgmt., Inc.*, 567 A.2d 59, 62 (D.C. 1989)).  Plaintiffs' principal argument is that Chishti acted as an agent of Isbei Hainan when he misappropriated Afiniti trade secrets.  Dkt. 89-2 at 18.  As Plaintiffs acknowledge, for much of the time at issue—including during Chishti's employment with Afiniti, the termination of that employment, and his initial refusal to return the Afiniti computers in his possession—no standard agency relationship could have existed between Isbei Hainan and Chishti because Isbei Hainan had not yet been formed.  *Id.* at 22.  Plaintiffs therefore invoke the doctrine of "ratification," by which a corporation might adopt the pre-incorporation activities of an agent.  *See Chase v. Pan-Pacific Broad., Inc.*, 617 F. Supp. 1414, 1424 (D.D.C. 1985) (citing *Rees v. Mosaic Tech., Inc.*, 742 F.2d 765, 768–69 (3d Cir. 1984)) ("[P]re[-]incorporation actions of a promoter of a corporation, when coupled with post[-]incorporation ratification by the corporation, may justify the exercise of personal jurisdiction over the corporation in the forum of the pre[-]incorporation activities.").

For support, Plaintiffs rely on *Stolle Machinery*, an (unpublished) Sixth Circuit decision involving facts similar to those alleged here.  In *Stolle Machinery*, the defendant Shu An had worked for the plaintiff corporation in Ohio, which produced equipment used to manufacture food and beverage cans.  605 F. App'x at 476.  An then left the company, moved to China, and founded a competing company called SLAC which, the plaintiff alleged, used machinery based on trade secrets that An had stolen from his former employer.  *Id.* at 477–78.  The Sixth Circuit

---

[7] Neither party addresses choice of law, and the Court need not address the question *sua sponte*. *See In re Korean Air Lines Disaster of Sept. 1, 1983*, 932 F.2d 1475, 1495 (D.C. Cir. 1991).  For present purposes, the Court assumes that D.C. law applies.

held that a federal district court in Ohio had personal jurisdiction over SLAC because An's conduct in the forum state could be imputed to his principal, SLAC, who had "subsequently ratified his conduct in Ohio" by exploiting the misappropriated trade secrets. *Id.* at 481.

Although *Stolle Machinery*'s reasoning is persuasive, there are some substantial differences between the facts of that case and those alleged here. First, while in *Stolle Machinery* all of An's conduct misappropriating the plaintiff's trade secrets occurred in the forum state (Ohio), much of Chishti's conduct relevant to this case took place in Bermuda rather than in the United States. Chishti resided in Bermuda when his employment relationship with Afiniti ended and he allegedly decided to keep the Afiniti trade secrets in his possession rather than returning them. *See* Dkt. 70-2 at 12, 74–75 (Am. Compl. ¶¶ 30, 183–84); Dkt. 78-2 at 2 (Chishti Decl. ¶ 6). Chishti's brief sojourn in Bermuda, however, does not necessarily forestall the exercise of personal jurisdiction under Plaintiffs' theory, particularly in light of his other contacts with the United States. Those include both working for Afiniti in Washington, D.C. (before moving to Bermuda), where he would have learned about the Afiniti trade secrets he is alleged to have misappropriated, and allegedly assisting in organizing companies and developing products to exploit those trade secrets in Puerto Rico (where he moved after leaving Bermuda).

The second, more substantial objection is that unlike An, who personally "founded" the SLAC corporation that exploited the plaintiff's trade secrets, *Stolle Mach.*, 605 F. App'x. at 477, Defendants maintain that Chishti has no official involvement with Isbei Hainan (or, for that matter, Isbei), *see* Dkt. 78-2 at 3 (Chishti Decl. ¶ 16), and they refer to him only as an informal advisor, *see* Dkt. 100-2 at 9–10. As Defendants emphasize, cases dealing with post-incorporation ratification of pre-incorporation conduct by a corporate agent, including *Stolle Machinery*, typically involve conduct by someone who, following incorporation, possesses some

30

formal, officially recognized role at the company.  *Id.* at 11.  Defendants also object that Plaintiffs have not shown that Isbei Hainan had knowledge of Chishti's alleged prior misappropriation of Afiniti trade secrets, as would be required for Plaintiffs to show ratification. *Id.* at 11–13; *see also Geier v. Conway, Homer & Chin-Caplan, P.C.*, 983 F. Supp. 2d 22, 39 (D.D.C. 2013) (ratification requires "crystal clear" and "unequivocal" intent "with full knowledge of all material facts and circumstances" (citation modified)).

The record produced during jurisdictional discovery demonstrates, however, that Chishti's involvement with the Defendant corporations is far more extensive than Defendants represent.  Rather than acting as a mere "advisor," Chishti—whom Isbei has, at times, referred to as a "founder" of the company, Dkt. 70-2 at 6–7 (Am. Compl. ¶ 8); *see* Dkt. 78-11 at 2 (Chisti Supp. Decl. ¶ 2) (Chishti not disputing that Isbei has listed him as a "founder" of the company)—has taken a direct role in overseeing and directing garden-variety corporate activities.  For example, in a lengthy chat with Isbei's COO Osman Niazi, Chishti discussed whether "we" had "created employment contracts" for Isbei staff/consultants and said he would set up wires for payment once Isbei had finalized their paperwork, Dkt. 89-11 at 5, approved acquiring computer equipment for Zamir's work at Isbei, *id.* at 6, confirmed the signing of bank paperwork (which technically needed to be completed by Pobereskin), *id.* at 9, described telling a government official that Chishti would "ask our [COO] Osman Niazi to reach out to you to brief you" on Isbei's efforts to penetrate the Chinese market, *id.* at 10, directed Niazi to provide him with specific details of Isbei, Isbei Hainan, and Qinhe's operations, *id.* at 15, 19, and insisted that certain language be included in Isbei staff contracts, *id.* at 19–20.  Chishti also received legal services from a Hong Kong law firm related to advice on pursuing patents in China, after which Isbei's COO informed the firm that Isbei should be listed as the client on record and billed

31

directly for the services. Dkt. 89-4 at 6. Additionally, Chishti directed Pobereskin to sign contracts in her capacity as Isbei director, Dkt. 89-12, ordered lawyers to prepare paperwork for a potential restructuring of Isbei, Dkt. 89-14, and was listed as an Isbei "Consultant" with authority to confirm bank transactions on behalf of the company on an official Isbei form, Dkt. 89-15. As discussed previously, Chishti also concedes that he helped oversee patent applications submitted on behalf of Isbei. Dkt. 78-11 at 17–18 (Chishti Supp. Decl. ¶ 61).

It is also undisputed that Chishti provided the funds needed to bankroll Isbei. *Id.* at 5 (Chishti Supp. Decl. ¶ 12). As discussed above, Defendants attempt to portray Chishti's funding of Isbei as "gift[s]" to Pobereskin for her entirely independent venture. *See* Dkt. 100-2 at 14. This narrative is implausible, to say the least. As the Court remarked at the hearing on January 12, it is "a little bit odd" to suggest that, following Chishti's departure from Afiniti, his wife just happened to form a company to pursue the exact same line of business and then hired many former Afiniti employees (i.e., Chishti's former coworkers and subordinates); that Chishti funded that enterprise with his own money but played no meaningful role in directing that process; and that he merely provided his wife with a "gift" to use in whatever way she deemed appropriate. Dkt. 108 at 19–21. Unsurprisingly, in the proceeding before Judge Rakoff in the Southern District of New York, Pobereskin testified under oath that Isbei was "a joint plan" between herself and Chishti, Dkt. 116-4 at 56, and that the decision to avoid presenting Chishti as the official funder/director of Isbei was motivated, in substantial part, by reputational concerns following his exit from Afiniti, *id.* at 56–58. At that same proceeding, when Judge Rakoff asked Chishti whether it was accurate that "[Pobereskin] didn't have the idea [for Isbei]. You had the idea, but she was convinced to put money into it or to take the role that she did," Chishti conceded that it was "about 93 percent" correct. Dkt. 116-5 at 109. Given this testimony and

other evidence, it is unsurprising that Judge Rakoff found "that Isbei, although nominally governed by Pobereskin, is in reality Chishti's venture." *Res. Grp. Int'l Ltd. v. Chishti*, 814 F. Supp. 3d. 467, 474 n.9 (S.D.N.Y. 2026).[8] Although Defendants attempt to minimize the extent of Chishti's involvement through self-serving declarations, *see* Dkt. 100-2 at 9–10, the Court is also persuaded, based at least on the current record in this case, that Chishti has acted as a *de facto* executive of Isbei, directing the activities of its employees and representing the company to outsiders.[9]

That determination does not, however, resolve the present jurisdictional question. In pressing their agency theory of jurisdiction as to Isbei Hainan, Plaintiffs face the further hurdle of making a prima facie showing that Chishti was directly involved with *that* company—that is, Isbei Hainan. As explained above, the record contains ample evidence of Chishti's direct involvement in Isbei, but his role in managing or otherwise acting on behalf of Isbei Hainan is less obvious. To be sure, in the operative complaint, Plaintiffs reproduce an email from Yolanda Liu—the founding executive director of Isbei Hainan as well as the sole shareholder/CFO of Qinhe—asking Chishti to review a draft master service contract between Qinhe and Isbei, an

---

[8] In later testimony in the Southern District of New York proceeding, Pobereskin attested that Chishti had acted as her "consultant and agent" in "assist[ing her] in conducting the affairs of Isbei." Dkt. 136-2 at 352. As Plaintiffs note, that sworn testimony contradicts Defendants' (implausible and unsupported) assertions in this case that Chishti has never been an agent of Pobereskin or the corporate Defendants. *See* Dkt. 100-2 at 8–11. Relying on that testimony and other evidence, Judge Rakoff later reaffirmed his finding that "Chishti, rather than Pobereskin, is and has been the prime mover behind Isbei" while Pobereskin, despite her official status, had "evinced unfamiliarity with Isbei's operations, both contemporaneously and in her testimony at various points in these proceedings." *Res. Grp. Int'l Ltd. v. Chishti*, __ F. Supp. 3d __, No. 25-cv-1021, 2026 WL 1756953, at *16 (S.D.N.Y. June 18, 2026).

[9] To be clear, the Court's decision is not premised on Judge Rakoff's decision but, rather, on some of the same evidence that he considered, including the sworn testimony, along with the additional evidence presented in this proceeding.

investor presentation, and a draft employment agreement.  Dkt. 70-2 at 22 (Am. Compl. ¶¶ 59–60).  Plaintiffs also reproduce an email where Chishti apparently reached out to potential clients of Isbei/Qinhe, which would necessarily implicate Isbei Hainan at least to some degree.  *Id.* at 26 (Am. Compl. ¶ 73).  But it is difficult to determine from the current record and uncontroverted allegations to what extent any of those communications involved Chishti acting as an agent of Isbei Hainan, as opposed to an agent of Isbei—at least, to the degree that those two entities are properly treated as distinct corporations.

That leads to Plaintiffs' second theory of personal jurisdiction:  Plaintiffs also contend that Isbei Hainan is an "alter ego" of Isbei (as well as of Qinhe).  Dkt. 89-2 at 12.  The alter ego doctrine is an exception to the general rule that one corporation's jurisdictional contacts are not typically to be attributed to an affiliated corporation.  *See IMark Mktg. Servs., LLC v. Geoplast S.p.A.*, 753 F. Supp. 2d 141, 149–50 (D.D.C. 2010).  To determine whether two corporations operate as alter egos, the plaintiff bears the burden of satisfying a two-part test.  First, the plaintiff must establish "a unity of interest and ownership" between the two corporations "such that their separate corporate personalities no longer exist," and second, the plaintiff must show that "an inequitable result" will occur if the relevant jurisdictional contacts are restricted to the purportedly separate entity.  *Id.* at 150 (citing *Labadie Coal Co. v. Black*, 672 F.2d 92, 96 (D.C. Cir. 1982)).  In assessing whether there is a sufficient unity of interest and ownership, courts consider six factors: "(1) the nature of the corporate ownership and control; (2) failure to maintain corporate minutes or adequate records; (3) failure to maintain the corporate formalities; (4) a commingling of funds and other assets; (5) diversion of corporate funds or assets to other uses; and (6) use of the same office or business location."  *Id.* (quoting *Labadie Coal*, 672 F.2d at 97–99).  The analysis is flexible and contextual, and not all factors need be present in each

34

individual case. *Id.* at 150–51.  Here, moreover, Plaintiffs must make only a prima facie showing that the corporations operate as alter egos.

Although a close question, the Court is persuaded that Plaintiffs have carried that burden with respect to Isbei and Isbei Hainan.  First, Isbei Hainan is a wholly owned subsidiary of Isbei, Dkt. 78-5 at 2 (Saud Decl. ¶ 4), and, while not dispositive, the fact that one corporation is wholly owned by another is a relevant factor that provides "increased justification" to treat the two as alter egos. *IMark Mktg.*, 753 F. Supp. 2d at 151 (quoting *Labadie Coal Co.*, 672 F.2d at 97). Plaintiffs have also alleged that "Isbei Hainan's operating capital and revenue comes exclusively from [Isbei]," Dkt. 70-2 at 91 (Am. Compl. ¶ 238), and that Isbei in effect pays Isbei Hainan's expenses, amounting to "a commingling of funds that evidences a unity of interest and control between the two entities," *IMark Mktg.*, 753 F. Supp. 2d at 152.  Defendants, in turn, concede that the money for Isbei Hainan comes, at least "[i]n large part," from Isbei.  Dkt. 108 at 7. Plaintiffs further emphasize that Isbei COO Niazi testified during jurisdictional discovery that Isbei and Isbei Hainan "pretty much do the same thing" and that the two companies' work was "combined," while Pobereskin admitted to being unsure of the precise differences between the two.[10]  Dkt. 70-2 at 91 (Am. Compl. ¶ 237).  Similarly, at the hearing on January 12, Defendants' counsel acknowledged that Pobereskin directs Isbei Hainan's executives, via Niazi, Dkt. 108 at 5–6, and that Isbei Hainan's sole purpose is to carry out Isbei's business in China, *id.* at 8–9.  Indeed, Defendants' counsel conceded that the only reason Isbei Hainan exists as a formally separate entity, rather than Isbei acting in China directly, is that doing so is easier under

---

[10] Although Defendants filed two supplemental declarations wherein Chishti and Pobereskin disputed the factual accuracy of an array of allegations in Plaintiffs' operative complaint, *see* Dkt. 78-9 (Pobereskin Supp. Decl.); Dkt. 78-11 (Chishti Supp. Decl.), those declarations do not dispute that the complaint accurately characterizes Niazi and Pobereskin's testimony.

"some of the laws [and] regulations in China." *Id.* at 8.  In sum, then, the record shows that Isbei

Hainan has no separate corporate personality, purpose, operations, or resources distinct from that

of its parent corporation.  And as for the question of equity, the Court is concerned that

recognizing Isbei and Isbei Hainan as separate entities would permit Isbei to form Isbei Hainan

"with the intention of merely opening a [Chinese] office for [Isbei]," *IMark Mktg.*, 753 F. Supp.

2d at 153, and to obscure and insulate its Chinese exploitation of the allegedly misappropriated

trade secrets from Isbei's U.S. presence.

The Court's conclusion is bolstered by the unusual circumstances of this dispute.  The

alter ego doctrine, along with other related tests, is most commonly applied "to determine

whether a parent corporation is liable for the acts of its subsidiary." *Material Supply Int'l, Inc. v.*

*Sunmatch Indus. Co.*, 62 F. Supp. 2d 13, 20 (D.D.C. 1999).  In such cases, a plaintiff typically

seeks to impute the contacts of a local subsidiary in the forum to the foreign parent company (or

to the foreign individual behind the local corporation), in order to obtain personal jurisdiction

over the controlling entity whom, in practice, she alleges is responsible for her injuries.  *See, e.g.*,

*IMark Mktg.*, 753 F. Supp. 2d at 150.  The case before the Court presents the opposite scenario:

The Court has determined that it may exercise personal jurisdiction over Isbei, the parent entity

that controls and funds the foreign subsidiary, and that, as a consequence, is ultimately

responsible for any injury to Plaintiffs resulting from Isbei Hainan's misappropriation of their

trade secrets abroad.  The question is whether Isbei may avoid the Court's exercise of

jurisdiction over a subpart of its operations by conducting business through a formally separate

entity that, as a practical matter, it "so dominate[s] . . . as to negate its separate personality."

*Material Supply Int'l*, 62 F. Supp. 2d at 20 (quoting *Hart v. U.S. Dep't of Agric.*, 112 F.3d 1228,

1231 (D.C. Cir. 1997)).  In such circumstances, where Plaintiffs have made a prima facie

36

showing that Defendants do not treat Isbei or Isbei Hainan as separate entities in any meaningful way, but instead as a single actor with "a unity of interest and control between the[m]," *IMark Mktg.*, 753 F. Supp. 2d at 152, the Court must deny Defendants' motion to dismiss Plaintiffs' claims against Isbei Hainan, which is "completely owned, governed, and financed" by its parent, *id.*

The Court will therefore treat Isbei Hainan as an alter ego of Isbei itself and will exercise personal jurisdiction over Isbei Hainan based on Isbei's forum contacts.

### d.   Qinhe

The question of the Court's personal jurisdiction over Qinhe raises similar questions to that of Isbei Hainan.  Like Isbei Hainan, Qinhe is incorporated in the People's Republic of China, Dkt. 70-2 at 14 (Am. Compl. ¶¶ 33, 35); Dkt. 78-4 at 2 (Zhao Decl. ¶ 2), and its CEO attests that it lacks any U.S. offices, employees, customers, revenue, or property, Dkt. 78-4 at 2–3 (Zhao Decl. ¶¶ 3, 8–11).

In response, Plaintiffs first argue that Chishti has acted as an agent for Qinhe in the United States.  Dkt. 89-2 at 12.  As with Isbei Hainan, for any act of Chishti's preceding Qinhe's creation in March of 2022, *see* Dkt. 78-4 at 2 (Zhao Decl. ¶ 2), Plaintiffs must show that Qinhe ratified his conduct following its incorporation.  But the sole theory of "ratification" that Plaintiffs identify is that Qinhe has "willfully accept[ed] and us[ed] misappropriated Afiniti Trade Secrets," Dkt. 89-2 at 25, by entering into a commercial agreement with Isbei to jointly develop and sell products in China.  The Court is not convinced that, by itself, agreeing to market products that rely on misappropriated trade secrets—particularly where Qinhe's knowledge of the precise nature of any misappropriation is largely unclear from the record—constitutes "ratification" of the foreign contacts of any individual involved in originally misappropriating those trade secrets, such that any company that does so can fairly be subject to personal

37

jurisdiction in a foreign forum on an agency theory.  Plaintiffs must, accordingly, do more than simply show that Qinhe is Isbei's local business partner.

To the extent that Chishti has acted as a *de facto* executive of Qinhe in the United States, in the manner that he has for Isbei, the Court could exercise personal jurisdiction along similar lines to those discussed above for Isbei vis-à-vis Pobereskin.  Although certainly colorable (and possibly enough to satisfy Plaintiffs' prima facie burden), that line of reasoning is more tenuous for Chishti and Qinhe than it was for Pobereskin and Isbei (or, for that matter, than it would have been for Chishti and Isbei), because the evidence linking Chishti to Qinhe is less substantial.  Plaintiffs rely, in particular, on a text conversation between Chishti and a Qinhe employee in which Chishti provided technical advice and encouragement.  *See* Dkt. 89-13.  Yolanda Liu, who at the time was Qinhe's sole shareholder and CFO, also asked Chishti to review Qinhe's contract with Isbei, as well as Qinhe's employment agreement and fundraising strategy.  Dkt. 70-2 at 22 (Am. Compl. ¶¶ 59–60).  Finally, Chishti appears to have solicited clients on behalf of Qinhe, as mentioned above.  *Id.* at 26 (Am. Compl. ¶ 73).  The record, in other words, shows that Chishti has played a role in encouraging and facilitating Qinhe's activities.  But the fact that Chishti assisted some of Qinhe's work from his residence in the United States does not necessarily mean that Qinhe has "purposefully availed" itself of this forum to the degree necessary to be subject to the Court's personal jurisdiction.  *See Burger King Corp.*, 471 U.S. at 475.

Merely contracting with a consultant or similar figure in a forum is usually insufficient to render a foreign corporation amenable to suit in that jurisdiction when that person's work, and the foreign corporation's broader business activities, are not themselves directed at the forum. The personal jurisdiction "'minimum contacts' analysis looks to the defendant's contacts with the forum State itself, not the defendant's contacts with persons who reside there."  *Walden v.*

38

*Fiore*, 571 U.S. 277, 285 (2014). Repeated conversations with business partners who happen to be located in the forum state therefore do not suffice for personal jurisdiction where those contacts concern work to be performed in and targeted at other jurisdictions. *See, e.g.*, *FC Inv. Group LC v. IFX Mkts., Ltd.*, 479 F. Supp. 2d 30, 39–41 (D.D.C. 2007). Similarly, in *Thompson Hine, LLP v. Taieb*, 734 F.3d 1187 (D.C. Cir. 2013), the D.C. Circuit held that a foreign defendant who had hired lawyers based in the District of Columbia to represent him in legal proceedings in Oregon was not subject to personal jurisdiction in the District, as Defendant's sole contact of having a person "perform[] work for him in the District" did not qualify as purposefully availing himself of D.C. law, *id.* at 1194. To the degree that Qinhe has used Chishti as a *de facto* consultant—without entering into a formal contractual relationship—and Chishti has, from the United States, provided advice and support for Qinhe's Chinese operations aimed at winning business in China, Chishti's incidental presence in the United States provides an insufficient predicate for the exercise of personal jurisdiction consistent with the protections of the due process clause. The same is true for Qinhe's contracting with the Chinese operations of Isbei, portions of which were directed from Puerto Rico, to perform work in China.

The above analysis, however, treats Qinhe's relationship with Isbei Hainan and its alter ego parent entity as a routine, arms-length commercial transaction. Plaintiffs' alternative theory for personal jurisdiction disputes that premise, arguing that Qinhe is itself an alter ego of the Isbei entities. Dkt. 89-2 at 29–31, *see also* Dkt. 108 at 33. Acknowledging that Plaintiffs' arguments on this point are not as strong as those for piercing the corporate veil separating Isbei and Isbei Hainan, and that the matter presents a close question, the Court is persuaded that Plaintiffs have also carried their burden of making a prima facie showing that Isbei and Qinhe are in essence the same entity, directed by Chishti and Pobereskin from the United States.

39

The Court's analysis begins with the formal relationship between the two (or three) corporations. It is true that, in contrast to Isbei's relationship with Isbei Hainan, Isbei lacks formal ownership or control over Qinhe. But that "fiction of separateness" counts for little in circumstances when, as here, Plaintiffs have made a showing that the Defendant corporations in essence function as a single entity. *See Valley Fin., Inc. v. United States*, 629 F.2d 162, 171 (D.C. Cir. 1980). Qinhe may not be formally constituted as a wholly owned subsidiary of Isbei, but its licensing agreement with Isbei Hainan achieves the same functional result through different means. Under that agreement, Qinhe holds an exclusive license to use Isbei's technology and Isbei agrees to pay all of Qinhe's costs, in return for which Qinhe must pay Isbei Hainan 98% of all revenue derived from the use of Isbei's intellectual property. Dkt. 70-2 at 82 (Am. Compl. ¶ 205).[11] In other words, Qinhe relies on Isbei's money—that is to say, Chishti's (or Pobereskin's) money, as Isbei Hainan has no revenue or separate sources of funding from which to draw upon to pay Qinhe's operating costs, *see* Dkt. 100-2 at 15—for its survival, and its sole business activity, as far as the record shows, is to sell Isbei-designed products and then pass all but a nominal amount of that revenue back to Isbei. As was the case with Isbei and Isbei Hainan, such total financial dependency on a *de facto* parent entity, which pays the expenses of the other, "amounts to a commingling of funds that evidences a unity of interest and control." *IMark Mktg.*, 753 F. Supp. 2d at 152.

Even such close financial ties and codependency might not be enough to justify the "extraordinary procedure" of piercing the corporate veil, *see Toumazou v. Turkish Republic of N. Cyprus*, 71 F. Supp. 3d 7, 19 (D.D.C. 2014), if they resulted from arms-length commercial

---

[11] Defendants have not disputed in their briefing or in their supplemental declarations that Plaintiffs have accurately characterized the licensing agreement between Isbei Hainan and Qinhe.

40

transactions between unrelated parties.  But the undisputed jurisdictional allegations and record developed thus far suggest just the opposite.  To take a few examples:  Plaintiffs allege, and Defendants have not contested, that Yolanda Liu, Qinhe's then-sole shareholder and CFO, was also Isbei Hainan's founding legal representative, Dkt. 70-2 at 87–88 (Am. Compl. ¶ 225, 230); Yan Min, a deputy chairperson and president of Qinhe, also worked as a supervisor at Isbei Hainan, *id.* (Am. Compl. ¶ 226), and Aleck Zhao, the CEO (and, for a time, majority shareholder) of Qinhe who submitted a declaration on behalf of the corporation, also served as the general manager of Isbei Hainan, *id.* (Am. Compl. ¶ 227); *see* Dkt. 78-4 (Zhao Decl.).  When the same individuals establish Qinhe and Isbei Hainan in short succession and then operate both companies in pursuit of a single commercial project directed and funded by Chishti and Pobereskin from the United States, the separate commercial forms employed by the Defendants cannot shield them from suit in the United States.

Furthermore, the record produced during jurisdictional discovery demonstrates that Defendants, as a practical matter, do not distinguish between Isbei (Hainan) and Qinhe employees or operations.  As an example, the amended complaint quotes a funding request that Yolanda Liu sent Isbei for the "full China operation," "payroll, T&E, and Office" expenses for both Qinhe and Isbei.  Dkt. 70-2 at 93 (Am. Compl. ¶ 243).  The complaint also quotes an email from "finance@isbei.com" that, in an attached spreadsheet, categorizes both Isbei and Qinhe employees and contractors as working for "Isbei China."  *Id.* at 87–88 (Am. Compl. ¶ 229). Plaintiffs also allege "[u]pon information and belief" that Chishti and Pobereskin considered at one point paying Qinhe employees in Isbei stock, which Defendants have likewise not disputed. *Id.* at 93 (Am. Compl. ¶ 244).  And, in the text conversation between Chishti and Isbei COO Osman Niazi discussed above, Niazi asked Chishti to join "a short call about [the] legal

41

implications of our [i.e., Isbei] employees becoming [Q]inhe employees for visa purpose[s]." Dkt. 89-11 at 9. The fact that Isbei's COO and its *de facto* chief executive believed that they could have Qinhe simply hire Isbei's employees directly, if doing so was more convenient, speaks to how loosely Defendants treated the formally distinct corporate entities at issue. Finally, Qinhe's in-house counsel Bo Xie—who sought Chishti's permission, via Pobereskin, to make hiring decisions at Qinhe, Dkt. 70-2 at 29 (Am. Compl. ¶ 82)—was responsible for filing, on behalf of Isbei, the Chinese patent applications that Plaintiffs allege rest on and disclose their trade secrets, *id.* at 103, 110 (Am. Compl. ¶¶ 292, 307).[12]

Overall, the record and the relevant, undisputed factual allegations meet Plaintiffs' prima facie burden of showing that Isbei and Qinhe share "a unity of interest and control," *IMark Mktg.*, 753 F. Supp. 2d at 151, and operate in tandem in pursuit of a single scheme directed by Chishti and Pobereskin from the United States. Accordingly, at least at this early stage of the proceeding, their separate formal corporate statuses are insufficient to prevent the Court from exercising personal jurisdiction over the entirety of that shared enterprise, including the portion that operates under the Qinhe label. Defendants remain free, however, to reassert the defense at a later stage of the proceeding, at which point Plaintiffs will face a more demanding evidentiary burden.

---

[12] Defendants dispute that Xie's request for Chishti's permission to hire an IP counsel for Qinhe went through Pobereskin, Dkt. 78-9 at 3–4 (Pobereskin Supp. Decl. ¶ 12), but do not dispute, as is apparent from the face of the email reproduced in Plaintiffs' amended complaint, that an email thread involving both Qinhe and Isbei officers (including Xie, Niazi, Chishti, and Pobereskin) stated that hiring an IP counsel was "ok per approval from [Chishti]." Dkt. 70-2 at 29 (Am. Compl. ¶ 82).

42

e.  Dataquartz

The final corporate defendant, Dataquartz, requires only brief discussion.  In their opposition to the motion to dismiss, Plaintiffs do not seriously contend that the current record in this case permits the Court to exercise personal jurisdiction over Dataquartz—which, as discussed above, Defendants attest is based in Canada and lacks any U.S. presence.  Dkt. 78-8 at 5–6 (Zamir Decl. ¶¶ 16–19).  Instead, Plaintiffs argue that "the best path forward" is for the Court to permit jurisdictional discovery into Dataquartz, given the discrepancies between its website (which Plaintiffs allege listed U.S. locations) and Defendants' declarations disclaiming any U.S. presence.  Dkt. 89-2 at 38.  As Plaintiffs explain, Dataquartz is a new party to the case, added in the most recent complaint, and was therefore not previously subject to jurisdictional discovery.  *Id.* at 39.  Defendants dispute that there is any need for jurisdictional discovery, arguing that the record contains unrebutted evidence explaining that Dataquartz has never had any U.S. operations and that statements to the contrary on its website were made in anticipation of "contemplate[ed] work[] with individuals in Washin[g]ton D.C. and Dallas" to generate opportunities for business in the United States that ultimately "never materialized."  Dkt. 78-6 at 3–4 (Riaz Decl. ¶ 12); *see* Dkt. 100-2 at 20–21.

For at least two reasons, the Court is unpersuaded that further jurisdictional discovery is warranted at this time.  First, the current record casts doubt on the prospect that jurisdictional discovery will bear fruit.  The record contains sworn declarations from both of Dataquartz's founders attesting that the company has never had any U.S. presence, including an explanation as to why Plaintiffs' (reasonable) inferences to the contrary based on the company's website are mistaken, *see* Dkt. 78-6 (Riaz Decl.); Dkt. 78-8 (Zamir Decl.), and Plaintiffs offer no basis to dispute those attestations other than general suggestions that the declarants might have perjured themselves, *see* Dkt. 89-2 at 39.  Second, although this case was filed over three years ago, it has

43

yet to proceed past the initial pleading stage, and the interest in judicial administration, *see* Fed. R. Civ. P. 1, counsels against any further delay. To the extent that questions relating to the role played by Dataquartz and its founders arise in the course of ordinary discovery, and to the extent that discovery reveals a basis to add Dataquartz as a party, Plaintiffs may move for leave to amend. There is no reason, however, to carve out a distinct process for taking discovery relating to Dataquartz's alleged connections to the United States. It is safe to assume that, if Dataquartz proves to be yet another proxy or alter ego for Chishti, Pobereskin, or Isbei, that fact will reveal itself in ordinary discovery.

The Court will therefore grant the motion to dismiss as to Dataquartz, but will do so without prejudice.[13]

3.    *Pobereskin*

The final jurisdictional issue to be addressed, the Court's personal jurisdiction over Pobereskin, requires a different form of analysis. As discussed above, Pobereskin—unlike the other non-Chishti Defendants—has conceded that she is subject to personal jurisdiction in Puerto Rico, Dkt. 100-2 at 22, and, therefore, Plaintiffs may not rely on Rule 4(k)(2)'s nationwide contacts test to establish this Court's jurisdiction. Plaintiffs must, accordingly, resort to the usual method of demonstrating that personal jurisdiction over Pobereskin is proper under both the D.C. long-arm statute and due process. *See FC Inv. Grp. LC*, 529 F.3d at 1094–95.

Plaintiffs concede that Pobereskin's personal contacts with the District of Columbia, which are, for the most part, limited to her pre-2021 (that is, prior to her move to Bermuda, marriage to Chishti, and subsequent move to Puerto Rico) residence and work in the District, *see*

---

[13] Unlike the other non-Chishti Defendants, Plaintiffs do not ask that the claims against Dataquartz be transferred to Puerto Rico in the event that the Court determines that it lacks personal jurisdiction. Dkt. 89-2 at 12.

Dkt. 78-3 at 2–3 (Pobereskin Decl. ¶¶ 5, 11, 13–14); Dkt. 78-9 at 2 (Pobereskin Supp. Decl. ¶¶ 2–3), are insufficient to bring her within the Court's jurisdiction, *see* Dkt. 89-2 at 12. Instead, Plaintiffs press two related arguments—first, that Pobereskin is Chishti's joint venturer and, second, that Chishti acted as her agent, such that Chishti's own D.C. contacts can be imputed to her. *Id.* Defendants, for their part, deny that Chishti and Pobereskin formed a joint venture or that he acted as her agent in relevant respects. *See* Dkt. 100-2 at 8–9, 13.

As the Court has explained, Defendants' insistence that Chishti is merely an "informal advisor" to Isbei and to Pobereskin is far-fetched. But Plaintiffs' argument as to personal jurisdiction over Pobereskin nonetheless fails to carry the day. Even if the Court were to agree with Plaintiffs that Chishti has at times operated as Pobereskin's agent, or that he and Pobereskin operate Isbei as a joint venture (as seems not unlikely), that would not suffice to establish personal jurisdiction over Pobereskin in the District of Columbia. Simply put, Plaintiffs cannot rely on Chishti's D.C. contacts to connect Pobereskin to the forum because they have failed to proffer evidence that Chishti himself had sufficient, imputable, claims-specific contacts with the District.

The provision of the D.C. long-arm statute on which Plaintiffs rely, *see* Dkt. 89-2 at 28, permits this Court to exercise personal jurisdiction over a foreign person, like Pobereskin, "who acts directly *or by an agent*, as to a claim for relief arising from the person's . . . causing tortious injury in the District of Columbia by an act or omission outside the District of Columbia" only if that person also "does or solicits business, engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed, or services rendered, in the District of Columbia," D.C. Code § 13-423(a)(4) (emphasis added). The record does not demonstrate that Pobereskin has done so, either herself or through an agent or joint venturer. Nor does the record

45

include evidence of Pobereskin, either herself or through an agent or joint venturer, conducting business or engaging in a persistent course of conduct in the district in a manner such that Plaintiffs' claims "arise out of or relate to [those] contacts with the forum." *Ford Motor Co.*, 592 U.S. at 359 (citation modified). And perhaps most fundamentally, the specific contacts by Chishti with the District of Columbia that Plaintiffs proffer cannot give rise to personal jurisdiction over Pobereskin without offending due process.

Chishti lived and worked for Afiniti in Washington, D.C. until November 2020, when he moved to Bermuda. Dkt. 78-2 at 2 (Chishti Decl. ¶ 6). At that time, Chishti remained CEO of Afiniti, a position he held until November 2021. *Id.* (Chishti Decl. ¶ 3). It was in Bermuda that, Plaintiffs allege, Chishti refused to return the Afiniti computers in his possession and thereby misappropriated Afiniti trade secrets, and it was in Bermuda and in Puerto Rico that Chishti allegedly orchestrated the creation of the corporate Defendants and assisted their efforts to develop and to market products using those allegedly misappropriated trade secrets. Plaintiffs argue that Chishti's prior employment in D.C. can be imputed to Pobereskin because she ratified his conduct by subsequently working with him in establishing Isbei. Dkt. 89-2 at 29. But Plaintiffs cite no authority for their contention that, by subsequently working with Chishti in Bermuda and Puerto Rico, Pobereskin somehow "ratified" not only his alleged misappropriation of the Afiniti trade secrets in Bermuda and Puerto Rico, but also his lawful employment for Afiniti in the District of Columbia. In *Stolle Machinery*, the principal case that Plaintiffs invoke concerning ratification of an agent's prior misappropriation of trade secrets, the court exercised jurisdiction over the defendant in the forum where the misappropriating activity took place (Ohio), not in a separate forum where the defendant had happened to work prior to the misappropriation. The Sixth Circuit's opinion in that case emphasized that the plaintiff there had

46

shown that the defendant "took drawings and other information from [the plaintiff]" in Ohio, and that the "entire cause of action ar[ose] from [the defendant's] actions while he was in Ohio." *Stolle Mach.*, 605 Fed. App'x at 481. Here, by contrast, the record contains no evidence that Chishti misappropriated Afiniti trade secrets, directed Isbei, or took any other actions in the District of Columbia which Pobereskin might have subsequently ratified.

Plaintiffs also invoke *Dayton Superior Corporation v. Yan*, which held that the U.S. District Court for the Southern District of Ohio could exercise personal jurisdiction over a foreign company founded by a person who had worked out-of-state for the Ohio-based plaintiff before misappropriating the plaintiff's trade secrets. 288 F.R.D. 151, 167 (S.D. Ohio 2012). *Dayton* bears a stronger resemblance to the facts of this case than *Stolle Machinery*. In *Dayton*, the individual defendant was working outside the forum state when the misappropriation occurred, and the court nonetheless held that the foreign company that he founded "engage[d] in a persistent course of conduct in Ohio by an agent" by ratifying the individual defendant's conduct. *Id.* But in *Dayton*, the individual defendant was still employed by the plaintiff corporation when he founded the defendant company, and the defendant company had also "made purchases" from the plaintiff Ohio corporation. *Id.* The Court's analysis here might be different if Chishti had worked with Pobereskin to misappropriate Afiniti trade secrets while he was still employed by Afiniti; in that scenario, Plaintiffs might plausibly argue that Chishti, by working for a D.C.-based corporation, was engaged in business in the District while also operating as Pobereskin's agent (or joint venturer). But that is not what happened here. Under Plaintiffs' more expansive theory, Pobereskin could be subject to personal jurisdiction in any forum in which Chishti previously worked for Afiniti or learned about Afiniti trade secrets, even if she herself never visited or engaged in any course of conduct in that jurisdiction, even though

47

Chishti's D.C. activities cannot be described, even retrospectively, as having been performed on her behalf, and even though her joint activity with Chishti did not occur until months or years later. It is enough, in Plaintiffs' view, that Chisti had some prior, non-tortious contact with the forum, simply because he *later* misappropriated trade secrets from Afiniti, and she *later* cooperated with Chisti in his post-Afiniti venture. The Court does not understand due process to sweep so broadly.

Plaintiffs' alternative joint venture theory suffers from similar defects. The joint venture doctrine permits a court to impute the conduct of one joint venturer to the other, but only if that conduct is "in furtherance of the venture." *HRH Servs., LLC v. Travelers Indemnity Co.*, No. 23-cv-2300, 2024 WL 5246521, at *11 (D.D.C. Dec. 30, 2024). Even accepting that Chishti and Pobereskin formed a joint venture around the time of their move from Bermuda to Puerto Rico, Chishti would not have been engaged in any joint venture with Pobereskin at the time of his employment with Afiniti in the District of Columbia. And he would not have been involved in any tortious misconduct at that time that the Court might attribute to Pobereskin based on a ratification theory. Plaintiffs do not allege, for example, that Chisti was already plotting with Pobereskin at that point in time to misappropriate trade secrets belonging to Afiniti—that is, the company at which he served as the CEO. Nor do Plaintiffs claim that Chishti subsequently traveled to D.C. to conduct business for Isbei or otherwise to act in furtherance of the joint venture. *See* Dkt. 78-2 at 3 (Chishti Decl. ¶ 12). Any holding that Pobereskin has nonetheless "purposefully availed" herself of the District's laws and is subject to personal jurisdiction in this forum merely because she agreed to form a joint venture with someone who had himself previously worked in the District would be inconsistent with due process. *See Burger King Corp.*, 471 U.S. at 475.

In their motion to supplement the record, Plaintiffs offer a further possible basis for asserting personal jurisdiction over Pobereskin in the District of Columbia. They report that, in a separate court proceeding in Bermuda, Chishti acknowledged having a D.C.-registered account with the Royal Bank of Canada ("RBC"), which he omitted from his discovery responses in this case. Dkt. 122 at 7; Dkt. 116-3 at 58. Plaintiffs claim, moreover, that Chishti (through a wholly owned company named Redcourt LLC, which was also not disclosed in jurisdictional discovery) sold $11 million worth of shares in an entity called IBEX from that RBC account and then wired at least $560,000 of the proceeds to Isbei (through another bank, JS Bank Ltd.). Dkt. 122 at 8–9. Plaintiffs thus maintain that Pobereskin has, through Chishti, "transacted business in Washington, D.C." in order to fund Isbei and that the Court may exercise jurisdiction over her based on that contact. *Id.* at 13. Defendants do not dispute that "Chishti transferred stock from a pass-through entity he owns called Redcourt LLC to his RBC brokerage account, which has an address in Washington, D.C." and that some of the proceeds of the sale of that stock were "used to fund Isbei," although they characterize the transaction as a gift to Pobereskin. Dkt. 127-2 at 14. They nonetheless argue that the transfer does not support personal jurisdiction over Pobereskin (or any other Defendant) for several reasons.

As an initial matter, Defendants emphasize that the relevant transfers from the RBC account to Isbei occurred, as Plaintiffs concede, "[b]etween November 2024 and January 2025," Dkt. 122 at 9, that is, *after* Plaintiffs initiated this suit in February 2023, Dkt. 127-2 at 14–15; *see* Dkt. 1 (Compl.). Defendants are correct that "post-complaint contacts are not relevant to the personal jurisdiction analysis." *Gather Workspaces LLC v. Gathering Spot LLC*, No. 19-cv-2669, 2020 WL 6118439, at *4 (D.D.C. Oct. 16, 2020) (collecting cases). Plaintiffs do not dispute that general proposition, but they argue that the Court may nonetheless consider Chishti's

49

use of the RBC account between November 2024 and January 2025 because it predated their filing of their amended complaint in March 2025.  Dkt. 129 at 19; *see* Dkt. 70-2 (Am. Compl.). Plaintiffs emphasize that their amended complaint was not only an amended pleading, but a supplemental pleading under Federal Rule of Civil Procedure 15(d), and they claim that "[i]t would make no sense to ignore salient jurisdictional facts post-dating the original complaint for purposes of determining personal jurisdiction in the context of a supplemental complaint."  Dkt. 129 at 19–20.  Plaintiffs admit, however, that they are unaware of any binding authority in support of their position that the Court may, consistent with due process, exercise jurisdiction over Pobereskin based on jurisdictional contacts that postdate the initiation of this lawsuit, even if those contacts predate the first amended complaint.  They characterize the question as "an issue of first impression" in this Circuit.  *Id.* at 19.

The Court agrees that there is some force to Plaintiffs' argument that it would be incongruous if the Court could not consider jurisdictional contacts identified in a supplemental pleading, the purpose of which is to introduce "new facts bearing on the relationship between the parties," only because those contacts did not predate the original complaint in a case.  *United States v. Hicks*, 283 F.3d 380, 385–86 (D.C. Cir. 2002).  Indeed, the D.C. Circuit has at times, but not always, taken a "practical approach to whether a plaintiff [can] cure a defect in [subject matter jurisdiction] through an amended or supplemental complaint," noting that "permitting plaintiffs to cure such jurisdictional defects through amended pleadings avoids 'the unnecessary hassle and expense of filing a new lawsuit when events subsequent to filing the original complaint have fixed the jurisdictional problem.'"  *Lamb v. Millennium Challenge Corp.*, 498 F. Supp. 3d 104, 119 (D.D.C. 2020) (quoting *Scahill v. District of Columbia*, 909 F.3d 1177, 1184 (D.C. Cir. 2018)).  Here, moreover, Plaintiffs represented that they intended to file an amended

complaint to "supplement and amend the jurisdictional and factual allegations to reflect new and different facts," Dkt. 64 at 2, and the Court subsequently permitted them to update their complaint based on that request, Min. Order (Jan. 21, 2025).  The Court need not, however, resolve this thorny issue because Chishti's use of the RBC account does not, in any event, permit the exercise of personal jurisdiction over Pobereskin.

Plaintiffs' latest jurisdictional theory amounts to the following:  Pobereskin, through an agent, sent (and received) money from an RBC account with a D.C. address and thereby "transact[ed] business in the District of Columbia," sufficing to establish personal jurisdiction in the District.  D.C. Code § 13-423(a).  Even assuming that this is what happened, the Court disagrees that directing Chishti to make a transfer from a financial account that happened to be based in the District of Columbia (and then, through Isbei, benefiting from that transfer), amounts to Pobereskin "purposely establish[ing] minimum contacts" in the District that suffice for personal jurisdiction.  *Asahi Metal Indus. Co. v. Superior Ct. of Cal., Solano Cnty.*, 480 U.S. 102, 108–09 (1987) (citation modified).  "It is recognized that the existence of a bank account in [the forum] is generally not sufficient to confer personal jurisdiction over a foreign defendant," *J.L.B. Equities, Inc. v. Ocwen Fin. Corp.*, 131 F. Supp. 2d 544, 548 (S.D.N.Y. 2001), "even in suits arising from the account," *Societe Generale v. Fla. Health Scis. Ctr., Inc.*, No. 03 Civ. 5615, 2003 WL 22852656, at *4 (S.D.N.Y. Dec. 1, 2003).  In arguing the opposite proposition, Plaintiffs rely on *Licci v. Lebanese Canadian Bank, SAL*, 984 N.E.2d 893 (N.Y. 2012), where the New York Court of Appeals held that a foreign bank's use of a New York correspondent account amounted to a "course of dealing" that constituted "purposeful availment of New York's dependable and transparent banking system," *id.* at 900; *see* Dkt. 122 at 9.  Other courts have also found that use of a specific bank account in the forum for "substantially all" of a foreign

corporation's income and expenses can support personal jurisdiction. *United Rope Distribs., Inc. v. Kimberly Line*, 785 F. Supp. 446, 450 (S.D.N.Y. 1992).

The allegations (and evidence in the record) here are a far cry from the consistent use of a correspondent account or the use of a D.C. bank account for "substantially all" of Pobereskin's financial dealings. Plaintiffs do not suggest that Pobereskin opened or maintained a D.C. account in her own name or that she directed Chishti to establish the RBC account—only that she requested (and Isbei received) a transfer from Chishti that happened to originate in a D.C. account. Plaintiffs cite no case in which a court held that it could exercise personal jurisdiction, consistent with due process, over a foreign individual like Pobereskin based only on that person's involvement in a couple of transfers from a foreign person to a foreign corporation that she directed, even though the transfer involved money held in a domestic account. Under that theory, an entrepreneur like Pobereskin could be haled into court in any jurisdiction where a commercial partner or agent happened to maintain a bank account. Due process requires that the defendant create a "substantial connection with the forum State" by "engag[ing] in significant activities within a State" in order to be subject to personal jurisdiction. *Burger King Corp.*, 471 U.S. at 475–76 (citation modified). Benefiting from a few transfers from a District-based RBC account is insufficient.

The Court therefore concludes that it lacks personal jurisdiction over Pobereskin.

### 4.    *Extraterritoriality and the Merits*

As a final argument, Defendants maintain that the above analysis is nonetheless insufficient to establish this Court's personal jurisdiction over any Defendant because, on their telling, Plaintiffs have failed to uncover any evidence that Defendants misappropriated Afiniti trade secrets. And, Defendants continue, because the declarations and other evidence proffered by Defendants during jurisdictional discovery deny any such misappropriation or use of Afiniti's

intellectual property, that should end the matter. *See, e.g.*, Dkt. 78-1 at 9; Dkt. 127-2 at 33–34; Dkt. 108 at 11, 14–15.

The Court disagrees. The personal jurisdiction standard asks whether Defendants have sufficient contacts with the relevant forum and—when, as here, it is specific jurisdiction that is at issue—whether "[t]he plaintiff's *claims* . . . arise out of or relate to the defendant's contacts with the forum," *Ford Motor Co.*, 592 U.S. at 359 (emphasis added and citation modified), and not whether the plaintiff has shown that she is likely to *prevail* on those claims. It is true that when Plaintiffs have benefited from jurisdictional discovery, they bear the burden of going forward and proffering evidence (or identifying undisputed facts) sufficient to establish personal jurisdiction; it is no longer sufficient, for example, to rely on the sufficiency of Plaintiffs' jurisdictional allegations. But Defendants otherwise conflate personal jurisdiction with the merits. The current procedural posture of the case—that is, the Court's consideration of Defendants' Rule 12(b)(2) motion to dismiss, following a period of jurisdictional discovery— affects only the standard of review applicable to Defendants' motion to dismiss for lack of personal jurisdiction, not the underlying substantive question whether the *claims* at issue arise out of or relate to Defendant's forum contacts.

Here, Plaintiffs allege that Defendants have misappropriated and commercially exploited Afiniti trade secrets in violation of federal law, state law, and Chishti's Employment Agreement. *See generally* Dkt. 70-2 (Am. Compl.). Plaintiffs have alleged, and jurisdictional discovery has established, that some of the Defendants have substantial contacts with the United States, such as Pobereskin and Chishti's ongoing direction of Isbei, Isbei Hainan, and Qinhe from Puerto Rico and the April 2022 Puerto Rico meeting between Chishti and Zamir. Plaintiffs further allege that those corporate activities and meetings in the United States involve the unlawful appropriation of

their trade secrets.  Accordingly, it is apparent that Plaintiffs' *claims* arise out of or relate to those jurisdictional contacts.  That suffices for personal jurisdiction.  Whether Plaintiffs' claims will succeed on the merits is a question for future stages of this litigation, which will not occur until after the parties have had the opportunity to engage in merits (and not simply jurisdictional) discovery.

For similar reasons, the Court is unpersuaded by Defendants' contention that the Defend Trade Secrets Act's extraterritoriality provision defeats personal jurisdiction over any of the Defendants.  *See* Dkt. 127-2 at 18–19.  That, too, is a merits defense.  The relevant provision of the Defend Trade Secrets Act, 18 U.S.C. § 1837(2), applies the statute to "conduct occurring outside the United States if . . . an act in furtherance of the offense was committed in the United States."  Although Defendants deny that any such offense or "act in furtherance" occurred here—within or without the borders of the United States—that question is distinct from the jurisdictional inquiry and, like Defendants' other merits defenses, must await a later stage of the proceeding.  For now, it is enough that Plaintiffs have alleged (and supported their allegations through jurisdictional discovery) that Defendants committed acts in the United States that, on Plaintiffs' theory of the case, amount to acts in furtherance of the claimed trade secrets misappropriation.

## C.    Transfer to Puerto Rico

Plaintiffs request that, in the event that the Court determines that it lacks personal jurisdiction over any Defendant, the claims against that Defendant be severed and transferred to the United States District Court for the District of Puerto Rico.  Dkt. 89-2 at 31.  Given the Court's conclusions set forth above, this proposed recourse is applicable only to Plaintiffs' claims against Pobereskin.  Although the Court has concluded that it also lacks personal jurisdiction over Dataquartz, the same lack of personal jurisdiction would apply in the District of

Puerto Rico. *See* 28 U.S.C. § 1631 (permitting transfer to another court "in which the action or appeal could have been brought at the time it was filed or noticed"); *id.* § 1406(a) (same).

As for Pobereskin, the Court will grant Plaintiffs' request to transfer the claims against her to the District of Puerto Rico. Transfer under Section 1631 is warranted where the current district court lacks jurisdiction, the transfer is "in the interest of justice," and the transfer is "to a court in which the action could have been brought at the time it was filed or noticed." *Does 1-144 v. Chiquita Brands Int'l, Inc.*, 285 F. Supp. 3d 228, 233 (D.D.C. 2018). The first requirement is met here because, as previously explained, the Court lacks personal jurisdiction over Pobereskin. The second requirement that the transfer be in the interest of justice requires that the Court "carefully weigh[]" the equities involved, including whether refiling would be "time consuming and costly," whether the plaintiff might be time barred from bringing the action in another court, and whether the plaintiff filed the case in the original, improper court in "good faith." *Janvey v. Proskauer Rose, LLP*, 59 F. Supp. 3d 1, 7 (D.D.C. 2014). Those factors favor transfer here. There is at least some risk that Plaintiffs' claims against Pobereskin would now be barred by the Defend Trade Secrets Act's three-year statute of limitations, *see* 18 U.S.C. § 1836(d); transfer would vindicate the broader interest an "an expeditious and orderly adjudication . . . on the merits" of Plaintiffs' claims, *Giallella v. United Property Mgmt., Inc.*, No. 23-cv-1978, 2024 WL 4722132, at *4 (D.D.C. Nov. 8, 2024) (quoting *Sinclair v. Kleindienst*, 711 F.2d 291, 293–94 (D.C. Cir. 1983)); and the Court determines that Plaintiffs had a reasonable basis for originally bringing the claims against Pobereskin in this forum, given her ties to Chishti and her own previous "erroneous" representations that she resided in the District, *see* Dkt. 78-9 at 2 (Pobereskin Supp. Decl. ¶¶ 2–3). Finally, there is no dispute that the claims against Pobereskin could have been brought in Puerto Rico, where she is domiciled.

55

Finally, although 28 U.S.C. § 1631 refers only to the transfer of an "action or appeal" to cure a want of jurisdiction, rather than a subset of claims, courts routinely sever and transfer individual claims when they lack jurisdiction over only a portion of a case. *See, e.g.*, *Does 1-144*, 285 F. Supp. 3d at 237–40; *Khalid v. Garland*, No. 21-cv-2307, 2023 WL 8600506, at *3–4 (D.D.C. May 25, 2023); *Bailey v. Fulwood*, 780 F. Supp. 2d 20, 25–26 (D.D.C. 2011). Defendants, moreover, have not raised any objection to the transfer of Plaintiffs claims against Pobereskin to Puerto Rico on this basis. *See* Dkt. 100-2 at 25–26. The Court will, accordingly, sever Plaintiffs' claims against Pobereskin under Federal Rule of Civil Procedure 21 and then transfer those claims to the District of Puerto Rico.

## D. Legal Sufficiency of Plaintiffs' Claims

With personal jurisdiction disposed of, the Court turns to Defendants' arguments concerning the legal sufficiency of the allegations in the amended complaint. Defendants first argue in broad terms that Plaintiffs' allegations are too speculative and conclusory to permit a plausible inference that Plaintiffs are entitled to relief on any of the counts of the complaint. Dkt. 78-1 at 40–48. Second, they argue that Plaintiffs' claim against Chishti under the CFAA fails to allege the required elements of the offense. *Id.* at 48–52. Neither set of arguments supports dismissal, with one small exception.

### 1. *Rule 8 and Rule 12*

Defendants maintain that the amended complaint as a whole "fails to allege plausible claims" because "the speculation offered by [Plaintiffs]" fails to "clear the bar" even of Rule 8's "not demanding" pleading standard. *Id.* at 40, 42. The Court disagrees and concludes that Plaintiffs' allegations "plausibly suggest an entitlement to relief." *Ashcroft v. Iqbal*, 556 U.S. 662, 681 (2009).

Plaintiffs allege that, following his departure from Afiniti, Chishti solicited former Afiniti employees and customers (in violation of the Employment Agreement) and misappropriated Afiniti trade secrets that he had retained following his departure (in violation of the Employment Agreement and federal, state, and District law) to develop competing products marketed by the corporate Defendants. And they allege that the other Defendants participated in the misappropriation of Afiniti's intellectual property. Defendants, in turn, object that the amended complaint "point[s] to business activities that could be based on either unlawful activity or ordinary business conduct," while "overlooking the existence of plausible and lawful explanations for the conduct [Plaintiffs] allege is wrongful." Dkt. 78-1 at 44.

To be sure, whether Plaintiffs' claims will succeed on the merits is an open question. But taking Plaintiffs' "well-pleaded factual allegations as true and draw[ing] all reasonable inferences" in Plaintiffs' favor as the Court must at this stage, *Ho v. Garland*, 106 F.4th 47, 50 (D.C. Cir. 2024), their allegations permit the reasonable inference that Chishti, after leaving Afiniti, established competing companies in the same business sector using the trade secrets that Chishti had retained from his prior employment and then conveyed to the other Defendants. The same is true for Plaintiffs' allegations that Chishti breached the Employment Agreement by, among other things, retaining Afiniti computers, establishing a competing business, and recruiting former Afiniti employees to join his efforts. Defendants are correct that "there are entirely legal ways that a company could rapidly develop sophisticated software" as Isbei and Qinhe have done without relying on misappropriated trade secrets.[14] Dkt. 78-1 at 44. That does

_____

[14] Defendants' motion to dismiss also relies on declarations produced in jurisdictional discovery wherein Defendants denied having used, or even having access to, Afiniti source code. Dkt. 78-1 at 44. Those merits arguments, turning on questions of fact outside the pleadings, are not properly raised in support of a motion to dismiss pursuant to Rules 8 and 12(b)(6). The fact that

not, however, make Plaintiffs' allegations that Defendants developed their products using Afiniti trade secrets, at the direction of Afiniti's embittered former CEO, implausible or otherwise subject to dismissal on the bare pleadings.  In resolving the motion to dismiss, it is not the Court's role to "speculate about which factual allegations are likely to be proved after discovery."  *Harris v. D.C. Water & Sewer Auth.*, 791 F.3d 65, 70 (D.C. Cir. 2015).  Nor do Rules 8 and 12 oblige Plaintiffs to anticipate and to refute Defendants' counter-narratives and merits defenses, much less to do so without the benefit of full discovery.

The Court therefore denies Defendants' motion to dismiss the amended complaint in its entirety under Rules 8 and 12.

2.      *Computer Fraud and Abuse Act*

Defendants offer a more targeted critique of Plaintiffs' claim against Chishti brought under the CFAA.  In their amended complaint, Plaintiffs allege that Chishti violated the CFAA both by accessing Afiniti computers without authorization and by exceeding his authorization, primarily by accessing Afiniti data that he had in his possession or had backed up to external cloud storage at the time his employment with Afiniti terminated.  Dkt. 70-2 at 139 (Am. Compl. ¶ 5).  Plaintiffs also allege "[o]n information and belief" that Chishti solicited current/former Afiniti employees to access Afiniti data and to provide it to him.  *Id.* (Am. Compl. ¶ 6).  In Defendants' view, those claims fail as a matter of law because any access to Afiniti's computers during Chishti's employment would have been authorized and therefore lawful, and the

---

the Court permitted Plaintiffs to take jurisdictional discovery (although, notably, not merits discovery) does not alter that blackletter principle.  Plaintiffs have also provided, in response to the Court's order, additional context as to the nature of the trade secrets that they allege Defendants to have misappropriated, *see* Dkt. 122, but, for the same reasons, the Court need not and does not consider those materials in resolving Defendants' motion to dismiss pursuant to Rules 8 and 12(b)(6).

allegations of post-termination access are conclusory and fail to identify with specificity the Afiniti employees whom Chishti allegedly solicited to access Afiniti's computers on his behalf. Dkt. 78-1 at 48–49.

Plaintiffs' allegations that Chishti, following the termination of his employment, accessed Afiniti's protected computers without authorization suffice to state a claim for relief under the CFAA. The statute, as relevant to Plaintiffs' claims, *see* Dkt. 89-2 at 49–50, prohibits "intentionally access[ing] a [protected] computer [to obtain information] without authorization or exceed[ing] authorized access," 18 U.S.C. § 1030(a)(2), or "intentionally access[ing] a protected computer without authorization, and as a result . . . caus[ing] damage or loss," *id.* § 1030(a)(5)(B)–(C). As the Supreme Court has emphasized, "exceed[ing] authorized access" for purposes of the CFAA requires that a person access information that he was forbidden to access at all, not that he merely access information for an improper purpose. *Van Buren v. United States*, 593 U.S. 374, 378, 384 (2021). Chishti's alleged misconduct—accessing Afiniti's computer system following his termination, Dkt. 70-2 at 139 (Am. Compl. ¶ 5)—qualifies. *See Lightfoot v. Koonz, McKenney, Johnson & DePaolis LLP*, No. 22-cv-238, 2022 WL 2176923, at *3 (D.D.C. June 16, 2022) (noting that "a departed employee [who] uses her still-working credentials to access her employer's computer" following her termination does so "without authorization" under the CFAA). Once Chishti's employment concluded, so too did his authorized access to Afiniti's computer network.

Defendants also object that Plaintiffs' complaint fails to plead any claims of fraud under the CFAA with the heightened particularity required by Federal Rule of Civil Procedure 9(b). Dkt. 78-1 at 49–50. One provision of the CFAA, 18 U.S.C. § 1030(a)(4), does prohibit "access[ing] a protected computer without authorization, or exceed[ing] authorized access,"

59

when done "knowingly and with intent to defraud," and when "such conduct furthers the intended fraud and obtains anything of value."  The amended complaint is silent on precisely which provision of the CFAA Plaintiffs are invoking, citing only 18 U.S.C. § 1030 in its entirety. Dkt. 70-2 at 138–40 (Am. Compl. ¶¶ 1–9).  But while alleging that Chishti accessed Afiniti's computer system without authorization and also exceeded his authorized access, the complaint makes no reference to any intent to defraud or fraudulent scheme.  *Id.*  In their opposition to the motion to dismiss, Plaintiffs clarify that they are pursuing claims only under 18 U.S.C. § 1030(a)(2) and (a)(5), which do not include an element of fraud, and thereby need not comply which the heightened pleading requirements of Rule 9(b), which apply to allegations of "fraud or mistake."  Dkt. 89-2 at 51; Fed. R. Civ. P. 9(b).

Defendants portray Plaintiffs' concession as an impermissible attempt to amend their complaint in the opposition to the motion to dismiss.  Dkt. 100-2 at 30.  The Court disagrees that Plaintiffs' clarification of the narrow scope of their CFAA claims constitutes "amending" the complaint—which, as discussed above, was always best read as asserting violations of 18 U.S.C. § 1030(a)(2) and (a)(5), and not of (a)(4).[15]  Plaintiffs' opposition to the motion to dismiss does not add new factual allegations or legal claims not already mentioned (albeit, at a higher level of generality than would be ideal) in the operative complaint.  Nor, insofar as Defendants argue otherwise, is the Court persuaded that Rule 9(b)'s heightened pleading standard has any relevance for Plaintiffs' claims under Section 1030(a)(2) and (a)(5), which do not rely on any allegations of fraud.

---

[15] To the extent that the amended complaint might arguably be read as asserting a claim under 18 U.S.C. § 1030(a)(4), Plaintiffs have clearly disclaimed that reading, and the Court will hold Plaintiffs to that representation.

Beyond alleging that Chishti himself accessed Afiniti computer systems in violation of the CFAA, Plaintiffs also claim that Chishti violated the statute indirectly, by "solicit[ing] current Afiniti employees that have access to Afiniti's data system to access and provide [him] information belonging to Afiniti."  Dkt. 70-2 at 139 (Am. Compl. ¶ 6).  Defendants argue both that Chishti cannot be liable under the CFAA for the actions of third parties, Dkt. 78-1 at 49, and that the allegations are conclusory in any case and merit dismissal under Rule 12, *id.*; Dkt. 100-2 at 29–30.  As to the first argument, Plaintiffs are correct that "courts have recognized that vicarious or indirect liability under [the CFAA] extends to parties who direct, encourage, or induce others to commit acts that violate the statute."  *Ryanair DAC v. Booking Holdings Inc.*, 636 F. Supp. 3d 490, 499 (D. Del. 2022) (collecting cases).  The amended complaint, however, while alleging that Chishti directed others to violate the statute on his behalf, does not identify a single person whom Chishti has so induced, or a specific computer system that Chishti has allegedly induced others to access, or the date or location of any such access, although Plaintiffs do allege that these unknown persons have "obtained[ed] Afiniti Trade Secrets, source code, and confidential documents from the protected computers" on Chishti's behalf.  Dkt. 70-2 at 139–40 (Am. Compl. ¶¶ 6–7).  This is in contrast to Plaintiffs' allegations that Chishti violated the statute himself, which include specific factual allegations concerning the Afiniti computers that Plaintiffs allege Chishti to have retained and backed up on an external storage account following his employment.  *Id.* at 139 (Am. Compl. ¶ 5).

Defendants are on firmer ground, therefore, in seeking to dismiss Plaintiffs' claim that "Chishti . . . solicited current Afiniti employees that have access to Afiniti's data system to access and provide [him] information belonging to Afiniti."  *Id*. at 139 (Am. Compl. ¶ 6).  That claim is premised exclusively on the conclusory allegation that Chishti directed (unnamed)

61

persons to access (unspecified) Afiniti systems at an (unknown) time.  The Court  agrees with Defendants that Plaintiffs have failed plausibly to allege a violation of the CFAA on a vicarious liability theory.  *Cf. Ryanair DAC*, 636 F. Supp. 3d at 502–03 (denying a motion to dismiss a vicarious liability claim under the CFAA where the plaintiff named "the specific third parties" alleged to have cooperated with the defendants, and the "portion of [plaintiff's] website" at issue).  Without more, "recitation of the elements of a cause of action" does not suffice.  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555–56 (2007).

Finally, Defendants object that Plaintiffs have failed to allege facts sufficient to support the required statutory losses under the CFAA.  To bring a civil suit under the CFAA in a case that does not involve medical care, physical injury, a threat to health or safety, or damage affecting a U.S. government computer, a plaintiff must allege (and eventually prove) at least $5,000 in losses.  18 U.S.C. § 1030(c)(4)(A)(i)(I)–(V), (g); *see Lightfoot*, 2022 WL 2176923, at *3.  Such losses include "any reasonable cost to any victim, including the cost of responding to an offense, conducting a damage assessment, and restoring the data, program, system, or information to its condition prior to the offense, and any revenue lost, cost incurred, or other consequential damages incurred because of interruption of service."  18 U.S.C. § 1030(e)(11); *see Psychas v. Dist. Dep't of Transp.*, No. 18-cv-81, 2019 WL 4644503, at *10 (D.D.C. Sep. 24, 2019) ("Many courts agree that loss [in the CFAA] refers only to the costs associated with responding to a violation or restoring the information that was damaged or any costs incurred because of an interruption of services.").

In their amended complaint, Plaintiffs allege that Chishti's unlawful access to Afiniti's computer system resulted in:

> [A] loss of at least $5,000 during a one-year period including the cost of responding to these offenses, conducting a damages assessment, the loss of

Chishti's one or more computers (and also potentially other devices), the costs of preventing unauthorized access to Afiniti's computer systems, and damages that flow from the foregoing and related acts described herein.

Dkt. 70-2 at 138 (Am. Compl. ¶ 3). Defendants argue that these allegations are conclusory and lack sufficient supporting factual allegations concerning the losses suffered by Plaintiffs. Dkt. 78-1 at 50–51, 50 n.34. The Court disagrees. Although short on detail, Plaintiffs have sufficiently alleged the requisite losses to bring a claim under the CFAA. They allege that their cost of responding to Chishti's unauthorized access, including a damage assessment and the cost of restoration, exceeded the statutory figure of $5,000. Plaintiffs will need to produce evidence in support of their alleged losses at later stages of this litigation, but they have cleared the first hurdle.

The Court will, accordingly, deny Defendants' motion to dismiss Plaintiffs' CFAA claim premised on Chishti's alleged post-employment access to an Afiniti computer, but will grant the motion as to Plaintiffs' alternative, indirect theory of inducement. In the event that discovery produces evidence of Chishti directing third parties to access Afiniti computers on his behalf in violation of the CFAA, however, the Court will entertain a motion to amend to reassert those claims.

## E.    Jury Trial Waiver

Defendants also move to strike Plaintiffs' demand for a jury trial, arguing that Plaintiffs waived their right to a jury trial in Afiniti's Employment Agreement with Chishti. Dkt. 78-1 at 52; *see* Dkt. 78-7 at 5. The relevant provision of the Employment Agreement reads as follows: "The Company and you [i.e., Afiniti and Chishti] each hereby irrevocably waive any right to a trial by jury in any action, suit or other legal proceeding arising under or relating to any provision of this Agreement." Dkt. 78-7 at 5. Defendants' understanding of the scope of that jury trial waiver has evolved over the course of briefing the pending motion. In their original motion to

63

strike, Defendants argued that the jury trial waiver applied to "all claims against Mr. Chishti," including Plaintiffs' statutory claims against him, as those claims, in the language of the Employment Agreement, "aris[e] under or relat[e] to any provision of th[e] Agreement." *Id.*; Dkt. 78-1 at 52. Defendants, accordingly, asked the Court to strike Plaintiffs' jury trial demand as to those claims and suggested that, if Plaintiffs elected to proceed with a jury trial on their claims against the non-Chishti defendants, "those claims be deferred for resolution until after any non-jury trial involving the claims against Mr. Chishti." Dkt. 78-1 at 52.

In Defendants' reply in support of the motion, however, they have adopted a new, more expansive reading of the jury trial waiver. They now argue that it also applies to Plaintiffs' "claims against the other Defendants," because the relevant clause of the Employment Agreement covers "any action, suit or other legal proceeding arising under or relating to any provision of this Agreement." Dkt. 100-2 at 30–31. In Defendants' most recent understanding, that includes any claims brought against non-signatories to the agreement if that same "action" also includes a claim against Chishti for breach of the Employment Agreement. *Id.* Defendants stuck to this revised view at the hearing held on January 12, 2026, arguing that, by signing the employment agreement, Plaintiffs had waived their right to a jury trial for any claim against any Defendant in this suit. Dkt. 108 at 25. If Plaintiffs had wished to assert their constitutional right to a jury trial against the non-Chishti Defendants, Defendants posit, they should "have filed a separate case." *Id.* Plaintiffs, for their part, accept that the Employment Agreement waives their right to a jury trial for the breach of contract claim against Chishti, but they dispute that it applies to their other claims against him, or to any claim brought against a non-signatory to the Agreement. Dkt. 89-2 at 52.

Because the question of the jury trial waiver does not require resolution at this stage of the proceedings, and because the parties have devoted only minimal briefing to the issue, the Court will grant Defendants' (unopposed) motion to strike Plaintiffs' jury trial demand with respect to their breach of contract claims against Chishti, but will otherwise deny the motion without prejudice and will defer further consideration until the parties have had an opportunity fully to brief the scope of the Employment Agreement. The Court does note that under District of Columbia law, which it assumes would apply, the Court must "'indulge every reasonable presumption against waiver' of a jury trial," *Rodenbur v. Kaufman*, 320 F.2d 679, 683 (D.C. Cir. 1963) (quoting *Aetna Ins. Co. v. Kennedy*, 301 U.S. 389, 393 (1937)), and that it would be unusual for Plaintiffs, by signing the Employment Agreement with Chishti, to have waived their jury trial right even against non-signatories to the agreement (including entities like the corporate Defendants who, Defendants insist, have no substantial ties to Chishti whatsoever). But there will be further opportunity for the Court to address the issue before this case proceeds to trial, if and when that occurs.

The Court will, accordingly, grant in part and deny in part without prejudice Defendants' motion to strike.

## F.    Motion for Sanctions

Finally, in their motion to supplement the record, Plaintiffs seek sanctions against Defendants for what Plaintiffs characterize as "Chishti and Pobereskin's inexcusable material omissions, contradictions, obfuscations and misleading statements" during jurisdictional discovery. Dkt. 122 at 22. Plaintiffs do not currently demand monetary sanctions (although they say that they might do so at a later date) and, instead, request that:

> the Court give no weight to any evidence (including but not limited to testimony and other sworn statements) that Defendants have proffered in support of their arguments that Chishti and Pobereskin (1) lack sufficient contacts with

Washington, D.C., for specific personal jurisdiction over them, or (2) are not in a joint venture with respect to running at least Isbei.

*Id.* at 22–23.

The Court declines to impose discovery sanctions at this juncture. As an initial matter, the Court is not yet persuaded that the sanctions that Plaintiffs seek would constitute a "just" and proportionate response to Defendants' behavior during jurisdictional discovery. *See Bonds v. District of Columbia*, 93 F.3d 801, 808 (D.C. Cir. 1996) (quoting *Ins. Corp. of Ireland*, 456 U.S. at 707). Putting aside Defendants' threshold objections that Plaintiffs did not confer with Defendants prior to seeking discovery sanctions as the Court's standing order and the local rules require, and that Federal Rule of Civil Procedure 26(e), on which Plaintiffs rely, does not apply to deposition testimony, *see* Dkt. 127-2 at 28–29, the disputed conduct is not so egregious, prejudicial, or suggestive of bad faith as to require that the Court wholly ignore Pobereskin's evidence that she is not subject to this Court's personal jurisdiction.[16]

Plaintiffs object that Chishti did not report ownership of the Redcourt LLC passthrough entity or the RBC bank account in his interrogatory responses; that Chishti and Pobereskin have denied that Chishti helped to "plan" the founding of Isbei in jurisdictional discovery in this case while admitting that the company was a "joint plan" between Chishti and Pobereskin in the proceedings before the U.S. District Court for the Southern District of New York; and that Defendants have minimized Chishti's involvement in overseeing Isbei in this case while elsewhere admitting that Chishti has directed Isbei from Pobereskin's email account. Dkt. 122 at

---

[16] Because Plaintiffs seek discovery sanctions solely against Chishti and Pobereskin (acknowledging the potential injustice of prejudicing *other Defendants* based on alleged discovery omissions by those two individuals), Dkt. 122 at 23; because the only sanction they seek is an order that effectively excludes Chishti and Pobereskin's evidence regarding personal jurisdiction; and because the Court's personal jurisdiction over Chishti is undisputed; Plaintiffs' request for discovery sanctions is relevant only as to Pobereskin.

15–24. As explained above, Plaintiffs have proffered substantial evidence that Chishti played a significant role in "planning" and directing Isbei, and any suggestion that he merely provided offhand advice to his wife and friends—with no greater strategic vision, role, or plan in mind—is highly implausible. But the relevant deposition testimony is not entirely contradictory, and it deals with a topic where there is at least some room for subjective characterization. As for Redcourt LLC and the RBC account, Chishti's explanations for the omissions—that Redcourt LLC was omitted by oversight, that the RBC account is a brokerage account that was not responsive to Plaintiffs' interrogatory request for "bank accounts," and that the transfer from the RBC account to Isbei was a personal gift to Pobereskin rather than a "business-related activit[y]" within the scope of Plaintiffs' interrogatories, Dkt. 127-2 at 20–22, 29–30—are at least colorable and, without additional evidence of bad faith, would not support the imposition of sanctions.

But, in any event, there is no need for Plaintiffs' requested sanction of giving no weight to Defendants' evidence concerning Chishti's role at Isbei because, as discussed above, the Court has already determined, and would have determined even without the benefit of the additional evidence highlighted in Plaintiffs' motion to supplement, that Isbei is, as Judge Rakoff phrased it "in reality Chishti's venture." *Res. Grp. Int'l Ltd*, 814 F. Supp. 3d. at 474 n.9. The relevant evidence concerning the RBC account and the related transfers is also now before the Court and has been timely considered as part of the resolution of the pending motions, preventing any prejudice to Plaintiffs. As the case proceeds to merits discovery, the Court expects that Defendants will diligently fulfill their discovery obligations. As things now stand, however, the Court sees no basis for sanctions.

**CONCLUSION**

For the foregoing reasons, Defendants' motion to dismiss and to strike, Dkt. 79, is hereby **GRANTED** in part and **DENIED** in part.  The Court denies the motion to dismiss for lack of personal jurisdiction as to Isbei, Zamir, Isbei Hainan, and Qinhe, but grants the motion as to Dataquartz and Pobereskin.  The Court orders that Plaintiffs' claims against Pobereskin are **SEVERED** and **TRANSFERRED** to the United States District Court for the District of Puerto Rico.  The Court also denies Defendants' motion to dismiss the amended complaint for failure to state a claim, except for Plaintiffs' allegations that Chishti indirectly violated the CFAA.  The Court grants Defendants' motion to strike Plaintiffs' demand for a jury trial with respect to their breach of contract claims against Chishti and otherwise denies the motion without prejudice.

It is further **ORDERED** that Plaintiffs' motion to supplement the record and for sanctions, Dkt. 122, is **GRANTED** in part and **DENIED** in part.  The Court grants the motion to supplement and Plaintiffs' attachments are **DEEMED FILED**, but the Court denies the motion for discovery sanctions.

**SO ORDERED**.

/s/ Randolph D. Moss
RANDOLPH D. MOSS
United States District Judge

Date:  July 22, 2026